**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MOHAMMAD FNEICH, et al.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ISLAMIC REPUBLIC OF IRAN, et al.**<br><br>**Defendants.** | **CA NO. 1:24-cv-01843-CRC** |

**REPORT AND RECOMMENDATION OF SPECIAL MASTER PAUL GRIFFIN REGARDING COMPENSATORY DAMAGES FOR ELIE SALEMEH**

In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below. This case arises from two terrorist attacks that occurred at the U.S. Embassy in Beirut, Lebanon on April 18, 1983, and September 20, 1984. Plaintiffs have brought this case against Defendants Islamic Republic of Iran and the Iranian Ministry of Information and Security (MOIS) (collectively "Defendants") pursuant to the District of Columbia Wrongful Death Act, the District of Columbia Survival Act, and the Foreign Sovereign Immunities Act, (28 U.S.C. § 1602 et seq.), as amended by § 1083 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181.

On April 18, 1983, and September 20, 1984, the U.S. Embassy was attacked by terrorists. These attacks resulted in the death of at least 78 people and injuries to over 120 people, which include US service members and Lebanese contractors. The 1983 and 1984 attacks on the U.S. Embassy in Beirut, Lebanon were made possible by Defendants' financial, operational, and technical support of Hezbollah. The actions of Defendants' agents constitute acts of torture,

extrajudicial killing, and the provision of material resources for such acts, as those terms are defined in 18 U.S.C. § 2339A.

Plaintiffs are seeking damages for the injuries sustained as a result of the attack on the U.S. Embassy in Beirut, Lebanon on April 18, 1983, and/or September 20, 1984.

**Background**

On April 18, 1983, a suicide bomber working with Hezbollah detonated a truck bomb laden with hundreds of pounds of explosives into the main entrance of the U.S. Embassy in Beirut, Lebanon, causing seven floors of the Embassy to collapse. The attack killed 63 people, wounding over 100 others to include American and Lebanese personnel. After relocating the Embassy due to this vicious and bloody attack, shortly after noon on September 20, 1984, the same Hezbollah parties, again wreaked havoc. A station wagon loaded with some 1500 kilograms of explosives was driven onto the embassy compound at a high speed and was detonated in the vicinity of a concrete cistern filled with water in front of the Embassy. The Embassy building was demolished. This second attack killed 11 people and injuring over 58 more Lebanese and American personnel.

The events of these two days and its aftermath have been documented and will not be repeated except as relevant to the assessment of individuated damages. It is undisputed that the September 20, 1984, terrorist attack on the U.S. Embassy Annex in Beirut, Lebanon, was carried out by the terrorist group Hezbollah, and that the financing, training, and preparation for the attack were conducted by Defendants. This Court has held in prior cases that Defendants directed and facilitated the attack and therefore proximately caused the injuries sustained by the victims of those attacks. In each case, Defendants were held liable to the victims of these attacks and their immediate family members for compensatory damages. See, e.g., Barry v. Islamic Republic of Iran, 437 F. Supp. 3d 15 (D.D.C. 2020) (Contreras, J.) ("Barry II") (holding Iran liable for the

April 18, 1983 U.S. Embassy bombing and the September 20, 1984 U.S. Embassy Annex bombing in Beirut); Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43 (D.D.C. 2009) (Huvelle, J.) (holding Iran liable for the 1984 attack); Welch v. Islamic Republic of Iran, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Distr. LEXIS 99191 (D.D.C. Sept. 20, 2007) (mag. op.), adopted by Final Judgment, ECF 70, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007) (Kollar-Kotelly, J.) (holding Iran liable for the 1984 attack); Estate of John Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1 (D.D.C. 2011) (holding Iran liable for the 1983 and 1984 attacks); Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128 (D.D.C. 2001) (Jackson, J.) (holding Iran liable for the 1984 attack).

## **Procedural History**

This Court has repeatedly found Defendants the Islamic Republic of Iran and its Ministry of Information and Security legally responsible for the provision of material as well as financial and logistical support in the planning of the attack of the American and American contractors in relation to the April 18, 1983, and September 20, 1984, Beirut Embassy Bombings. *See above.* In all of these cases, Defendants were held liable for acts of state sponsored terrorism, with judgments entered in favor of the Plaintiffs accordingly. *Id.* In these opinions, the Court held that the surviving family members have suffered and continue to suffer mental anguish and loss of society. *Id.*

On August 3, 2023, Plaintiffs filed a complaint against the above-named Defendants. On August 6, 2025, this Court entered an order Granting Plaintiffs' request for a Default Judgment as to Liability, taking judicial notice of the factual findings set for the in the decision of this Court, in the related cases of *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15 (D.D.C. 2020) (Contreras, J.) ("Barry II") (holding Iran liable for the April 18, 1983, U.S. Embassy bombing and the September 20, 1984, U.S. Embassy Annex bombing in Beirut); *Brewer v. Islamic Republic of*

*Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009) (Huvelle, J.) (holding Iran liable for the 1984 attack); *Welch v. Islamic Republic of Iran*, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Distr. LEXIS 99191 (D.D.C. Sept. 20, 2007) (mag. op.), adopted by Final Judgment, ECF 70, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007) (Kollar-Kotelly, J.) (holding Iran liable for the 1984 attack); *Estate of John Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) (holding Iran liable for the 1983 and 1984 attacks); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C. 2001) (Jackson, J.) (holding Iran liable for the 1984 attack).. On September 10, 2025, the Court appointed me as a Special Master to consider issues on compensatory damages.

In accordance with this directive, and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT**

Elie Salameh was born on December 27, 1956, in Lebanon and is now and always has been a Lebanese citizen.[1] He was a Lebanese National employed as security for the U.S. Embassy in Beirut, Lebanon from July 2, 1984, until May 5, 1990.[2] His family is included in a separate, but related case, *Estate of Abdallah el Deek, et al. v. Islamic Republic of Iran, et al*., in the United States District Court for the District of Columbia, Case No. 1:23-cv-2241.

***Embassy Bombing Incident***

On Sept.20, 1984, Elie was at work at the U.S. Embassy, sitting in the rest area chatting with his co-workers.[3] Suddenly, Elie was thrown by a huge concussive force and was briefly knocked unconscious.[4] Upon opening his eyes, he could not focus and all around him was

[1] Elie Salameh Aff. (July 1, 2023)
[2] Embassy Employment Letter (March 5, 2021)
[3] Elie Salameh Dep. 6 (May 13, 2023)
[4] Elie Salameh Dep. 8 (May 13, 2023)

destruction.[5] His heart was racing and he was filled with an overwhelming fear and rubble pinned him down which prevented him from helping those around him who were injured.[6] Due to the fear and shock, Elie sat in the wreckage, unable to move, until first responders were able to get him out of the Embassy.[7] While waiting, he had difficulty breathing due to his crushing injuries and the dust/smoke in the air.[8] Elie is unsure of how long he sat in the rubble until he was finally able to get our and leave the Embassy.[9] He described that day as a "hellish day" and was unable to return to work at the U.S. Embassy for three weeks after the attack.[10]

**ELIE SALEMEH**

***Deposition Details***

- The deposition of Eli Salemeh was taken virtually on May 13, 2023, in the presence of a notary and an Arabic translator. [11]

***Personal Information***

In 1984, prior to the bombing in question, Elie Salemeh was working at the United States Embassy in Lebanon.[12] While working at the U.S. Embassy, he participated in training and even gained an appreciation award for his actions on Sept. 20, 1984.[13] Elie currently has graduate degree in accounting, but at the time of the attack, he was 24 years old living in Beirut, Lebanon with is parents and siblings.[14]

[5] Elie Salameh Dep. 8 (May 13, 2023)
[6] Elie Salameh Dep. 8 (May 13, 2023)
[7] Elie Salameh Dep. 8 (May 13, 2023)
[8] Elie Salameh Dep. 8-9 (May 13, 2023)
[9] Elie Salameh Dep. 9 (May 13, 2023)
[10] Elie Salameh Dep. 6, 10 (May 13, 2023)
[11] Elie Salameh Dep. (May 13, 2023)
[12] Embassy Employment Letter (March 5, 2021)
[13] Embassy Protective Training (July 20, 1984); Appreciation Award for 09/20/1984 Attack; Elie Salameh Dep. 5 (May 13, 2023)
[14] Elie Salameh Dep. 9 (May 13, 2023)

***Psychological/Physical Impact***

On Sept. 20, 1984, Elie testified that he was terrified and left in a state of shock.[15] Physically, he was knocked unconscious for a time, was trapped by falling debris, and was left gasping for air and had difficulty breathing.[16] He had difficulty focusing, struggled with fatigue, and constantly had flashbacks to the explosion.[17] Elie testified that after the attack, he struggled with nightmares and hallucinated images of the bombing.[18] He sought medical care for anxiety, constant fear, shock, and what is clearly PTSD symptoms after the Embassy attack.[19] Elie testified that "I had lots of pressure and – and every time I hear, for example, the sound of bullets, I'd be very stressed and fearful and also, because people knew that we worked at the embassy, so there – there was a question mark about us. So that why I had to – to leave the country – and left the country."[20]

***Economic Damages***

While Elie Salameh survived the bombing, he was left with significant injuries, and his work history has been documented. An economic report was created discussing the economic damages as a result of these injuries.[21] Jerome Paige, PhD, an economist, analyzed work documents, testimony, and affidavits and came to the conclusion that Elie Salameh had an economic loss ranging from $180,414.00 to $353,215.00 as a direct result of the bombing.[22]

[15] Elie Salameh Dep. 6-8 (May 13, 2023)
[16] Elie Salameh Dep. 8 (May 13, 2023)
[17] Elie Salameh Dep. 10 (May 13, 2023)
[18] Elie Salameh Dep. 10-11 (May 13, 2023)
[19] Elie Salameh Dep. 12-13 (May 13, 2023)
[20] Elie Salameh Dep. 14 (May 13, 2023)
[21] Elie Salameh Economic Report (Dec. 23, 2024)
[22] Elie Salameh Economic Report (Dec. 23, 2024)

## LAW ON DAMAGES

Pursuant to the Foreign Sovereign Immunities Act:

> A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office employment, or agency, shall be liable to
>
> **(1) A national of the United States,**
>
> **(2) A member of the armed forces,**
>
> **(3) An employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or**
>
> **(4) The legal representative of a person described in paragraph (1), (2), or (3),**
>
> for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

(28 U.S.C. § 1605A(c)).

Pursuant to the District of Columbia Standardized Civil Jury Instructions §13.01, the finder of fact:

> May award damages for any of the following harms that you find [Defendant's] negligence or wrongful conduct caused:
>
> 1. **The extent and duration of any physical injuries sustained by [Plaintiff];**
> 2. **The effects that any physical injuries have on the overall physical and emotional well-being of [Plaintiffs];**
> 3. **Any physical pain and emotional distress that [Plaintiff] has suffered in the past or may suffer in the future;**
> 4. **Any disfigurement or deformity suffered by [Plaintiff], as well as any humiliation or embarrassment associated with the disfigurement or deformity;**

5. **Any inconvenience [Plaintiff] has experienced in the past or may experience in the future;**

6. **Any medical expenses incurred by [Plaintiff] in the past or may incur in the future;**

7. **Any loss of earnings that [Plaintiff] has incurred in the past or may incur in the future; and**

8. **Any damage or loss to [Plaintiff's] personal property.**

(D.C. Standardized Civil Jury Inst. §13.01).

Furthermore, if the Plaintiffs have "offered evidence that [Defendant's] [negligence/wrongful conduct] caused [Plaintiff] to suffer injury, and that the effects of that injury still exist today, more than [40 years] after the incident[,] [a]lthough no physician or other expert testified about how long the effects of the injury might last, you are permitted but not required to conclude from the facts and circumstances of the case and from the nature and duration of the injury, that [Plaintiff] has suffered a permanent injury and award any damages accordingly." (D.C. Standardized Civil Jury Inst. §13.02).

As pertains to Past Lost Earnings, "[t]o determine the reasonable value of the time lost by [Plaintiff] from [his/her] work caused by [Defendant's] negligence, you should consider any evidence of [Plaintiff's] actual earnings and the work that [he/she] normally performed before the injury. You should then determine the amount that [Plaintiff] was reasonably certain to have earned during the time lost from work because of [Defendant's] negligence." (D.C. Standardized Civil Jury Inst. §13.04). With regard to Future Lost Earnings, the fact finder:

> may award [Plaintiff] an amount that will reasonably and adequately compensate [him/her] for any loss of earnings which [he/she] is reasonably certain to suffer in the future. In determining this amount, you may consider several factors:

1. **[Plaintiff's] age, health, physical and/or mental ability and earning capacity before the injury;**

2. **[Plaintiff's] likely future earnings for [his/her] remaining working life, if the injury had not occurred, reduced to present value;**

3. **[Plaintiff's] decreased earning capacity as a result of the injury;**

4. **[Plaintiff's] likely future earnings for [his/her] remaining working life, taking into account the injury and how long it may affect both earnings and working life, reduced to present value;**

5. **The effects of inflation when estimating [Plaintiff's] future earnings.**

(D.C. Standardized Civil Jury Inst. §13.05).

As pertains to the loss of consortium damages that may be sought:

you may consider in this case, [Plaintiff (husband or wife)] is seeking damages for loss of consortium. *Consortium* means not only the injured spouse's material services, but also includes love, affection, companionship, sexual relations and other matters generally associated with a marital relationship.

You may award damages to [Plaintiff] from the person whose negligence caused the injuries if you find that:

**(1) Physical injury to [the injured spouse] had an adverse effect upon [Plaintiff's] right to consortium; or**

**(2) Plaintiff suffered an actual loss of services even if Plaintiff's spouse did not suffer physical injury.**

To decide the amount that would fairly and reasonably compensate [Plaintiff] for loss of consortium, you should consider the facts of the is case in the light of your own experience.

The services and companionship that a spouse provides may be, and often are, of such character that no witness can say precisely what they are worth. Often, consortium, that is, services and companionship, will have no market value equivalent. Nevertheless, a husband or wife is entitled to damages for loss of consortium even if there is no specific testimony about the precise value of an injured spouse's services and companionship.

(D.C. Standardized Civil Jury Inst. §13.06).

The finder of fact may also award damages for emotional distress:

> [Plaintiff] is seeking damages for emotional distress. If you find [Defendant's] [conduct][action][negligence] caused [Plaintiff] emotional distress, then you may award damages for the emotional distress. [Plaintiff] has the burden to prove the amount of damages that fairly compensates [him/her]. There is no exact standard or mathematical formula for deciding the compensation to be awarded for this type of harm. Nor is the testimony of any witness required about the amount of compensation. To decide the amount that would fairly and reasonably compensate [Plaintiff] for emotional distress, you should consider the facts of this case in the light of your own experience and common sense.
>
> [Elements to consider when deciding a damages award include: any mental pain and suffering, fear, inconvenience, nervousness, indignity, insult, humiliation, or embarrassment that [Plaintiff] proves [he/she] suffered directly because of [Defendant's] [conduct][action][negligence].]

(D.C. Standardized Civil Jury Inst. §13.09).

Finally, the D.C. Court of Appeals has held that the "two fold purpose of punitive damages is 'to punish unlawful conduct and to deter its repetition.' . . . (punitive damages 'operate as 'private fines' intended to punish' and are 'an expression of . . . moral condemnation'. . .)" *Chatman v. Lawlor*, 831 A.2d 395, 402 (D.C. 2003). Further, the "reasonableness of a punitive damages award is determined by three 'guideposts': (1) the reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and any potential civil or criminal penalties." *Chatman v. Lawlor*, 831 A.2d 395, 405 (D.C. 2003).

**ANALYSIS OF DAMAGES LAW TO FINDINGS OF FACT**

To recover damaged, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq,* 328 F.3d 680, 684-85 (D.C. Cir. 2003) (*citation omitted*).

**Economic Damages**

The Plaintiffs have presented an economic evaluation related to Elie Salemeh's inability to continue working as a direct and proximate result of the actions of the Defendant.

Mr. Paige's Economic Report provides two different "Scenario's." Under Scenario I of Mr. Paige's Report, a conservative assumption was made that Elie made earnings "at the level of an average Lebanese work, post-event" while Scenario II assumes that Elie did not "work due to injury or death." The testimony is clear and undisputed that he did return to work and, thus, it is clear from the testimony that Scenario I is the appropriate measure of economic damages and the calculation of $180,414.00 is the appropriate measure of economic damages to award.

**Non-Economic Damages**

Throughout the legal history of the application of the Foreign Sovereign Immunities Act to terrorist activities conducted by Iran, there has been ample case law addressing the manner in which to evaluate the non-economic damages incurred. On December 22, 2006, this Court issued its opinion in the matter of *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 299 (D.D.C. 2006).

*Heiser* held that "[w]hile the loss suffered by the plaintiffs in these cases in undeniably difficult to quantify, courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed." *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 269 (2006) (*See also Valore v. Islamic Republic of Iran*, 700 F.Supp.2d at 83 – 84; *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57-58 (D.D.C. 2009)).

Subsequent to *Heiser*, this Court adopted the *Heiser* Matrix: "This Court finds that the damages framework set forth in *Heiser* to be an appropriate measure of damages for those family members of victims who died in this attack." *Peterson II* at 51 - 52. The Court then pivoted away from the solatium damages and directed its attention to the damages model associated with those servicemembers and their families for those who survived the terrorist attack: "The Court finds that the framework detailed in *Blais*[23] is appropriate to help determine damages for those surviving servicemen and their families seeking redress." *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 51 – 52 (D.D.C. 2007). The individual awards for the surviving servicemember for non-economic damages varied between $2 million to $12 million based on the various physical injuries suffered.

The Court also issued a ruling in *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010). *Valore* examined the initial award to the survivors of terrorist attacks in the *Peterson* case and reaffirmed the following:

> Damages for surviving victims are determined based upon an assessment of such factors as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson II,* 515 F.Supp.2d at 52 n. 26 (quotation omitted). "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." *Peterson II,* 515 F.Supp.2d at 54. Thus in *Peterson,* the Court granted a baseline award of $5 million to individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain." *Id.* The Court was willing to depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries,

[23] In *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006), the Court determined that, "[w]ith respect to pain and mental anguish damages, the Court admits that assessing the amount of compensatory damages for pain and suffering due an injured plaintiff is undeniably difficult. This Court has, however, established a general framework for making such a determination. In cases that involve an attack where the victim survives, and where no captivity occurred, courts typically award a lump sum award based in large part on an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Id.* at 73." *Blais v. Islamic Republic of Iran,* 459 F. Supp. 2d 40, 59 (D.D.C. 2006), enforcement granted, No. 02-CV-285 (RCL), 2011 WL 13376985 (D.D.C. Dec. 2, 2011).

> were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead, as was one soldier who "was placed in a body bag [and] buried alive in a morgue for four days until someone heard him moaning in pain." *Id.* Similarly, the Court was willing to depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire. *Id.* With these considerations in mind, the Court now considers whether departures recommended by the special masters are warranted.

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83–84 (D.D.C. 2010).

In addition to the case law cited above, I have also reviewed the Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Adjustments of Non-Economic Damages Matrix. I concur with the brief and find that an upward adjustment of the *Heiser* Matrix consistent with the Consumer Price Index is a just and fair modification to make at this point in time, twenty years after *Heiser*. The modification recommendation was identified as follows:

| **Claimant** | **2006 Established Base Matrix** | **2006 Upward Adjustment** | **2006 Downward Adjustment** | **2026 Adjusted Matrix** |
|---|---|---|---|---|
| Spouse of Decedent | $8-$12 million | | | $13,156,960.24 – $19,735,440.36[24] |
| Parent/Child of Decedent | $5 million | | | $8,223,100.15 |
| Sibling of Decedent | $2.5 million | | | $4,111,550.08 |
| Survivor | $5 million | $12 million | $1.5 million | $2,466,930.05 – $8,223,100.15 – $19,735,440.36 |
| Spouse of a Survivor | $4 - $6 million | | $1.5 million | $2,466,930.0 – $6,578,480.12 – $9,867,720.18 |
| Parent/Child of a Survivor | $2.5 million | | $1 million | $1,644,620.03 – $4,111,550.08 |
| Sibling of a Survivor | $1.25 million | | $500,000 | $822,310.02 – $2,055,775.04 |

[24] Due to the U.S. Labor and Statistics calculator not being able to calculate inflationary adjustments for values over $10,000,000, I have utilized the Federal Reserve Bank of Minneapolis' website calculator found at https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator.

Elie Salameh

The testimony cited above demonstrates beyond a preponderance of evidence that Elie Salameh suffered and continued until his death to suffer compensable non-economic damages, which were permanent in nature. It is clear that during his life, Elie suffered compensable non-economic damages that the *Heiser* framework would set between $5,000,000 and $12,000,000. Given the inflationary effects since the *Heiser* matrix was set and the testimony pertaining to the non-economic damages suffered by Elie for the remainder of his life, I would value the non-economic damages recoverable to be $15,000,000.

## CONCLUSION

Upon consideration of the evidence and facts submitted and the aforementioned legal framework, the Special Master must consider whether the Plaintiffs are entitled to damages including compensatory damages for the pain and suffering s/he has endured, economic damages, loss of consortium damages, solatium damages, and punitive damages. There is evidence of the Plaintiffs having endured such damages from the point of injury to the present, and that will continue into the future on a permanent basis.

The Special master concludes as a matter of law that judgment should be entered as follows:

**Elie Salameh**

| | |
|---|---|
| Economic Damages: | $ 180,414.00 |
| Non-Economic Damages | $ 15,000,000.00 |
| Punitive Damages | $ 633,638.70[25] |
| **Total:** | **$ 15,814,052.70** |

In conclusion, based upon the evidence provided, the above-named Plaintiffs are entitled to judgments each in accordance with the "Total" identified above.

**July 8, 2026**
**Date**

**/s/Paul G. Griffin**
**Paul G. Griffin, Esq.**
**Special Master**

[25] The calculation of punitive damages has been made in accordance with *Ewan v. Islamic Republic of Iran*, 466 F.Supp3d236 (D.D.C. 2020), wherein the Court applied a proportionate ration of $0.03699 in punitive damages to ever $1.00 in compensatory damages. This calculation has also been adopted by this Court in *Maxwell v. The Islamic Republic of Iran*, 1:22-cv-00173-RC Dock. No. 38). Other cases, such as *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 have awarded larger lump sum punitive damages. In *Eisenfeld*, the Court award $300,000,000 in punitive damages. Should the Court wish to follow the *Eisenfeld* model, it is obviously free to do so; however, in an effort to provide a more conservative approach based upon the more recent Court determination, I have adopted the *Ewan* model.