**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**MOHAMMAD FNEICH, et al.**

**Plaintiffs,**

**v.**

**ISLAMIC REPUBLIC OF IRAN, et al.**

**Defendants.**

**CA NO. 1:24-cv-01843-CRC**

**REPORT AND RECOMMENDATION OF SPECIAL MASTER PAUL GRIFFIN REGARDING COMPENSATORY DAMAGES FOR <u>THE LOUISE BRIATORE RASSI FAMILY</u>**

In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below. This case arises from two terrorist attacks that occurred at the U.S. Embassy in Beirut, Lebanon on April 18, 1983, and September 20, 1984. Plaintiffs have brought this case against Defendants Islamic Republic of Iran and the Iranian Ministry of Information and Security (MOIS) (collectively "Defendants") pursuant to the District of Columbia Wrongful Death Act, the District of Columbia Survival Act, and the Foreign Sovereign Immunities Act, (28 U.S.C. § 1602 et seq.), as amended by § 1083 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181.

On April 18, 1983, and September 20, 1984, the U.S. Embassy was attacked by terrorist. These attacks resulted in the death of at least 78 people and injuries to over 120 people, which include US service members and Lebanese contractors. The 1983 and 1984 attacks on the U.S. Embassy in Beirut, Lebanon were made possible by Defendants' financial, operational, and technical support of Hezbollah. The actions of Defendants' agents constitute acts of torture,

extrajudicial killing, and the provision of material resources for such acts, as those terms are defined in 18 U.S.C. § 2339A.

Plaintiffs are seeking damages for the injuries sustained as a result of the attack on the U.S. Embassy in Beirut, Lebanon on April 18, 1983, and/or September 20, 1984.

**Background**

On April 18, 1983, a suicide bomber working with Hezbollah detonated a truck bomb laden with hundreds of pounds of explosives into the main entrance of the U.S. Embassy in Beirut, Lebanon, causing seven floors of the Embassy to collapse. The attack killed 63 people, wounding over 100 others to include American and Lebanese personnel. After relocating the Embassy due to this vicious and bloody attack, shortly after noon on September 20, 1984, the same Hezbollah parties, again wreaked havoc. A station wagon loaded with some 1500 kilograms of explosives was driven onto the embassy compound at high speed and was designated in the vicinity of a concrete cistern filled with water in front of the Embassy. The Embassy building was demolished. This second attack killed 11 people and injuring over 58 more Lebanese and American personnel.

The events of these two days and its aftermath have been documented and will not be repeated except as relevant to the assessment of individuated damages. It is undisputed that the September 20, 1984, terrorist attack on the U.S. Embassy Annex in Beirut, Lebanon, was carried out by the terrorist group Hezbollah, and that the financing, training, and preparation for the attack were conducted by Defendants. This Court has held in prior cases that Defendants directed and facilitated the attack and therefore proximately caused the injuries sustained by the victims of those attacks. In each case, Defendants were held liable to the victims of these attacks and their immediate family members for compensatory damages. See, e.g., Barry v. Islamic Republic of Iran, 437 F. Supp. 3d 15 (D.D.C. 2020) (Contreras, J.) ("Barry II") (holding Iran liable for the

April 18, 1983 U.S. Embassy bombing and the September 20, 1984 U.S. Embassy Annex bombing in Beirut); Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43 (D.D.C. 2009) (Huvelle, J.) (holding Iran liable for the 1984 attack); Welch v. Islamic Republic of Iran, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Distr. LEXIS 99191 (D.D.C. Sept. 20, 2007) (mag. op.), adopted by Final Judgment, ECF 70, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007) (Kollar-Kotelly, J.) (holding Iran liable for the 1984 attack); Estate of John Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1 (D.D.C. 2011) (holding Iran liable for the 1983 and 1984 attacks); Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128 (D.D.C. 2001) (Jackson, J.) (holding Iran liable for the 1984 attack).

**Procedural History**

This Court has repeatedly found Defendants, the Islamic Republic of Iran and its Ministry of Information and Security, legally responsible for the provision of material, financial, and logistical support in the planning of the attack of the American and American contractors in relation to the April 18, 1983, and September 20, 1984, Beirut Embassy Bombings. *See above.* In all of these cases, Defendants were held liable for acts of state sponsored terrorism, with judgments entered in favor of the Plaintiffs accordingly. *Id.* In these opinions, the Court held that the surviving family members have suffered and continue to suffer mental anguish and loss of society. *Id.*

On August 3, 2023, Plaintiffs filed a complaint against the above-named Defendants. On August 6, 2025, this Court entered an order Granting Plaintiffs' request for a Default Judgment as to Liability, taking judicial notice of the factual findings set for the in the decision of this Court, in the related cases of *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15 (D.D.C. 2020) (Contreras, J.) ("Barry II") (holding Iran liable for the April 18, 1983, U.S. Embassy bombing and the September 20, 1984, U.S. Embassy Annex bombing in Beirut); *Brewer v. Islamic Republic of*

*Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009) (Huvelle, J.) (holding Iran liable for the 1984 attack); *Welch v. Islamic Republic of Iran*, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Distr. LEXIS 99191 (D.D.C. Sept. 20, 2007) (mag. op.), adopted by Final Judgment, ECF 70, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007) (Kollar-Kotelly, J.) (holding Iran liable for the 1984 attack); *Estate of John Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) (holding Iran liable for the 1983 and 1984 attacks); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C. 2001) (Jackson, J.) (holding Iran liable for the 1984 attack).. On September 10, 2025, the Court appointed special masters to consider issues on compensatory damages.

In accordance with this directive, and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT**

Louise Briatore Rassi was employed at the U.S. Embassy in Beirut, Lebanon from July 9, 1979, until December of 1984 performing consular tasks.[1] She was working at the U.S. Embassy in Beirut, Lebanon on April 18, 1983 and she and her family suffered numerous injuries, to include severe emotional stress and extraordinary grief, mental anguish, and intentional infliction of emotional distress.[2] Her family involved in this litigation includes: Louise Briatore Rassi (victim), Khazan Rassi (mother), Maha Weber Rassi (sister), Suzana Rassi (sister), and Marwan Assad Rassi (brother).[3] The remaining family members are either included in the *El Halabi* matter, did not qualify, or chose not to participate.[4]

---

[1] U.S. Embassy Letter (June 14, 1984); Louise Rassi Aff. (July 4, 2023)
[2] Louise Rassi Aff. (July 4, 2023)
[3] Louise Rassi Family Tree
[4] On May 29, 2024, the Court granted Plaintiffs' Motion to Withdraw as Attorney and split the case/parties into two pending actions. The cases are *El Halabi, et al. v Iran, et al.*, 1:22-cv-3190 and *Fneish, et al. v. Iran, et al.* 1:24-cv-1843. *El Halabi* Dk. 36

### *Embassy Bombing Incident*

On April 13, 1983, Louise was at work at the U.S. Embassy in Beirut, Lebanon as a cashier and in charge of stamping visas.[5] She was standing behind the filing cabinets.[6] Louise testified that she "remember[s] every second. Almost every second. The bombing happened, I think maybe five to 1:00 p.m. . . . I felt the floor and the walls were shaking. And there was a what I take – it's not a noise. I don't know what it was. Something like thunder, maybe because the building was collapsing. . . . And the noise – the – the – the floor was shaking. I remember the colleagues – my colleagues who passed away who were in front of me. . . . I remember where they were and then, yah, it was a noise. And then I heard the noise, like a thunder. . . . And I don't know how long I stayed under the rubble. All what I remember is somebody was pulling me from the rubble. . . . And I don't know how long that I stay unconscious."[7] At least five co-workers were murdered right next to Louise, their bodies scattered around the room.[8] After the first responders were able to get Louise out of the rubble, she was rushed to the hospital.[9] They took her to the American University Hospital of Beirut.[10] Her uncle went looking for her, but due to her facial injuries, he did not immediately recognize her even when she called out to him.[11] She was not able to return home and let her family know she had survived until after 11:00 pm that evening.[12]

[5] Louise Rassi Dep. 21 (July 31, 2024)
[6] Louise Rassi Dep. 23 (July 31, 2024)
[7] Louise Rassi Dep. 22-23 (July 31, 2024)
[8] Louise Rassi Dep. 24 (July 31, 2024)
[9] Louise Rassi Dep. 23 (July 31, 2024)
[10] Louise Rassi Dep. 23 (July 31, 2024)
[11] Louise Rassi Dep. 25 (July 31, 2024)
[12] Louise Rassi Dep. 27 (July 31, 2024)

## 1) LOUISE BRIATORE RASSI[13]

***Deposition Details***

- The deposition of Louise Rassi was taken virtually on July 31, 2024, in the case of *Fneish, et al. v. Islamic Republic of Iran, et al.*, in the United States District Court for the District of Columbia, Case No. 1:24-cv-1843 in the presence of a notary and an Arabic translator.[14]

***Personal Information***

Louise was born on Dec. 26, 1955, in Lebanon and is not and always has been a Lebanese citizen and currently has dual citizenship with Switzerland.[15] She currently lives in Geneva, Switzerland and is retired.[16] She married Mark Briatore in 1987 and has no children.[17] On April 18, 1983, Louise lived in Beirut, Lebanon with her grandmother.[18] She was in good mental and physical health before the bombing.[19]

***Psychological/Physical Impact***

As a result of the attack, Louise was left with bruises, a head injury, and many of her teeth were knocked out.[20] Specifically, Louise said her teeth "were completely pulled from the gum. Not – not broken, but extracted from the gum."[21] She also broke her foot, resulting in her being unable to walk on the foot for many weeks until the bones healed.[22] At the hospital, she was in a state of shock, unable to feel anything for the first couple of hours.[23] She was left "feeling numb"

[13] Due to the difficulty of translating from Arabic to English, Louise Rassi's name is listed different ways: Louise Briatore Rassi, Louise El-Rassi, Lou Briatore Rairassi, and Louise Rassi. Louise Rassi Family Tree; Louise Rassi Aff. (July 4, 2023); U.S. Embassy Letter (June 14, 1984); Louise Rassi Dep. (July 31, 2024)
[14] Louise Rassi Dep. (July 31, 2024)
[15] Louise Rassi Aff. (July 4, 2023)
[16] Louise Rassi Dep.6 (July 31, 2024)
[17] Louise Rassi Dep. 6-7 (July 31, 2024)
[18] Louise Rassi Dep. 27 (July 31, 2024)
[19] Maha Rassi Dep. 24 (Aug. 7, 2023)
[20] Louise Rassi Dep. 26 (July 31, 2024)
[21] Louise Rassi Dep. 27 (July 31, 2024)
[22] Louise Rassi Dep. 232 (July 31, 2024)
[23] Louise Rassi Dep. 26 (July 31, 2024)

for days after the attack.[24] She was prescribed numerous pain killers for the extensive physical injuries.

More than the physical injuries, Louise was left with deep and significant emotional injuries. Specifically, she was left with a feeling of survivor's guilt, depression, stress and anxiety.[25] The anxiety never faded away, resulting in Louise seeking medical help for her mental injuries.[26] She is still on medication for anxiety and sleep as a direct result of the trauma she suffered as a result of the bombing.[27] Louise testified that the terrorist attack was a "big trauma in my life. . . . I remember every second before I was under the rubble, you know. My colleagues, where they were standing, what they were wearing. It's unbelievable."[28] As a result of the psychological trauma, Louise was unable or unwilling to every have children.[29] She continued that the bombing "is a part of my life I can never forget."[30]

Her sister Maha testified that when she saw Louise after the bombing that she was clinically depressed and Louise stated "I know, that's why I survived, Go wants to – to punish me because I survived" in reference to her no longer being able to carry a child.[31] She became withdrawn and stop sharing her life with her family, to include her two cancer diagnosis.[32] She had huge feelings of guilt and she still struggles with the trauma from the bombing to this day.[33]

[24] Louise Rassi Dep. 30 (July 31, 2024)
[25] Louise Rassi Dep. 38-39 (July 31, 2024)
[26] Louise Rassi Dep. 39 (July 31, 2024)
[27] Louise Rassi Dep. 39 (July 31, 2024)
[28] Louise Rassi Dep. 45 (July 31, 2024)
[29] Khazna Rassi Dep. 12 (Aug. 7, 2023
[30] Louise Rassi Dep. 47 (July 31, 2024)
[31] Maha Rassi Dep. 22-23 (Aug. 7, 2023)
[32] Maha Rassi Dep. 26 (Aug. 7, 2023)
[33] Maha Rassi Dep. 23-24 (Aug. 7, 2023)

***Economic Damages***

While Louise survived the bombing, she was left with significant injuries, and her work history has been documented. An economic report was created discussing the economic damages as a result of these injuries.[34] Jerome Paige, PhD, an economist, analyzed work documents, testimony, and affidavit of Louise Rassi and came to the conclusion that Louise had an economic loss ranging from $484,250.00 to $624,476.00 as a direct result of the bombing.[35]

**2) KHAZANA RASSI[36]**

***Deposition Details***

- The deposition of Khazna Rassi was taken virtually on Aug. 7, 2023, in the case of in the case of *El Halabi, et al. v Iran, et al.*., in the United States District Court for the District of Columbia, Case No. 1:22-cv-3190 in the presence of a notary and an Arabic translator.[37]

***Personal Information***

Khazana was born in 1934 in Lebanon and is now and always has been a Lebanese citizen.[38] She is the mother of Louise Rassi.[39] On April 18, 1983, she lived in Tripoli, Lebanon with her husband.[40]

[34] Louise Rassi Economic Report (Dec. 23, 2024)
[35] Ibrahim Sultani Economic Report, 12 (March 4, 2026)
[36] Due to the difficulty of translating from Arabic to English, Khazana Rassi's name is listed different ways: Khazana Rassi, Khazna Kouteit Assad Rassi, Khazana Rassi Passport; Khazna Rassi Aff. (July 7, 2023); Khazna Rassi Dep. (Aug. 7, 2023)
[37] Khazna Rassi Dep. (Aug. 7, 2023); On May 29, 2024, the Court granted Plaintiffs' Motion to Withdraw as Attorney and split the case/parties into two pending actions. The cases are *El Halabi, et al. v Iran, et al.*, 1:22-cv-3190 and *Fneish, et al. v. Iran, et al.* 1:24-cv-1843. *El Halabi* Dk. 36.
[38] Khazna Rassi Aff. (July 7, 2023)
[39] Khazna Rassi Aff. (July 7, 2023)
[40] Khazna Rassi Dep. 10 (Aug. 7, 2023

***Psychological/Physical Impact***

When the bombing first occurred, Khazana learned through the radio that her daughter was listed as a victim.[41] As soon as she heard that news, she believed her daughter was dead and she started crying then fainted.[42] Before finding her daughter, each person Khazana spoke with to find her daughter kept telling her that her daughter was dead.[43] The shock and horror of believing your child is dead was overwhelming for Khazana and remains with her today, clear in the video of her deposition. Her daughter described her mother as "hysterical" and sobbing nonstop when she learned about the attack.[44]

Khazana rushed to Beirut to look for her daughter, seeing helicopters in the air, and when they found her at the hospital, she was covered in blood, a cut clear across her face, her teeth missing, and Khazana did not recognize her at first due to Louise's injuries.[45]

**3) MAHA WEBBER RASSI[46]**

***Deposition Details***

- The deposition of Maha Makki was taken virtually on Aug. 7, 2023, in the case of in the case of *El Halabi, et al. v Iran, et al.*., in the United States District Court for the District of Columbia, Case No. 1:22-cv-3190 in the presence of a notary and an Arabic translator.[47]

---

[41] Louise Rassi Dep. 28 (July 31, 2024)
[42] Louise Rassi Dep. 28 (July 31, 2024)
[43] Khazna Rassi Dep. 10 (Aug. 7, 2023
[44] Suzana Rassi Dep. 18 (Aug. 7, 2023)
[45] Khazna Rassi Dep. 8-9 (Aug. 7, 2023
[46] Due to the difficulty of translating from Arabic to English, Maha Webber Rassi name is listed different ways: Maha Webber Rasso and Maha Rassi. Maha Rassi Dep. (Aug. 7, 2023); Maha Rassi Aff. (July 28, 2023)
[47] Maha Rassi Dep. (Aug. 7, 2023); On May 29, 2024, the Court granted Plaintiffs' Motion to Withdraw as Attorney and split the case/parties into two pending actions. The cases are *El Halabi, et al. v Iran, et al.*, 1:22-cv-3190 and *Fneish, et al. v. Iran, et al.* 1:24-cv-1843. *El Halabi* Dk. 36.

***Personal Information***

Maha Rassi was born on November 5, 1957, and has been a Lebanese citizen throughout her life and now has dual citizenship with Switzerland.[48] She is the sister of Louise Rassi.[49] Maha is retied after working for the Swiss Minister of Defense.[50] She is married with a grown son.[51]

Maha grew up with Louise in Lebanon.[52] They shared everything and had a close relationship growing up.[53] On April 18, 1983, Maha was in Switzerland attending university.[54]

***Psychological/Physical Impact***

On April 18, 1983, Maha learned about the Embassy attack while watching the news.[55] As she saw the U.S. Embassy in Beirut, Lebanon flash across the screen, she immediately thought of her sister Louise.[56] Maha testified that she felt "[v]ery bad. Very bad. Usually I'm not that emotion or don't show my emotions, but at this moment, I just hit my head to the wall and I shout at my husband and I asked him, what am I doing in Switzerland, I should travel now back to Lebanon. I should be with my family and – and tried calling Lebanon to hear what happened, nothing."[57] She was unable to get any information, causing her to cry all the time, until her aunt in the United States finally called her to let her know that Louise had survived.[58]

---

48 Maha Rassi Aff. (July 28, 2023); Maha Rassi Dep. 7 (Aug. 7, 2023)
49 Maha Rassi Aff. (July 28, 2023)
50 Maha Rassi Dep. 8 (Aug. 7, 2023)
51 Maha Rassi Dep. 8 (Aug. 7, 2023)
52 Maha Rassi Dep. 11 (Aug. 7, 2023)
53 Maha Rassi Dep. 11 (Aug. 7, 2023)
54 Maha Rassi Dep. 14 (Aug. 7, 2023)
55 Maha Rassi Dep. 14 (Aug. 7, 2023)
56 Maha Rassi Dep. 15 (Aug. 7, 2023)
57 Maha Rassi Dep. 15 (Aug. 7, 2023)
58 Maha Rassi Dep. 16 (Aug. 7, 2023)

As a result of the attack, Maha was overwhelmed with guilt for living outside the country and away from her family.[59] She was in a state of shock and described the feelings as a "dissociation."[60] She eventually sought care from a therapist to help with the trauma and the damages done to herself and her family.[61]

**4) SUZANA RASSI[62]**

***Deposition Details***

- The deposition of Suzana Rassi was taken virtually on Aug. 7, 2023, in the case of *El Halabi, et al. v Iran, et al.*., in the United States District Court for the District of Columbia, Case No. 1:22-cv-3190 in the presence of a notary and an Arabic translator.[63]

***Personal Information***

Suzana was born on Feb. 21, 1962, in Lebanon and throughout her life has been a Lebanese citizen and now has dual citizenship with the United States.[64] She is the sister of Louise Rassi.[65] She is married to Ghassan Attiyeh and two children. She had a close relationship growing up with Louise, describing her as "a wonderful sister, very emotional, very loving, especially because I'm her younger sister, very warm, affectionate."[66] On April 18, 1983, she lived in Tripoli and was in college.[67]

---

[59] Maha Rassi Dep. 17 (Aug. 7, 2023)
[60] Maha Rassi Dep. 19 (Aug. 7, 2023)
[61] Maha Rassi Dep. 29 (Aug. 7, 2023)
[62] Due to the difficulty of translating from Arabic to English, Suzana Rassi name is listed in different ways: Suzana Rassi and Suzana Rassi Attiyeh. Louise Rassi Family Tree; Suzana Attiyeh Aff. (July 7, 2023); Suzana Rassi Dep. (Aug. 7, 2023)
[63] Suzana Rassi Dep. (Aug. 7, 2023); On May 29, 2024, the Court granted Plaintiffs' Motion to Withdraw as Attorney and split the case/parties into two pending actions. The cases are *El Halabi, et al. v Iran, et al.*, 1:22-cv-3190 and *Fneish, et al. v. Iran, et al.* 1:24-cv-1843. *El Halabi* Dk. 36
[64] Louise Rassi Family Tree; Suzana Attiyeh Aff. (July 7, 2023)
[65] Suzana Attiyeh Aff. (July 7, 2023)
[66] Suzana Rassi Dep. 13 (Aug. 7, 2023)
[67] Suzana Rassi Dep. 15 (Aug. 7, 2023)

***Embassy Bombings***

On April 18, 1983, Suzana was returning home from her studies when she "heard noises, lots of noises, I didn't know what was going on. I took the stairs, I didn't go up the elevator, the stairs and we live on the second floor. I remember on the first floor, the doors were open and I'm hearing noises and when I went up to our apartment, the noises were almost from our apartment. I entered, the – all the – the neighbors were there and I saw my mom on the ground crying, pulling her hair and I asked her, what's going on? And she said, there was an explosion at the American Embassy and we know nothing about your sister."[68] It would not be for a number of hours later, well into the evening, before Suzana and her family would learn that Louise survived.[69]

***Psychological/Physical Impact***

When Suzana first learned about the attack she felt awful.[70] She initially thought that her sister was dead. The psychological injuries suffered from the severe emotional distress was described by Suzana as: "I have a problem – but personally, I have a problem related, I've heard that God gave us a blessing [her sister living] and for years, I had psychological problem, I've heard that God might punish me because I have my sister back, I – I might be punished. Every time something happened to me – every time something bad happened to me I feel I'm being punished because my sister is still alive. It's like I gave you something, but I'm going to take something in return. I h.ad this problem and it's still affecting me. It's still affecting me and you can see I have cancer. I have cancer. When I had it, I felt that – I felt that my – I think – every time something bad happened to me I feel I'm paying the price that my sister is still alive."[71]

---

[68] Suzana Rassi Dep. 17 (Aug. 7, 2023)
[69] Suzana Rassi Dep. 19 (Aug. 7, 2023)
[70] Suzana Rassi Dep. 17 (Aug. 7, 2023)
[71] Suzana Rassi Dep. 26-27 (Aug. 7, 2023)

## 5) MARWAN ASSAD RASSI[72]

***Deposition Details***

- The deposition of Marwan Rassi was taken virtually on Aug. 7, 2023, in the case of *El Halabi, et al. v Iran, et al.*., in the United States District Court for the District of Columbia, Case No. 1:22-cv-3190 in the presence of a notary and an Arabic translator.[73]

***Personal Information***

Marwan Rassi was born on January 10, 1969, in Tripoli, Lebanon and has been a Lebanese citizen his entire life.[74] He is the brother of Louise Rassi.[75] He is currently an engineer and is the director of Rassi Engineering, Ltd, a software company.[76] While Marwan testified that he was close with each of his sister's growing up, he was closest to his sister Louise, where she used to visit his sister and she would bring him to the American Embassy as a child.[77] On April 18, 1983, Marwan was around 14 years old.

***Psychological/Physical Impact***

On April 18, 1983, Marwan was at school when the U.S. Embassy was attacked in Beirut, Lebanon.[78] After learning of the attack, he immediately ran out into the streets to look for his sister.[79] Unsuccessful, he had to return home where after a day, she returned "shattered and bruised and without teeth."[80] Louise became distant and "changed", deeply hurting her relationship with

[72] Due to the difficulty of translating from Arabic to English, Marwan Rassi's name is listed different ways: Marwan Assad Rassi and Marwan Rassi. Marwan Rassi Passport; Marwan Rassi Aff. (Aug. 7, 2023)
[73] Marwan Rassi Dep. (Aug. 7, 2023); On May 29, 2024, the Court granted Plaintiffs' Motion to Withdraw as Attorney and split the case/parties into two pending actions. The cases are *El Halabi, et al. v Iran, et al.*, 1:22-cv-3190 and *Fneish, et al. v. Iran, et al.* 1:24-cv-1843. *El Halabi* Dk. 36.
[74] Marwan Rassi Aff. (Aug. 7, 2023)
[75] Marwan Rassi Aff. (Aug. 7, 2023)
[76] Marwan Rassi Dep (Aug. 7, 2023)
[77] Marwan Rassi Dep 5 (Aug. 7, 2023)
[78] Marwan Rassi Dep 9 (Aug. 7, 2023)
[79] Marwan Rassi Dep 9 (Aug. 7, 2023)
[80] Marwan Rassi Dep 9 (Aug. 7, 2023)

Marwan.[81] Marwan testified that due to the injuries suffered by Louise, he felt as if he "lost her for her."[82] When describing the impact of the bombing on himself and his family, Marwan testified that "I can feel but not describe this change that happened to my sister and now probably decades later on I can feel them quite completely, quite tangibly. Now I know Louise post-explosion, not pre. It's like two different persons."[83]

He goes on to describe how his relationship "shattered" and became something different after the attack.[84] When describing if he still thinks about the attack, Marwan testified that "we have given this country a lot, we have given our sister and then there's deception after deception and it's called because of terrorist of the people – they don't use the law to take what they need, they just kill you. They kill intellectuals, even until now they do it." Through his video deposition, it was clear that Marwan was deeply impacted and still impacted by the bombing. He showed evidence of fear, stress, and anxiety while testifying how the April 18, 1983, attack shattered his family and stole his sister Louise.

## LAW ON DAMAGES

Pursuant to the Foreign Sovereign Immunities Act:

> A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office employment, or agency, shall be liable to
>
> (1) A national of the United States,
>
> (2) A member of the armed forces,
>
> (3) An employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

[81] Marwan Rassi Dep 10-11 (Aug. 7, 2023)
[82] Marwan Rassi Dep 11 (Aug. 7, 2023)
[83] Marwan Rassi Dep 14 (Aug. 7, 2023)
[84] Marwan Rassi Dep 14 (Aug. 7, 2023)

> (4) The legal representative of a person described in paragraph (1), (2), or (3),
>
> for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

(28 U.S.C. § 1605A(c)).

Pursuant to the District of Columbia Standardized Civil Jury Instructions §13.01, the finder of fact:

> May award damages for any of the following harms that you find [Defendant's] negligence or wrongful conduct caused:
>
> 1. The extent and duration of any physical injuries sustained by [Plaintiff];
> 2. The effects that any physical injuries have on the overall physical and emotional well-being of [Plaintiffs];
> 3. Any physical pain and emotional distress that [Plaintiff] has suffered in the past or may suffer in the future;
> 4. Any disfigurement or deformity suffered by [Plaintiff], as well as any humiliation or embarrassment associated with the disfigurement or deformity;
> 5. Any inconvenience [Plaintiff] has experienced in the past or may experience in the future;
> 6. Any medical expenses incurred by [Plaintiff] in the past or may incur in the future;
> 7. Any loss of earnings that [Plaintiff] has incurred in the past or may incur in the future; and
> 8. Any damage or loss to [Plaintiff's] personal property.

(D.C. Standardized Civil Jury Inst. §13.01).

Furthermore, if the Plaintiffs have "offered evidence that [Defendant's] [negligence/wrongful conduct] caused [Plaintiff] to suffer injury, and that the effects of that injury

still exist today, more than [40 years] after the incident[,] [a]lthough no physician or other expert testified about how long the effects of the injury might last, you are permitted but not required to conclude from the facts and circumstances of the case and from the nature and duration of the injury, that [Plaintiff] has suffered a permanent injury and award any damages accordingly." (D.C. Standardized Civil Jury Inst. §13.02).

As pertains to Past Lost Earnings, "[t]o determine the reasonable value of the time lost by [Plaintiff] from [his/her] work caused by [Defendant's] negligence, you should consider any evidence of [Plaintiff's] actual earnings and the work that [he/she] normally performed before the injury. You should then determine the amount that [Plaintiff] was reasonably certain to have earned during the time lost from work because of [Defendant's] negligence." (D.C. Standardized Civil Jury Inst. §13.04). With regard to Future Lost Earnings, the fact finder:

> may award [Plaintiff] an amount that will reasonably and adequately compensate [him/her] for any loss of earnings which [he/she] is reasonably certain to suffer in the future. In determining this amount, you may consider several factors:
>
> 1. [Plaintiff's] age, health, physical and/or mental ability and earning capacity before the injury;
> 2. [Plaintiff's] likely future earnings for [his/her] remaining working life, if the injury had not occurred, reduced to present value;
> 3. [Plaintiff's] decreased earning capacity as a result of the injury;
> 4. [Plaintiff's] likely future earnings for [his/her] remaining working life, taking into account the injury and how long it may affect both earnings and working life, reduced to present value;
> 5. The effects of inflation when estimating [Plaintiff's] future earnings.

(D.C. Standardized Civil Jury Inst. §13.05).

As pertains to the loss of consortium damages that may be sought:

> you may consider in this case, [Plaintiff (husband or wife)] is seeking damages for loss of consortium. *Consortium* means not only the injured spouse's material

> services, but also includes love, affection, companionship, sexual relations and other matters generally associated with a marital relationship.
>
> You may award damages to [Plaintiff] from the person whose negligence caused the injuries if you find that:
>
> (1) Physical injury to [the injured spouse] had an adverse effect upon [Plaintiff's] right to consortium; or
>
> (2) Plaintiff suffered an actual loss of services even if Plaintiff's spouse did not suffer physical injury.
>
> To decide the amount that would fairly and reasonably compensate [Plaintiff] for loss of consortium, you should consider the facts of the is case in the light of your own experience.
>
> The services and companionship that a spouse provides may be, and often are, of such character that no witness can say precisely what they are worth. Often, consortium, that is, services and companionship, will have no market value equivalent. Nevertheless, a husband or wife is entitled to damages for loss of consortium even if there is no specific testimony about the precise value of an injured spouse's services and companionship.

(D.C. Standardized Civil Jury Inst. §13.06).

The finder of fact may also award damages for emotional distress:

> [Plaintiff] is seeking damages for emotional distress. If you find [Defendant's] [conduct][action][negligence] caused [Plaintiff] emotional distress, then you may award damages for the emotional distress. [Plaintiff] has the burden to prove the amount of damages that fairly compensates [him/her]. There is no exact standard or mathematical formula for deciding the compensation to be awarded for this type of harm. Nor is the testimony of any witness required about the amount of compensation. To decide the amount that would fairly and reasonably compensate [Plaintiff] for emotional distress, you should consider the facts of this case in the light of your own experience and common sense.
>
> [Elements to consider when deciding a damages award include: any mental pain and suffering, fear, inconvenience, nervousness, indignity, insult, humiliation, or embarrassment that [Plaintiff] proves [he/she] suffered directly because of [Defendant's] [conduct][action][negligence].]

(D.C. Standardized Civil Jury Inst. §13.09).

Finally, Punitive Damages may be awarded pursuant to 28 U.S.C. §1605A(c): "A foreign state that is or was a state sponsor of terrorism . . . shall be liable . . . for personal injury or death .

. . [for which] [d]amages may include economic damages, solatium, pain and suffering, and punitive damages." The D.C. Court of Appeals has held that the "two fold purpose of punitive damages is 'to punish unlawful conduct and to deter its repetition.' . . . (punitive damages 'operate as 'private fines' intended to punish' and are 'an expression of .. . moral condemnation'. . .)" *Chatman v. Lawlor*, 831 A.2d 395, 402 (D.C. 2003). Further, the "reasonableness of a punitive damages award is determined by three 'guideposts': (1) the reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and any potential civil or criminal penalties." *Chatman v. Lawlor*, 831 A.2d 395, 405 (D.C. 2003).

**ANALYSIS OF DAMAGES LAW TO FINDINGS OF FACT**

To recover damaged, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq,* 328 F.3d 680, 684-85 (D.C. Cir. 2003) (*citation omitted*).

**Economic Damages**

The Plaintiffs have presented an economic evaluation related to Louise's inability to continue working and/or reduced ability to work as a direct and proximate result of the actions of the Defendant.

Mr. Paige's Economic Report provides two different "Scenario's." The testimony is clear that Louise's ability to work was impacted as a direct and proximate result of the terrorist activities. Under Scenario I of Mr. Paige's Report, a conservative assumption was made that Louise made earnings "at the level of an average Lebanese work, post-event" while Scenario II assumes that Louise did not "work due to injury or death." The testimony is clear and undisputed that she did return to work at the Embassy after the bombing and, thus, it is clear from the testimony that

Scenario I is the appropriate measure of economic damages and the calculation of $484,250.00 is the appropriate measure of economic damages to award.

**Non-Economic Damages**

Throughout the legal history of the application of the Foreign Sovereign Immunities Act to terrorist activities conducted by Iran, there has been ample case law addressing the manner in which to evaluate the non-economic damages incurred. On December 22, 2006, this Court issued its opinion in the matter of *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 299 (D.D.C. 2006).

*Heiser* held that "[w]hile the loss suffered by the plaintiffs in these cases in undeniably difficult to quantify, courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed." *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 269 (2006) (*See also Valore v. Islamic Republic of Iran*, 700 F.Supp.2d at 83 – 84; *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57-58(D.D.C. 2009)).

Subsequent to *Heiser*, this Court adopted the *Heiser* Matrix: "This Court finds that the damages framework set forth in *Heiser* to be an appropriate measure of damages for those family members of victims who died in this attack." *Peterson II* at 51 - 52. The Court then pivoted away from the solatium damages and directed its attention to the damages model associated with those servicemembers and their families for those who survived the terrorist attack: "The Court finds that the framework detailed in *Blais*[85] is appropriate to help determine damages for those surviving

[85] In *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006), the Court determined that, "[w]ith respect to pain and mental anguish damages, the Court admits that assessing the amount of compensatory damages for pain and suffering due an injured plaintiff is undeniably difficult. This Court has, however, established a general framework for making such a determination. In cases that involve an attack where the victim survives, and where no captivity

servicemen and their families seeking redress." *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 51 – 52 (D.D.C. 2007). The individual awards for the surviving servicemember for non-economic damages varied between $2 million to $12 million based on the various physical injuries suffered.

The Court also issued a ruling in *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010). *Valore* examined the initial award to the survivors of terrorist attacks in the *Peterson* case and reaffirmed the following:

> Damages for surviving victims are determined based upon an assessment of such factors as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson II,* 515 F.Supp.2d at 52 n. 26 (quotation omitted). "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." *Peterson II,* 515 F.Supp.2d at 54. Thus in *Peterson,* the Court granted a baseline award of $5 million to individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain." *Id.* The Court was willing to depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead, as was one soldier who "was placed in a body bag [and] buried alive in a morgue for four days until someone heard him moaning in pain." *Id.* Similarly, the Court was willing to depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire. *Id.* With these considerations in mind, the Court now considers whether departures recommended by the special masters are warranted.

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83–84 (D.D.C. 2010).

In addition to the case law cited above, I have also reviewed the Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Adjustments of Non-Economic Damages Matrix. I

---

occurred, courts typically award a lump sum award based in large part on an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Id.* at 73." *Blais v. Islamic Republic of Iran,* 459 F. Supp. 2d 40, 59 (D.D.C. 2006), enforcement granted, No. 02-CV-285 (RCL), 2011 WL 13376985 (D.D.C. Dec. 2, 2011)

concur with the brief and find that an upward adjustment of the *Heiser* Matrix consistent with the Consumer Price Index is a just and fair modification to make at this point in time, twenty years after *Heiser*. The modification recommendation was identified as follows:

| **Claimant** | **2006 Established Base Matrix** | **2006 Upward Adjustment** | **2006 Downward Adjustment** | **2026 Adjusted Matrix** |
|---|---|---|---|---|
| Spouse of Decedent | $8-$12 million | | | $13,156,960.24 – $19,735,440.36[86] |
| Parent/Child of Decedent | $5 million | | | $8,223,100.15 |
| Sibling of Decedent | $2.5 million | | | $4,111,550.08 |
| Survivor | $5 million | $12 million | $1.5 million | $2,466,930.05 – $8,223,100.15 – $19,735,440.36 |
| Spouse of a Survivor | $4 - $6 million | | $1.5 million | $2,466,930.0 – $6,578,480.12 – $9,867,720.18 |
| Parent/Child of a Survivor | $2.5 million | | $1 million | $1,644,620.03 – $4,111,550.08 |
| Sibling of a Survivor | $1.25 million | | $500,000 | $822,310.02 – $2,055,775.04 |

**Louise Briatore Rassi**

The testimony cited above demonstrates beyond a preponderance of evidence that Louise suffered and continues to suffer compensable non-economic damages, which are permanent in nature and will continue into the future. Thankfully, Louise was not of the category of survivors to have suffered lost limbs or other physically catastrophic damages; however, the evidence is clear that she suffered significant physical injuries with lifelong sequalae. Given the inflationary effects since the *Heiser* matrix was set, I award as a reasonable value of these damages: $15,000,000.

[86] Due to the U.S. Labor and Statistics calculator not being able to calculate inflationary adjustments for values over $10,000,000, I have utilized the Federal Reserve Bank of Minneapolis' website calculator found at https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator.

**<u>Khazna Rassi</u>**

The testimony cited above demonstrates beyond a preponderance of evidence that Khazna suffered and continues to suffer compensable non-economic damages, which are permanent in nature and will continue into the future. It is clear that during life, Khazna suffered compensable non-damages that the *Heiser* framework would set at $2,500,000. Given the inflationary effects since the *Heiser* matrix was set, I would value the non-economic damages recoverable to be $4,111,550.08.

**<u>Maha Weber Rassi</u>**

The testimony cited above demonstrates beyond a preponderance of evidence that Maha suffered and continues to suffer compensable non-economic damages, which are permanent in nature and will continue into the future. It is clear that during life, Maha suffered compensable non-damages that the *Heiser* framework would set at $1,250,000.00. Given the inflationary effects since the *Heiser* matrix was set, I would value the non-economic damages recoverable to be $2,055,775.04.

**<u>Suzana Rassi</u>**

The testimony cited above demonstrates beyond a preponderance of evidence that Suzana suffered and continues to suffer compensable non-economic damages, which are permanent in nature and will continue into the future. It is clear that during life, Suzana suffered compensable non-damages that the *Heiser* framework would set at $1,250,000.00. Given the inflationary effects since the *Heiser* matrix was set, I would value the non-economic damages recoverable to be $2,055,775.04.

**Marwan Rassi**

The testimony cited above demonstrates beyond a preponderance of evidence that Marwan suffered and continues to suffer compensable non-economic damages, which are permanent in nature and will continue into the future. It is clear that during life, Marwan suffered compensable non-damages that the *Heiser* framework would set at $1,250,000.00. Given the inflationary effects since the *Heiser* matrix was set, I would value the non-economic damages recoverable to be $2,055,775.04.

**CONCLUSION**

Upon consideration of the evidence and facts submitted and the aforementioned legal framework, the Special Master must consider whether the Plaintiffs are entitled to damages including compensatory damages for the pain and suffering s/he has endured, economic damages, loss of consortium damages, solatium damages, and punitive damages. There is evidence of the Plaintiffs having endured such damages from the point of injury to the present, and that will continue into the future on a permanent basis.

The Special master concludes as a matter of law that judgment should be entered as follows:

**Louise Briatore Rassi**

| | |
|---|---|
| Economic Damages: | $ 484,250.00 |
| Non-Economic Damages: | $15,000,000.00 |
| Punitive Damages:[87] | $ 633,638.70 |
| **TOTAL:** | **$16,117,888.70** |

[87] The calculation of punitive damages has been made in accordance with *Ewan v. Islamic Republic of Iran*, 466 F.Supp3d236 (D.D.C. 2020), wherein the Court applied a proportionate ratio of $0.03699 in punitive damages to ever $1.00 in compensatory damages. This calculation has also been adopted by this Court in *Maxwell v. The Islamic Republic of Iran*, 1:22-cv-00173-RC Dock. No. 38). Other cases, such as *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 have awarded larger lump sum punitive damages. In *Eisenfeld*, the Court award $300,000,000 in punitive damages. Should the Court wish to follow the *Eisenfeld* model, it is obviously free to do so; however, in an effort to provide a more conservative approach based upon the more recent Court determination, I have adopted the *Ewan* model.

**Khazna Rassi**

| | |
|---|---|
| Non-Economic Damages: | $4,111,550.08 |
| Punitive Damages: | $ 152,086.24 |
| **TOTAL:** | **$4,263,636.32** |

**Maha Rassi**

| | |
|---|---|
| Non-Economic Damages: | $2,055,755.04 |
| Punitive Damages: | $ 76,042.38 |
| **TOTAL:** | **$2,131,817.42** |

**Suzana Rassi**

| | |
|---|---|
| Non-Economic Damages: | $2,055,755.04 |
| Punitive Damages: | $ 76,042.38 |
| **TOTAL:** | **$2,131,817.42** |

**Marwan Rassi**

| | |
|---|---|
| Non-Economic Damages: | $2,055,755.04 |
| Punitive Damages: | $ 76,042.38 |
| **TOTAL:** | **$2,131,817.42** |

In conclusion, based upon the evidence provided, the above-named Plaintiffs are entitled to judgments each in accordance with the "Total" identified above.

**July 8, 2026**
**Date**

**/s/Paul G. Griffin**
**Paul G. Griffin, Esq.**
**Special Master**