**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MOHAMMED FNEICH, *et alii*,** | : | |
| **Plaintiffs,** | : | |
| **versus** | : | **Civil Action No.: 24-1843 (CRC)** |
| **ISLAMIC REPUBLIC OF IRAN, *et alii*,** | : | |
| **Defendants.** | : | |

***REPORTS AND RECOMMENDATIONS OF SPECIAL MASTER JOSEPH PETER DRENNAN***

COMES NOW, before this Honorable Court, Special Master Joseph Peter Drennan, undersigned, pursuant to the provisions of F.R. Civ. P. 53, this Honorable Court's Order of 4 February 2026, and the Administrative Plan Governing Appointed Special Masters, to consider the individual claims of claimants who are direct victim employees of the United States Government who were seriously injured in the terrorist suicide bombing attack, on 18 April 1983, against the U.S. Embassy, in Beirut, Lebanon, and/or the terrorist suicide bombing attack, on 20 September 1984, against the U.S. Embassy Annex, in East Beirut, Lebanon, as well as estates of direct victims or family members of direct victims who have sued herein the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security hereinafter "MOIS"), seeking damages under 28 U.S.C. § 1605A, of the Foreign Sovereign Immunities Act ("FSIA").

***Materials Considered***

This Special Master has received extensive recorded and transcribed testimony and documentation from Plaintiffs' counsel in respect of the claims of 17 of the Plaintiffs herein to assist in determining any damages to which the respective subject Plaintiffs herein may be entitled. The video depositions and other remote depositions taken of the Plaintiffs and their

witnesses were taken exclusively by Plaintiffs' counsel. The Special Master has not challenged the veracity of the uncontroverted evidence submitted by Plaintiffs' counsel. Pursuant to the Administrative Plan, Plaintiffs' counsels' "representation that a proffered document is genuine and is an accurate copy of what counsel proffers it to be" is sufficient to satisfy the authentication requirements of Federal Rule of Evid. 901. Accordingly, the Special Master has accepted the documents proffered as genuine. It is the belief of the Special Master that all available evidence bearing on the damages suffered by each plaintiff have been furnished to the Special Master.

### ***Background***

On 18 April 1983, a suicide bomber working with Hezbollah[1] detonated a truck bomb laden with hundreds of pounds of explosives into the main entrance of the U.S. Embassy, then located on the Corniche (Avenue de Paris), along the waterfront in the Ain el-Mreisseh District of West Beirut, Lebanon, in a seven-storey building, shearing off the front of the building, collapsing the central façade and all seven floors of the Chancery into a heap of rubble. The attack killed more than 20 people, wounding over 50 others, including American and Lebanese Embassy personnel. After relocating the Embassy to an Annex[2] in East Beirut, due to the destruction of the Chancery in West Beirut, shortly after noon on 20 September 1984, the same Hezbollah party again struck against the American Embassy Annex with a second terrorist bombing. Such latter terrorist attack consisted of a station wagon loaded with some 1500

[1] The transliterated spelling of this word, in the Latin alphabet, differs slightly in various publications, with such variations including, *inter alia,* Hizbollah and Hizballah. However, it is believed that this spelling is the most common and reflects the phonetic Arabic pronunciation. The organization also refers to itself in some English language publications as the "Party of God", which is the literal English translation of the term.

[2] The Embassy staff referred publicly to the relocated building in East Beirut as the "Embassy Annex" to avert the impression that the United States has been forced to abandon the destroyed embassy building in West Beirut, as in fact it had. *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 138, fn.#4 (D.D.C. 2001).

kilograms of high explosives which was driven into the Embassy Annex compound at high speed and was detonated in the vicinity of a concrete cistern filled with water in the Embassy compound. Such latter attack resulted in the destruction of the Embassy Annex building, with 11 people killed and over 58 more Lebanese and American embassy personnel injured, many seriously.

The instant case consists of 17 total plaintiffs, including 2 of the direct victims of the 1984 Beirut Embassy Bombing, their respective estates, and their immediate family members, as well as immediate family members of a direct victim in a related case before this Honorable Court, *viz*., *Abdallah, et alii, versus Islamic Republic of Iran, et alii,* Civil Action No. 21-2889-CRC.[3]

The events of the aforesaid two terrorist attacks upon United States embassy facilities and its aftermath have been documented and will not be repeated here except as relevant to the assessment of individuated damages. It is undisputed that both of the aforesaid 18 April 1983, and 20 September 1984, terrorist attacks on the U.S. Embassy were carried out by the terrorist group Hezbollah, and that the financing, training, and preparation for the attack were conducted by Iran and MOIS. This Court has held in prior cases that Iran directed and facilitated the attack and therefore proximately caused the injuries sustained by the victims of those attacks. In each case, Iran was held liable to the victims of these attacks and their immediate family members for compensatory damages*. See, e.g., Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15 (D.D.C. 2020) (Contreras, J.) ("Barry II") (holding Iran liable for the April 18, 1983 U.S. Embassy bombing and the 20 September 1984 U.S. Embassy Annex bombing in Beirut); *Brewer v. Islamic*

[3] Such direct victim in the *Abdallah, supra,* where the Special Master serves as the sole Special Master, is Mahmoud Yakzan, whose claims are addressed in the *Report of the Special Master* filed in said related case on 5 May 2025 [Doc 40, at Pages 99 - 104 of 128].

*Republic of Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009) (Huvelle, J.) (holding Iran liable for the 1984 attack); *Welch v. Islamic Republic of Iran*, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Distr. LEXIS 99191 (D.D.C. Sept. 20, 2007) (mag. op.), adopted by Final Judgment, ECF 70, No. 01-cv-00863 (CKK)(AK), 2007 U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007) (Kollar-Kotelly, J.) (holding Iran liable for the 1984 attack); *Estate of John Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011) (holding Iran liable for the 1983 and 1984 attacks); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C. 2001) (Jackson, J.) (holding Iran liable for the 1984 attack).

***Procedural History***

The instant action was initially filed herein on 19 October 2022, against the Islamic Republic of Iran and the Iranian Ministry of Information and Security, by, or in respect of, a number of individual foreign national employees of the United States Government, and family members thereof, who were victims of terrorist suicide bombing attacks against the U.S. Embassy in Beirut, Lebanon, on 18 April 1983, and or the U.S. Embassy Annex, in East Beirut, Lebanon, on 20 September 1984, under, *inter alia*, the Foreign Sovereign Immunities Act (28 U.S.C., §§ 1602, *et seq*.) (hereinafter "FSIA"), and, per the Order entered herein on 26 June 2024 [Doc. 44], the instant action was severed from the related case of *Estate of Zouhair El Halabi, et alii, v. Islamic Republic of Iran, et alii,* Case No. 2022-cv-3190, and redesignated as *Mohammed Fneich, et alii, versus Islamic Republic of Iran, et alii*, Case No. 1:24-cv-01843-CRC.

The Plaintiffs in *Fneich, supra, id est,* the instant case, thereupon filed their Second Amended Complaint on the following day, *viz*., 27 June 2024 [Doc. 45].

Following service of process upon the Defendant, through diplomatic means, on 13 January 2025 [Doc. 61, filed on 28 February 2025], and the Clerk's entry of default [Doc. 63, filed on 17 March 2025], the Plaintiffs thereupon moved this Honorable Court, on 16 June 2025,

for default judgment on liability [Doc. 64], and, per this Honorable Court's 4 February 2026 Order herein [Doc. 68], the Court granted the Plaintiffs' motion for default judgment as to liability under the FSIA. On that same day, *id est,* 4 February 2026, this Honorable Court entered an Order [Doc. 69], appointing Irwin Weiss, Esquire, Paul Griffin, Esquire, Judge William Nicklas, and Joseph Peter Drennan, undersigned, to be special masters, under the provisions of F. R. Civ. P 53, *inter alia*, to consider issues regarding compensatory damages and to submit to this Honorable Court their Report and Recommendation as to each Plaintiff, containing findings of fact and conclusions of law, by 8 July 2026[4]. The said order further provided that the Plaintiffs submit all evidence supporting damages to be submitted to the Special Masters on or before 8 May 2026. Plaintiffs' counsel complied with the said Order by making their evidence consisting of, *inter alia,* video depositions, deposition transcripts, official government documents and other documentation, accessible to the Special Masters via the cloud based content file storage and sharing Internet portal Box.com.

On motions brought by the undersigned, the Court granted successive enlargements of time within which the Special Masters may file their respective Reports and Recommendations, with 28 August 2026 being the current due date set by the Court for the submission of the Reports and Recommendations. Special Master Paul Griffin, Esquire, submitted his Reports and Recommendations on 8 July 2026 [Doc. Nos. 73 & 74] and 9 July 2026 [Doc. 75], and the undersigned, Joseph Peter Drennan, now submits herewith his Reports and Recommendations on behalf on behalf of 17 claimants, including 2 direct victims.

---

[4] Paul Weiss, Esquire, was reportedly unable to serve as a special master due to his retirement and Judge Nicklas was also unable to serve as a special master herein due to health-related reasons.

***Initial Proviso Applicable to the Evidence Received From Plaintiffs' Counsel***

It bears mention that all of the unsworn Declarations (styled as Affidavits) provided by the claimants, through their counsel, are compliant with the requirements for declarations executed without the United States, as set forth in 28 U.S.C., § 1746 (1).

For the sake of clarity and context, I, Joseph Peter Drennan, have grouped my reports and recommendations for the remaining estates and family members under the rubric of the family of the corresponding direct victim, and have ordered such findings and recommendations, *seriatim*, roughly in the order in which such claimants appear in the Second Amended Complaint filed herein on 27 June 2024 [Doc. 45], as follows, *viz.*:

***Claims From the Family of Mohammad Youssef Fneich and Youssef Fneish***

*Findings of Fact*:

1. Direct victim and Plaintiff Mohammad Youssef Fneich was born on 10 October 1958, in Beirut, Lebanon[5], and died on 21 May 2023, in Abbassich, in the Tyre District of South Lebanon[6].

2. Throughout his natural life and up until his death, Mohammad Youssef Fneich was a citizen of the Republic of Lebanon[7].

---

[5] Verified per the Special Master's review of The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, entered on 14 June 2017.

[6] Verified per the Special Master's review of Republic of Lebanon, Ministry of Interior and Municipalities, Directorate of General Civil Status, Death Certificate, entered on 3 July 2023.

[7] Verified per the Special Master's review of the Declaration (styled as an Affidavit) of Abbas Mohamad Fneich, on behalf of and as Personal Representative of the Estate of Youssef Fneich and Mohammed Youssef Fneich, executed on 25 August 2026.

3. Abbas Mohamad Fneich, a son of the late Mohammad Youssef Fneich, is the personal representative of the Estate of Mohammad Youssef Fneich[8].

4. On 20 September 1984, Mohammad Youssef Fneich was employed by the United States Government, at the United States Embassy Annex, in East Beirut, Lebanon[9].

5. Direct victim and Plaintiff Youssef Fneich was born in 1924, in Maaroub, in the State of Greater Lebanon (État du Grand Liban), and died on 29 March 2012, in Ghobeiry, in the Baabda District of the Mount Lebanon Governorate, Lebanon, and was the father of direct victim and Co-Plaintiff Mohammad Youssef Fnecich.[10]

6. Throughout his natural life and up until his death, Youssef Fneich was a citizen of Lebanon[11].

7. Abbas Mohamad Fneich, a grandson of the late Youssef Fneich, is the successor Personal Representative of the Estate of Youssef Fneich.[12]

---

[8] Verified by the Special Master's review of an Arabic and English translation of a Lebanese Jafaari School Personal Representative: Line of Succession Document furnished by Plaintiffs' counsel, obtained from Plaintiffs' Lebanese counsel, Advocate Abbas Ghandour, of the Ghandour Law Firm, Beirut, Lebanon, dated 26 August 2026.It bears mention that the Second Amended Complaint in the instant matter, filed just a month after the death of Mohammad Youssef Fneich, lists Mohammad Youssef Fneich as a party but does not reference his estate, apparently because Plaintiffs' counsel was not aware of his decease at the time that the Second Amended Complaint was drafted and filed. Thus, the Special Master presumes that this Honorable Court will reference the estate, with Abbas Mohamad Youssef as the Personal Representative thereof, as the successor party.

[9] Verified by the Special Master's review of an employment verification letter, dated 13 July 2022, from Caren A. Brown, Human Resources Officer with the Embassy of the United States of America, Beirut, Lebanon.

[10] Republic of Lebanon, Ministry of Interior and Municipalities, Directorate of General Civil Status, Death Certificate, delivered 13 April 2012.

[11] Verified per the Special Master's review of the Declaration (styled as an Affidavit) of Abbas Mohamad Fneich, on behalf of and as Personal Representative of the Estate of Youssef Fneich and Mohammed Youssef Fneich, executed on 25 August 2026.

[12] Verified by the Special Master's review of an Arabic and English translation of a Lebanese Jafaari School Personal Representative: Line of Succession Document furnished by Plaintiffs' counsel, obtained from Plaintiffs' Lebanese counsel, Advocate Abbas Ghandour, of the Ghandour Law Firm, Beirut, Lebanon, dated 25 August 2026. As was the case in respect of Plaintiff Mohammad Youssef Fneich, as referenced in Footnote #7, *supra,* since the Second Amended Complaint was filed only a little more than a month following the death of Mohammad Youssef Fneich, the Second Amended Complaint still lists him as the Personal Representative of his late father's estate. The Special Master presumes that this Honorable Court will therefore recognize Abbas Mohamad Fneich, grandson of Youssef Fneich, as the successor Personal Representative of that Estate.

8. On 20 September 1984, United States Embassy Annex, in East Beirut, Lebanon, was attacked by a suicide bomber who drove a station wagon vehicle loaded with some 1,500 kilograms of high explosives into the Embassy Annex compound. Upon entering the Embassy compound the explosives detonated, collapsing the embassy building, killing more than 20 people and injuring more than 50 others.

9. At the moment of the bombing, Mohammad Youssef Fneich was working on the Embassy Annex compound, near the site of the blast.

10. As a direct, proximate and actual result of the bombing, Mohammad Youssef Fneich suffered physical injury and emotional trauma incident to the subject terrorist attack, that was both severe and was permanent.

11. At the moment of the bombing, Youssef Fneich, the father of Mohammad Youssef Fneich, was also working for the U.S. Embassy, on the Embassy Annex compound, near the site of the blast.

12. As a direct, proximate and actual result of the bombing, Youssef Fneich suffered physical injury and emotional trauma incident to the subject terrorist attack, that was both severe and was permanent.

13. As of 20 September 1984, the direct victims, *viz*., the late Mohammad Youssef Fneich, and his father, the late Youssef Fneich, had the following immediate family members in the instant litigation who are all citizens and, excepting Samira Youssef Fneich, who lives in Canada, residents of the Republic of Lebanon[13] and parties plaintiff to the instant litigation, and who all sustained significant and lasting emotional and psychological injury as a direct,

---

[13] Samira Youssef Fneich, sister of the late Mohammad Youssef Fneich and daughter of the late Youssef Fneich also has acquired Canadian citizenship. Verified by the Special Master's review of a copy of Samira Fneich's Canadian Passport, issued on 11 April 2025, with an expiry date of 11 April 2035.

proximate result of the harm sustained by the late Mohammad Youssef Fneich and the late Youssef Fneich in the subject 20 September 1984 terrorist bombing attack, *viz*.: Maryam Fneich, sister of the late Mohammad Youssef Fneich and daughter of the late Youssef Fneich, who was born on 1 January 1970, in Beirut, Lebanon[14]; Zainab Fneich, sister of the late Mohammad Youssef Fneich and daughter of the late Youssef Fneich, who was born on 1 December 1967, in Beirut, Lebanon[15]; Ali Fneich, brother of the late Mohammad Youssef Fneich and son of the late Youssef Fneich, who was born on 3 September 1962, in Beirut, Lebanon[16]; Hussein Fneich, brother of the late Mohammad Youssef Fneich and son of the late Youssef Fneich, who was born on 1 August 1971, in Beirut, Lebanon[17]; Essam Fneich, brother of the late Mohammad

[14] Fneich Family Tree; Remote Deposition of Maryam Fneich, taken on 4 December 2023, at 4-6; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, delivered on 14 June 2017.
[15] Fneich Family Tree; Remote Deposition of Zainab Fneich, taken on 4 December 2023, at 4-5; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, delivered on 14 June 2017.

[16] Fneich Family Tree; Remote Deposition of Ali Fneich, taken on 11 December 2023, at 8-10; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, delivered on 14 June 2017.

[17] Remote Deposition of Hussein Fneich, taken on 4 December 2023, at 3-4; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, Family Extract of Civil Registration, delivered on 14 June 2017. It bears mention here that, insofar as the Certified English translation of said Lebanese Government's Family Extract of Civil Registration document, which is presented in in a table or grid format is concerned, although that document's references the Hussein Fneich (using the French rendering of Hussein, *viz*., "Houssein"), under the column labeled "**Place and date of Birth**" (emphasis in original), the entry reads "Beyrouth 01/08/1981", suggesting that he was born on 1 August 1981 (using the applicable European day-month-year format), the entry under the column labeled "**Registration Date and Notes**" (emphasis in original) reads, incongruously, "Birth entry 5133/1971", indicating that the subject birth was the 5133rd birth registered in ***1971*** – a full decade before the form indicates that the subject was said to have been born! Since this is the only instance of such an anomaly that the Special Master has observed in his review of over a dozen Family Extract of Civil Registration forms from the Lebanese Government reviewed by the Special Master in the instant case and two related cases before this Court, the Special Master credits Hussein Fneich's deposition testimony that he was born on 1 August 1971. Incidentally, the reference to "Beyrouth" on the form is the French spelling for Beirut. Both are transliterations of the Arabic بيروت (*Bayrūt*) — French rendered it *Beyrouth*, English *Beirut*, using each language's own spelling conventions to land on roughly the same sound. Although Article 11 of the Lebanese Constitution designates Arabic as the sole official language of Lebanon, given Lebanon's history having been ruled under the French Mandate from the League of Nations in 1923, the use of French spellings on Lebanese Government documents is normal French remains a working language in Lebanon, appearing on road signs, currency and government documents.

Youssef Fneich and son of the late Youssef Fneich, who was born on 10 April 1953, in Beirut, Lebanon[18]; Samira Youssef Fneich, sister of the late Mohammad Youssef Fneich and daughter of the late Youssef Fneich, who was born on 10 May 1973, in Beirut, Lebanon[19]; Amna Youssef Fneich, sister of the late Mohammad Youssef Fneich and daughter of the late Youssef Fneich, who was born on 1 July 1965[20], in Beirut, Lebanon; & Fatima Youssef Fneich, sister of the late Mohammad Youssef Fneich and daughter of the late Youssef Fneich, who was born on 12 April 1961, in Beirut, Lebanon[21].

***Evidence of the Estate of Mohammad Youssef Fneich*:**

Mohammed Youssef Fneich was a direct victim of the subject terrorist bombing, being a Lebanese national employed by the United States Government at the United States Embassy, in Beirut, Lebanon, and acting within the scope of that employment when the Embassy was attacked.[22] He was born on 10 October 1958, and was the eldest son of the direct victim Youssef Fneich by his marriage to Laila Khamis.[23] He survived the attack, and died in May 2023.[24] His son, Abbas Muhammad Fneich, born on 10 November 1987, years after the bombing, gave a

[18] Fneich Family Tree; Remote Deposition of Essam Fneich, taken on 13 May 2023, at 7,10; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, delivered on 14 June 2017.

[19] Fneich Family Tree; Remote Deposition of Samira Youssef Fneich, taken on 7 June 2024, at 11-13; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, delivered on 14 June 2017.

[20] Fneich Family Tree; Remote Deposition of Amna Youssef Fneich, taken on 4 December 2023, at 3-4; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, delivered on 14 June 2017.

[21] Fneich Family Tree; Remote Deposition of Fatima Youssef Fneich, taken on 7 June 2024, at 11-13; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, delivered on 14 June 2017.

[22] Declaration (styled as an Affidavit) of Abbas Mohamad Fneich, on behalf of and as Personal Representative of the Estate of Youssef Fneich and the Estate of Mohammad Youssef Fneich, executed on 25 August 2026.

[23] The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, delivered on 14 June 2017.

[24] Remote Deposition of Abbas Fneich, taken on 4 December 2023, at p. 4. Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 9.

remote video deposition in this matter on 4 December 2023, providing noteworthy recollections noteworthy evidence of what his late father, Mohammad Youssef Fneich, had told him of his haunting recollections of what him experienced at the subject bombing.[25]

The Embassy has certified that "Mr. Mohammed Y. Fneish was employed by the U.S. Embassy, Beirut, Lebanon, as a Laborer from April 1, 1983, until April 26, 1987."[26] Mohammad Yousef Fneich's brother Hussein Youssef Fneich described Mohammad's work at the Embassy as "transportation," helping "the logistics at the embassy, getting things back and forth from the embassy," and "general transportation of people and things that the embassy needed."[27]

The circumstances of the explosion were related by the direct victim Mohammad Youssef Fneich to his son, Abbas, in the following terms: Mohammed Fneich was standing at a door and calling to his father, Youssef Fneich, to come, their supervisor having need of him. As his father came, and the two men stood facing one another, the bomb detonated. Both were thrown, in the witness's words, "knocked … off to the other side of the … building," being the side which did not collapse. "[T]hey jumped away, they fly in the air [*sic*.]."[28]

What his father did in the minutes that followed, per the account said to have been imparted by Mohammad Youssef Fneich, to his son, Abbas Mohamad Fneich, is, in the Special Master's view, among the more striking evidence in this family's file. His son testified that his father told him that he was at first "shocked," but that "he started running to help people when he was alive," and that he "named so many people for me, from the army, from … the people inside." He recalled his father telling him "that someone was like coming down on a rope in his leg

[25] Remote Deposition of Abbas Fneich, taken on 4 December 2023, at pp. 3-4.
[26] Embassy of the United States of America, Beirut, Lebanon, Letter of 13 July 2022, Caren A. Brown, Human Resources Officer.
[27] Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at p. 9.
[28] Remote Deposition of Abbas Fneich, taken on 4 December 2023, at pp. 5-7.

[*sic*.]." His father, he said, "was shocking, but he was running there … trying to … save people." He first "tried … to take out my grandfather, and he put him down, then tried to help people." It was only then that "he realized that … he can't move anymore because his leg," and "he laid down."[29]

The injury which Mohammed Fneich sustained was, by the account he was said to have provided to his son, Abbas, who gave evidence, less visible than that sustained by his father, Youssef Fneich, but no less real. As Abbas related of the accounts provided him by his father, Mohammad Youssef Fneich, "his dad didn't sustain any external injuries," and "the damage … is more internal": "[h]e would complain of knee pain and back pain and obviously the emotional distress from the actual explosion (and that) the real damage happened in my grandfather, not in my father, but my father had damage inside, not outside."[30] The direct victim Mohammad Youssef Fneich's brother Ali Youssef Fneich, who saw him come home, testified that he had "injuries to his leg," which he described as "less major … than my dad," and that his brother "didn't say anything" when he came in.[31] Mohammad Youssef Fneich's sister Zainab Youssef Fneich testified that he "sustained injuries to his knees," but was careful to add that "the physical injuries … doesn't even compare to the emotional and mental strain that this has caused."[32] His sister Maryam Youssef Fneich recalled her father and brother "coming home all dusty and scraped up."[33]

---

[29] *Id*. at pp. 7-8.
[30] *Id*. at p. 6.
[31] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at pp. 18-19.
[32] Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at p. 6.
[33] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 6.

Direct victim Mohammad Youssef Fneich returned to work at the Embassy following the bombing, and continued to work there for several years thereafter.[34] His brother Ali Youssef Fneich testified that after the attack he was "depressed and ill," which the witness rendered as "a little mental illness … the best way to describe it"; that he suffered nightmares; and that he "mainly kept it … to himself on the inside."[35] His son, Abbas Mohamad Fneich testified that his father would speak of the bombing only "during special gatherings," or "when certain people remind him of the incident," and that he described the Embassy before the explosion as "like heaven and happiness,", but that the explosion was the moment when "everybody's lives were flipped upside down."[36]

His son Abbas gave evidence of two further consequences which endured into the next generation. The first was pride: the children were raised upon their father's account of his service, upon photographs of him at the Embassy, and, as the witness put it, "we more like to hear the story of our hero's father. And our father is a hero for us." Yet the telling had its cost, for "when he was telling these stories … he gets sad when we start to remember what really happened," and "he told us he remember names and then he gets sad more and more," so that the children learned "to concentrate on … the good things."[37] The second was the hostility of others. The witness testified that the family "always end at the other side," with "bad memories from the way that our community was treating us," and that he was told as a child, "your father worked for America," and "[y]our dad is like a spy or something like that," which he heard "too many

---

[34] Remote Deposition of Abbas Fneich, taken on 4 December 2023, at p. 9. Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 22..

[35] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 21.

[36] Remote Deposition of Abbas Fneich, taken on 4 December 2023, at pp. 8-9.

[37] *Id*. at pp. 9-10.

times," from young and grown alike.[38] Of his father he said, simply, that when he told the story it was because "he feels like he lost something there."[39]

Mohammed Youssef Fneich died 21 May 2023 at the age of 64.[40]

***Evidence of the Estate of Youssef Fneich*:**

Youssef Fneich was a direct victim of the subject terrorist bombing, being a Lebanese national employed by the United States Government at the United States Embassy, in Beirut, Lebanon, and acting within the scope of that employment when the Embassy was attacked. He was born in 1924, in Lebanon, and was at all times throughout his life a citizen of Lebanon. Because he gave no deposition, having died over a decade prior to the commencement of the instant action, the evidence of what he suffered is given, in conclusory form, by the Declaration executed for his Estate, by his the successor Personal Representative thereof, *viz*., his grandson, Abbas Fneich[41], which evidence is expanded and detailed through depositions given by several of his own children, each of whom gave a deposition in the instant matter and each of whom is a party plaintiff herein which are summarized below.

Youssef Fneich was employed at the Embassy in maintenance and cleaning. His daughter Maryam Youssef Fneich described him as "an employee at the US embassy in Beirut," who "was a maintenance guy"; his daughter Zainab Youssef Fneich as "a maintenance person for the … embassy"; and his son Hussein Youssef Fneich described him as "an employee at … U.S.

---

38 *Id*. at pp. 11-12, 14.
39 *Id*. at p. 10.
40 Ministry of Interior and Municipalities, Directorate of General Civil Status, Death Certificate, entered on 3 July 2023.
41 Declaration (styled as an Affidavit) of Abbas Mohamad Fneich, on behalf of and as Personal Representative of the Estate of Youssef Fneich and (the Estate of) Mohammed [*sic*.] Youssef Fneich, executed on 25 August 2026, at ¶ 8.

Embassy" in "kind of maintenance and cleaning."[42] His son Ali Youssef Fneich testified that his father "was very happy and comfortable working at the embassy," and Hussein Youssef Fneich that it "was a normal job" of which his father never complained.[43] His son Mohammed Youssef Fneich, himself a direct victim and a party plaintiff herein, was employed at the same Embassy and was at work there upon the same day.[44]

The most particular account of the moment of the explosion comes from Abbas Fneich, the grandson of Youssef Fneich, who testified regarding recollections from the moment of the subject explosion imparted to him by his late father, Youssef Fneich's son, Mohammed Youssef Fneich, who told him that he was standing at a door, calling to his father, Youssef Fneich, to come, because their supervisor required him. As Youssef Fneich came, and the two men stood facing one another, the bomb detonated. Both were thrown by the blast, in the witness's words, "knocked … off to the other side of the … building," being the side which did not collapse.[45]

The nature of those injuries is described consistently by four of his children, deposed separately. Ali Youssef Fneich testified that his father "had sustained injuries to his eye, his back, his shoulder and to his chest and to his leg," with "scratches all over his leg and body," and he alone supplied the mechanism: a metal ricochet "went into his eye and they had to pull it out," while a further fragment of metal entered his back which "they couldn't pull … out"; the shoulder injury was continuous with the back, and the chest injury was likewise "from ricochet and things falling on him."[46] Hussein Youssef Fneich recalled "a right leg injury and a shoulder

[42] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 5. Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at pp. 4-5. Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at p. 6..
[43] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 11.
[44] Remote Deposition of Abbas Fneich, taken on 4 December 2023, at pp. 5-6.
[45] *Id.* at pp. 6-7.
[46] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at pp. 16-17.

injury," testified that "[f]rom the kneecap down, his dad was hurt significantly," and, upon reflection, added that his father "also sustained … eye and back injuries during the first attack."[47] Zainab Youssef Fneich gave "injuries to his back, his eye, his leg and his shoulder."[48] Maryam Youssef Fneich recalled her father "having back injuries, injuries to his eye and complaining of the pain in his knee."[49] Four witnesses, in four separate depositions, agree upon injury to the eye, the back, the shoulder and the leg. The Special Master regards that concordance, upon an event of more than forty years' standing, as materially strengthening the proof that Youssef Fneich's injuries were severe.

The family waited some hours without knowing whether Youssef Fneich was alive. Ali Youssef Fneich put the interval at seven to eight hours from the family's learning that the explosion had been at the Embassy to their learning that the two men had survived; Hussein Youssef Fneich, Zainab Youssef Fneich and Maryam Youssef Fneich each described the same waiting.[50] When he returned home, his son Ali testified, his father "was in still shock. He was like unable to talk, he was shaking," and the sight of him was "very upsetting … I couldn't even feel any feelings and lost all senses."[51] Hussein Youssef Fneich described his father arriving "very dusty, very injured," in a state he could not describe "because it's indescribable," and said that the injury was "not only physical … but mental," as though his father "had like shockwaves through his body," so that "personally he wasn't himself, his spirit wasn't … the same."[52]

[47] Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at p. 7.
[48] Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at p. 6.
[49] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at pp. 6-7.
[50] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 15. Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at p. 8. Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at p. 7. Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 7..
[51] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at pp. 17-18.
[52] Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at p. 7.

The injury did not end with the healing of the wounds. Ali Youssef Fneich testified that his father "recovered physically, but he always complained of … internal injuries," explaining that his father "wasn't able to sleep and when he was able to sleep, he would have nightmares," that he suffered "soreness during the day," and "nerve issues that would be on and off," so that "physically he looked like he healed, but on the internal, he was just dealing with … trauma and nerve issues."[53] Zainab Youssef Fneich testified to the same effect, that her father "had … constant nightmares" and "was constantly agitated and upset for years after the explosion."[54] Ali Youssef Fneich further described a permanent alteration of temper: his father's "mood has changed from before," as he "would be angry because he was just in pain all the time," and he became "edgier, moodier."[55] He was approximately one year away from his employment, and the household, having lost the income of both of the men who supported it, suffered accordingly; Maryam Youssef Fneich testified that "the biggest impact was financially because those are the only two sources of income they had as a family."[56]

Youssef Fneich returned to the Embassy and continued in that service.[57] His children testified that the family bore a further injury in consequence of that employment, being the hostility of those about them: neighbours "look[ed] down upon them" and "gave [them] a hard time for being employees at the US embassy," so that the family "were judged" and people "would say negative things about her dad and brother for … working at the embassy"; Abbas Fneich, of the next generation, testified that he was told as a child, "your father worked for America," and

[53] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 19.
[54] Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at pp. 6-7.
[55] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 20.
[56] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 8. Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at pp. 7-8. Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at p. 10..
[57] Remote Deposition of Ali Youssef Fneich, taken on 11 December 2023, at p. 20.

"[y]our dad is like a spy."[58] Maryam Youssef Fneich testified that "an incident like this is not never forgettable," that "small things happen in her daily life that takes her back to that moment," and that it is "something that will live with her for the rest of her life."[59] Youssef Fneich died on 29 March 2012.

***Evidence of Maryam Youssef Fneich*:**

Maryam Youssef Fneich[60] is a daughter of the direct victim, Youssef Fneich, and a sister of the direct victim, Mohammed Youssef Fneich. She gave a remote video deposition, through an English-Arabic interpreter, on 4 December 2023.[61] She was born on 1 January 1970, in Beirut, Lebanon.[62] She resides at Nabatiyeh, in Southern Lebanon, is married to Ibrahim Ali Baydoun, and has three children, Haidar, Hadi and Zara.[63] Her parents, Youssef Fneich and Layla Khamis, are both deceased, her father having died approximately eight years and her mother approximately three years before the date of her deposition; her siblings include Essam, Ali, Fatima and Samira Fneich, each of whom is a party plaintiff herein.[64] She testified that both her father and her brother were employed by the United States Government at the United States Embassy, in Beirut, both were at work there when the Embassy was attacked by a suicide bomber, and both were injured in the explosion.[65] Her father, she testified, "was an employee at

[58] Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at pp. 8-9. Remote Deposition of Abbas Fneich, taken on 4 December 2023, at pp. 12, 14.

[59] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 9.

[60] Although her given name is spelt as Maryam Youssef Fneich in the Second Amended Complaint herein, her Declaration is captioned in the name of "Mariam Youssef Fneich" and recites, at ¶ 3, that "[v]ariations of my name include 'Maryam'." Counsel's client breakdown likewise employs "Maryam." For the sake of clarity and consistency, her name is spelt herein as it is spelt in the Second Amended Complaint. In any event, the Special Master observes that both spellings are romanizations of the same name, مريم, which has only one spelling in Arabic script.

[61] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at *passim*.

[62] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 3. Declaration (styled as an Affidavit) of Mariam Youssef Fneich, executed on 14 October 2023, at ¶ 2.

[63] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 4.

[64] *Id.* at pp. 4-5.

[65] Declaration (styled as an Affidavit), of Mariam Youssef Fneich, executed on 14 October 2023, at ¶¶ 4-6.

the U.S. embassy in Beirut," working in maintenance; however, she was unable to say when he began that employment, being then "around ten years old."[66] Her testified that her brother Mohammed was likewise employed there.[67]

Maryam Youssef Fneich was at home upon the day of the bombing, and she heard the explosion itself, the family house being "a five-minute drive from the embassy." She and her mother then waited several hours without word. Her father and brother did not return until that evening, and when they came she recalls them "coming home all dusty and scraped up." She observed her father to have "back injuries, injuries to his eye," and to be "complaining of the pain in his knee."[68] Asked how she felt upon seeing them again, she testified that "[s]he was very relieved," but that "it was a very scary moment seeing them in that state," which she described as "indescribable," the family then "living in a very dangerous time for Lebanon" and "living in terror and fear."[69] Of her mother she testified that she "was very, very worried from hearing the explosion," then upon "identifying that the explosion was at the embassy," and thereafter in "[w]orrying about her husband and brother"; that she was "in tears and a state of panic"; and that, being at home "taking care of all the kids" and "unable to go out," she was left "feeling more so of a hopeless situation."[70]

Both her father and her brother returned to their employment at the Embassy after the bombing, and the witness testified that "she was very afraid for them to continue working there."[71] She described the family as "a very close-knit family," and said that "[t]he explosion

[66] Remote Deposition of Maryam Youssef Fneich, taken on 4 December 2023, at p. 5.
[67] *Id*. at p. 6.
[68] *Id*. at pp. 6-7.
[69] *Id*. at p. 7.
[70] *Id*.
[71] *Id*. at p. 8.

brought them together closer," though thereafter in "a very state of fear, living day by day."[72] She testified that their return to the Embassy drew censure from those about them, "people were very opinionated about them going back to the embassy after the explosion," and that "[i]t had, like, a negative judgment towards it."[73] The greatest consequence, in her account, was pecuniary: "the biggest impact was financially because those are the only two sources of income they had as a family, so [it] took a big toll on the family when they're unable to work."[74] Invited to add anything further, she testified that "an incident like this is not never forgettable," that "[u]ntil this day, small things happen in her daily life that takes her back to that moment," and that it is "something that will live with her for the rest of her life. It's not something that you forget."[75] She returned, in closing, to the way in which others spoke of what had happened at the Embassy "in a negative way," and how that had affected her family.[76] Her Declaration attests that, as a result of the bombing, she "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that she "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[77]

***Evidence of Zainab Youssef Fneich*:**

Zainab Youssef Fneich is a daughter of the direct victim, Youssef Fneich, and a sister of the direct victim, Mohammed Youssef Fneich, and gave a remote video deposition, through an English-Arabic interpreter, on 4 December 2023.[78] She was born on 1 January 1967, in

[72] *Id.*
[73] *Id.* at pp. 8-9.
[74] *Id.* at p. 9.
[75] *Id.*
[76] *Id.* at pp. 9-10.
[77] Declaration (styled as an Affidavit) of Mariam Youssef Fneich, executed on 14 October 2023, at ¶¶ 7-8.
[78] Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at *passim*.

Lebanon.[79] She is married to Abbas Hussein Jaber and has three sons, Muhammad, Ahmad and Ali.[80] Her parents, Youssef Fneich and Laila Khamis, are both deceased, her father having died in 2012 and her mother approximately three years before the date of her deposition.[81] Both her father and her brother were employed by the United States Government at the United States Embassy, in Beirut; both were at work there when the Embassy was attacked by a suicide bomber; and both were injured in the explosion.[82] Her father, she testified, "was a maintenance person for the embassy," and her brother Mohammed "used to work for the embassy as well." She was unable to give the dates of their employment, recalling only that her father's service at the Embassy had stopped "for a while," and that he had then "returned back to work."[83] She confirmed that both men were employed at the Embassy at the time it was attacked.[84]

Zainab Youssef Fneich was at home when the bomb detonated. The family "didn't live far from the embassy," and she testified that "she heard the explosion and felt the shockwaves," learning from neighbours that the attack had been upon the Embassy.[85] Her immediate apprehension was that both men were dead: she "was fearful that her brother and dad had passed away," and she testified that the family "were living in fear for a while," that "they're still living in fear now," and that "thinking of that day just brings a lot of painful memories."[86] Her father, she testified, sustained "injuries to his back, his eye, his leg and his shoulder," and her brother

---

[79] Fneich Family Tree; Remote Deposition of Zainab Fneich, taken on 4 December 2023, at 4-5; & The Lebanese Republic, Ministry of Interior and Municipalities, Directorate General of Civil Status, Family Extract of Civil Registration, delivered on 14 June 2017.

[80] Remote Deposition of Zainab Youssef Fneich, taken on 4 December 2023, at pp. 3-4.
[81] *Id.* at 4.
[82] *Id.* at pp. 5-6.
[83] *Id.* at pp. 4-5.
[84] *Id.* at p. 5.
[85] *Id.* at . 6.
[86] *Id.*

"sustained injuries to his knees"; but she was clear that "the physical injuries … doesn't even compare to the emotional and mental strain that this has caused."[87] Of her father, she testified that he "had … constant nightmares," and that "[h]e was constantly agitated and upset for years after the explosion."[88] Of her mother, she gave this account: upon the day of the explosion "her mom fainted," and "she was walking around on the street barefoot in panic"; thereafter "her mom would cry a lot," and was obliged "to exert additional mental emotional support for her dad and her brother," being herself "in a lot of pain."[89]

Both her father and her brother returned to the Embassy and continued in that employment afterwards.[90] The injury which the witness pressed most insistently, and to which she returned when invited to add anything further, was not physical but social. She testified that the explosion "caused a lot of … stress on her brother and … father," and that this arose "[n]ot just from the physical impact … but also from society." Neighbours, she said, "look down upon them" and "gave [them] a hard time for being employees at the US embassy"; the family "were looked down upon and they were judged," and people "would say negative things about her dad and brother for … working at the embassy." The consequence, in her account, was that beyond "the actual explosion effects they're under a lot of pressure from … the neighbors, from society," which "just added on additional stress and trauma."[91] Asked how she felt about her father and brother continuing at the Embassy in the face of that hostility, she answered that "she understood that they had to provide," that the employment "was … a means to provide for the family," and

87 *Id.*
88 *Id.* at pp. 6-7.
89 *Id.* at p. 7.
90 *Id.* at pp. 7-8.
91 *Id.* at p. 8.

that accordingly "she was glad that they were back working at the U.S. embassy."[92] Invited at the close of her deposition to add anything further, she emphasised once more "the social pressure and the negative spotlight that the explosion put on her family," which "lasted for … a while after the explosion."[93] Her Declaration attests that, as a result of the bombing, she "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that she "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[94]

***Evidence of Ali Youssef Fneich*:**

Ali Youssef Fneich is a son of the direct victim, Youssef Fneich, and a brother of the direct victim, Mohammed Youssef Fneich, and gave a remote video deposition, through an English-Arabic interpreter, on 11 December 2023.[95] He was born on 3 September 1962, in Beirut, Lebanon, and now resides at Sur (also known as Tyre), in Southern Lebanon.[96] He is married to Ikanam Fneich, to whom he has been married some thirty years, and has three children; he is not presently employed.[97] He lived in Germany for eighteen years, where his wife and children still reside, and returned to Lebanon in 2011.[98] His parents were Youssef Fneich and Layla Khamis; his father died in 2013 and his mother in 2019, both at Beirut.[99] He is one of nine children, having three brothers and five sisters, of whom Essam, Fatima, Amna, Zainab, Maryam and Samira Fneich are parties plaintiff herein.[100] Both his father and his brother Mohammed were

---

[92] *Id*. at 9.
[93] *Id*.
[94] Declaration (styled as an Affidavit) of Zainab Youssef Fneich, executed on 14 October 2023, ¶¶ 7-8.
[95] Remote Deposition of Ali Youssef Fneich, taken on 16 December 2023, at *passim.*
[96] *Id.* at p. 5.
[97] Remote Deposition of Ali Youssef Fneich, taken on 16 December 2023, at pp. 5-6.
[98] *Id.* at 6-7.
[99] *Id.* at 10.
[100] *Id*. at 7-9.

employed at the United States Embassy, in Beirut; he was unable to state their positions, but placed their service at "about four or five years," continuing "up to 1985," and he confirmed that both were so employed in 1983 and in 1984.[101] His father, he said, "was very happy and comfortable working at the embassy," as was his brother, and the family "were very happy and comfortable with them working at the U.S. Embassy."[102]

He described the family's early life as "a really great childhood," and said that "life was great until the Civil War in Lebanon, which put a lot of strain and tension on the simple things to do in Lebanon."[103] His relationship with his father he characterised as "a very close relationship," recalling helping his father "getting things done" and "just playing around and running around," which he described as "a pretty normal son-father relationship."[104] Of his elder brother Mohammed he recalled "hanging out with his brother a lot," "going to the villages up in the mountain to visit," "going to the beach with his brother, playing games, driving around a lot," which he summed up as "the prototypical brother activities."[105]

Ali Youssef Fneich recalled "just being home and feeling the explosion and hearing [the explosion]" and learning of the attack by "[w]ord of mouth," "the word was out in the street there was the explosion at the embassy."[106] Knowing that his father and his brother were at the Embassy, the family were, in his words, "living in terror trying to find out their fate"; he himself "was very ill and sick to his stomach, very upset."[107] Seven to eight hours passed between the family's learning that the explosion had been at the Embassy and their learning that the two men

[101] Id. at 10-11.
[102] Id. at 11.
[103] Id. at 11-12.
[104] Id. at 12.
[105] Id. at 12-13.
[106] Id. at 13-14.
[107] Id. at 14.

were alive.[108] Asked how those hours felt, he answered: "Imagine your own family being part of an explosion, it's an indescribable feeling close to a mental breakdown, nervous breakdown." Of his mother he said that she "didn't know what to do, didn't know how to act," and that she fainted.[109]

His father returned home injured. Ali Youssef Fneich testified that his father "had sustained injuries to his eye, his back, his shoulder and to his chest and to his leg," with "scratches all over his leg and body." The injury to the eye was caused by "a ricochet that went into his eye and they had to pull it out," which he confirmed to have been a fragment of metal; metal also entered his back, "but they couldn't pull it out"; the shoulder injury was continuous with the back, and the chest injury, though minor, was likewise "from ricochet and things falling on him."[110] Asked how he felt when his father walked through the door, he said, "It was very upsetting, I couldn't even feel any feelings and lost all senses," and, while he was of course relieved, "it was still very upsetting to see him in that state and know what had happened to him." His father, he said, "was in still shock. He was like unable to talk, he was shaking."[111] His brother Mohammed arrived at the same time and in the same condition of shock, having sustained injuries to his leg which the witness described as "less major injuries than my dad," and "very minor" by comparison; his brother "didn't say anything" when he came in.[112] Of his father's recovery he testified that "he recovered physically, but he always complained of … internal injuries," explaining that his father "wasn't able to sleep and when he was able to sleep, he would have nightmares," that he had "soreness during the day," and "nerve issues that would be on and off," so that "physically

---

[108] *Id.* at p. 15.
[109] *Id.* at p. 16.
[110] *Id.* at pp. 16-17.
[111] *Id.* at pp. 17-18.
[112] *Id.* at pp. 18-19.

he looked like he healed, but on the internal, he was just dealing with … trauma and nerve issues."[113] His father was about a year away from work, and then returned to the United States Embassy.[114] His brother, after the attack, was "depressed and ill," which the witness described as "a little mental illness … the best way to describe it"; he suffered nightmares, and "mainly kept it … to himself on the inside."[115]

The family's apprehension did not end with the men's recovery. Ali Youssef Fneich testified that, upon their return to work, the family were "clearly and obviously … very worried about another explosion happening and them being affected by it," and that his mother "was very worried, she was concerned and when they went back, she was even more concerned."[116]

Ali Youssef Fneich went on to describe the nursing of his father, which fell not upon him alone but upon "everybody else in the family," the siblings taking turns, "from changing his bandages to helping him up, everything that you can imagine," which he described as "around-the-clock care."[117] Asked whether he had nightmares about almost losing his father and his brother, he answered that he did, and that "every time he sees something similar to that it takes him back to that day"; asked whether he struggles with those feelings still, he answered, "Yes, of course, up to this day, we still remember."[118] He agreed that the attack had left lasting damage to his relationship with both men, and that he continues to struggle with the fears and the anxiety it created, describing "nightmares and dreams, waking up with a panic and … depression that they will have to live that experience again."[119] Asked whether his father and his brother suffered

[113] *Id.* at p. 19.
[114] *Id.* at p. 20.
[115] *Id.* at p. 21.
[116] *Id.*
[117] *Id.* at pp. 23-24.
[118] *Id.* at p. 24.
[119] *Id.* at p. 25.

ongoing anxiety and depression until their deaths, he answered that they had, and that "a part of them was lost due to that incident."[120] Invited to add anything further for the Court, he said that the family "tried to live a normal life, but every time they go back to the incident sadness comes over … and clouds the … family minds."[121]

***Evidence of Hussein Youssef Fneich*:**

Hussein Youssef Fneich[122] is a son of the direct victim, Youssef Fneich, and a brother of the direct victim, Mohammed Youssef Fneich, and gave a remote video deposition, through an English-Arabic interpreter, on 4 December 2023.[123] He was born on 1 August 1971, at Bourj Hammoud, in Lebanon, and resides at Beirut.[124] He is married to Mariam and has five children, Layla, Zainab, Ali, Rayan and Jasmine.[125] His parents, Youssef Fneich and Layla Khamis, are both deceased.[126] He is one of nine children.[127] His father was "an employee at … U.S. Embassy," in "kind of maintenance and cleaning," and his brother Mohammed "used to work for the U.S. Embassy as well," in "transportation," helping "the logistics at the embassy, getting

[120] *Id.* at p. 26.
[121] *Id.*
[122] Although his given name is spelt as Hussein Youssef Fneich in the Second Amended Complaint herein, his Declaration (styled as an Affidavit), executed on 16 October 2023, is captioned in the name of "Houssein Youssef Fneich" and recites, at ¶ 3, that "[v]ariations of my name include 'Hussein'." For the sake of clarity, his name is spelt herein as it is spelt in the Second Amended Complaint. In any event, both spellings render the same name in Arabic, حسين, with *Houssein* following French orthography and *Hussein* following English.
[123] Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at *passim.*
[124] Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at p. 3. His Declaration, at ¶ 2, gives his date of birth as 1 August 1981, as does the Declaration made for the Estate of Youssef Fneich, which enumerates the nine children of the direct victim with their dates of birth. The documentary date cannot readily be reconciled with the witness's testimony that he was "around 12 years old around that time," nor with his recollection of hearing the explosion, of awaiting his father's return, and of tending to his mother when she fainted, a witness born in 1981 having been three years of age upon the date of the later attack and two upon the date of the earlier. Id. at pp. 5, 6, 8. The Special Master is unable to resolve the discrepancy upon the materials presently furnished and it is referred to the civil status records of the Republic of Lebanon.
[125] *Id.* at p. 4.
[126] *Id.*
[127] *Id.* at pp. 4-5.

things back and forth from the embassy."[128] He was unable to give the dates of his father's service, being "very young" at the time, but he was clear that his father "was there during and after the … embassy attack," and he placed his own age at that period at "around 12 years old."[129] His father, he testified, "was comfortable and happy working at the embassy, it was a normal job," and he did not recall his father "ever complaining or having any issues with the job at the embassy."[130]

Asked which attack his father had been working there for, the witness answered that "he remembers his dad was there for the first and second explosions."[131] The evidence he then gave of injury relates to the first of those attacks. He acknowledged that he "was very young" and "might not remember full details," but observed that "when you're a kid and you're waiting for your dad to come home and your dad shows up in an indescribable image, it's hard to forget the … state that he … was in." He heard the explosion; he was at home; and he was "very concerned for his dad and his brother."[132] At that time, he explained, Lebanon was "in a state of war," with "stuff happening from fightings to bullets or bombings," and "everybody's super cautious." Word "spreads fast," and he learned from neighbours that the explosion had been at the United States Embassy, whereupon began "the panic of trying to find out the … fate of his dad."[133] His mother was present when the news came, and she fainted; the witness described his own position as a child "torn up between trying to investigate where his dad is and trying to tend after his mom who is passed out."[134] When his father came home he was "very dusty, very injured," and

[128] *Id.* at p. 6.
[129] *Id.* at p. 5.
[130] *Id.* at pp. 5-6.
[131] *Id.* at p. 6.
[132] Remote Deposition of Hussein Youssef Fneich, taken on 4 December 2023, at pp. 6-7.
[133] *Id.* at p. 8.
[134] *Id.* at pp. 8-9.

the witness said he was unable to describe the state his father was in "because it's indescribable." He recalled "a right leg injury and a shoulder injury," that "[f]rom the kneecap down, his dad was hurt significantly," that he had "pain in his shoulder," and that he was "scratched up and banged up all over." Pressed further, and upon reflection, he added that his father "also sustained … eye and back injuries during the first attack." The injury, he was careful to say, was "not only physical … but mental": it was as though his father "had like shockwaves through his body," and "personally he wasn't himself, his spirit wasn't … the same."[135]

Counsel invited the witness to clarify which attack he had been describing, and he answered that he was "talking about the first attack when he was describing his dad," placing it, without precision, at "between 83 or 82, something like that."[136] Both his father and his brother returned to the Embassy afterwards. The witness testified that he "didn't mind, because it was his dad's decision, his brother's decision," that "they got treated," that "their health was … good for them to work," and that "they wanted to work."[137] Asked how his relationship with his father had been affected, he testified that "they got in closer due to this," that the family "appreciated the … time … even more," because "living during war, you just never know … when's your last day going to be," and that "[e]verybody was living in fear." He acknowledged that "his dad's mood has changed after the bombings," but said that this "made him get closer," and "made them try harder to make sure that … he was communicating and that … the relationship doesn't change." The family, he said, "tried to like not make a big deal out of it, not let it affect them and to get closer and closer because of it."[138] Invited at the close of his deposition to add anything further,

---

[135] *Id.* at pp. 7, 10.
[136] *Id.* at pp. 9-10.
[137] *Id.* at p. 10.
[138] *Id.* at pp. 10-11.

he declined, saying that he had nothing else to add "because just remembering that incident and going back just brings him a lot of hurt and pain."[139] His Declaration attests that, as a result of the bombing, he "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that he "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[140]

***Evidence of Essam Youssef Fneich*:**

Essam Youssef Fneich[141] is a son of the direct victim, Youssef Fneich, and a brother of the direct victim, Mohammed Youssef Fneich, and gave a remote video deposition, through an English-Arabic interpreter, on 11 December 2023.[142] He was born on 10 April 1953, in Beirut, Lebanon, and resides at Tyre, in Southern Lebanon.[143] He married Zainab Fneich in 1987 and has three children, Yusif, Sada and Fatme; he is retired.[144] He is the eldest of the four sons of Youssef Fneich, of nine children in all.[145] Of his relationship with the direct victims he testified that the family "had a very close relationship," and that he was "very close to his brother," recalling that when he first began to earn he "would go to buy clothes and outfits" and "would buy the same outfits for his brother as well," the two being "super close in age"; with the money

[139] *Id.* at p. 11.
[140] Declaration (styled as an Affidavit) of Houssein Youssef Fneich, executed on 16 October 2023, ¶¶ 7-8.

[141] Although his given name is spelt as Essam Youssef Fneich in the Second Amended Complaint herein, his Declaration (styled as an Affidavit) is captioned in the name of "Issam Youssef Fneich" and recites, at ¶ 3, that "[v]ariations of my name include 'Essam'." For the sake of clarity, his name is spelt herein as it is spelt in the Second Amended Complaint. The Special Master has confirmed that "Essam" and "Issam" represent the same name in Arabic script: عصام (*ʿIṣām*), a masculine name representing "safeguard" or "bond."

[142] Remote Deposition of Essam Youssef Fneich, taken on 11 December 2023, at *passim*..
[143] *Id.* at p. 5.
[144] *Id.* at pp. 5-6.
[145] *Id.* at pp. 6-7.

he made he would "also help his dad and learn from his dad how to … provide for the family."[146] The closeness endured to the end: "even before his brother passed away, they were super close, because they were neighbors and they would spend time together daily."[147]

He was working overseas until the end of 1982, and upon his return recalled both his father and his brother being employed at the United States Embassy.[148] His father was "a maintenance man," and the witness recalled being taken to the Embassy as a boy, where "everybody would treat him nicely and give him treats and … candy and chocolate," and where his father "would collaborate and interact with everybody in a very nice and happy way."[149] His brother Mohammed, he said, "used to … drive a lot back and forth to get the embassy goods," and "was in charge of a group of people that he would send out places to … run errands and obtain goods for them."[150] The employment was, in his account, "a family affair." His father "recruited not only his brother Mohammed but also his uncles to work for the embassy," and would "recruit the neighbors … to go help the U.S. Embassy and … work there" when labour was needed; the family "were very happy and prideful to be working at the … U.S. Embassy," and had "built a community" there.[151]

Regarding the subject bombing, Essam Youssef Fneich stated that he heard the explosion but "didn't think anything … major or severe, because at that time, it was war and he thought it was like internal clashes." He then learned from the news that the explosion had been at the United States Embassy, and "knew that this was not an ordinary day."[152] The household was a single

[146] *Id*. at p. 8.
[147] *Id.*
[148] *Id*. at p. 9.
[149] *Id.* at pp. 9, 11.
[150] *Id*. at pp. 11-12.
[151] *Id*. at pp. 12-13.
[152] *Id*. at p. 13.

one, and he testified that "we all lived in the same house," so that it "was a daily occurrence to see them both get up before us and … go to work," and "there was no question that they were there."[153] He got into his motor car and drove toward the Embassy "trying to verify the news," exchanging telephone calls with a family at home who were "all panicking and … devastated and … urging him to … locate his father and … brother." The scene was chaotic and he could not get through; he tried "other workarounds and other routes," and when he knew it to be "impossible for him to get to the embassy, he returned home."[154] Of the moment he stopped, he testified that "once he got home, reality hit," that "once he sat and calmed down … his brain emotion got split in half," and that he was "all over the place with the emotions and … the helplessness feeling." Asked whether he had been scared, he answered in a single word: "Petrified."[155] He was upon the road some five to six hours, and when at length he returned home he found that his father and his brother had just arrived.[156]

He described what he found. "[T]he fear and terror was on their faces, they're … still in shock, unable to speak. They were … dusty and their clothes were all scratched up." He "approaches them, hugs them and kisses them," and of his brother in particular, whom he saw every day and from whom he was never parted, he was "just so happy to … hug him and kiss him, to see him again."[157] His father, he testified, "had a ricochet in his eye and his back," had "got banged into a … wall," so that "his body was … banged up and sore and shaken up," and "complained of chest pain and just overall soreness."[158] He gave also the reason the two men

---

153 *Id.* at p. 14.
154 *Id.* at pp. 14-15.
155 *Id.* at pp. 15-16.
156 *Id.* at p. 16.
157 *Id.* at p. 17.
158 *Id.*

survived, as his father had told it to him: his father "was at … recess … in the break room eating," his brother having said, "hey, let's … go get lunch," and "forcing him to," for which his father "was grateful … because the area that they were in, the main area, was like demolished."[159] It was his brother rather than his father who spoke of the bombing afterwards, his father having "never really discussed it"; his brother "would … tell him exactly what happened," and "always tells him that ever since he had knee pain … from that incident, … constant knee pain throughout his life."[160]

Asked whether either man had suffered psychological or emotional injury, the witness answered, "Yes, of course, greatly."[161] Of his father he testified that he became "a lot more introverted," that "[h]e would sit sad, he would be edgier and moodier," and that after he left the Embassy "it … took a downward turn because he wasn't working," so that "the frustration and the sadness had just accumulated into a depression." His father afterwards sold vegetables, and, with the civil war then raging, his motor car came to be "in the middle of … a conflict," after which "he was in a very traumatic state," "he stopped working," and "his situation has gotten worse and worse." That, the witness said, "was … the bone that broke the camel's back."[162] Of his brother he testified that he "was a lot edgier, he would get angry easily," and that he "would be sleeping fine, then all the sudden he would have nightmares and wake up in a panic," suffering also "mood swings."[163]

In his Declaration, executed prior to his remote deposition, addressing the impact upon him of the 20 September 1984 bombing, Essam Youssef Fneich stated, *inter alia*, that "[a]s a result of

---

[159] *Id*. at 17-18.
[160] *Id*. at 18.
[161] *Id*. at 18-19.
[162] *Id*. at 19-20.
[163] *Id*. at 20-21.

the bombing, I experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress [and that] I suffered and continue to suffer because of the pain inflicted by those injuries."[164]

***Evidence of Samira Youssef Fneich*:**

Samira Youssef Fneich is a daughter of the direct victim, Youssef Fneich, and a sister of the direct victim, Mohammed Youssef Fneich, and gave a remote video deposition on 7 June 2024.[165] She was born on 10 May 1973, and is the youngest of the nine children of Youssef Fneich.[166] She resides at Edmonton, in the Province of Alberta, Canada, where she is employed by Alberta Health Services in an administrative capacity, and she is now a citizen of Canada; in 1983 and 1984 she was a citizen of Lebanon and resided at Beirut.[167] She is married and has three children, Hussein, Youssef and Mariam Ataoui, born in 1994, 1996 and 2002 respectively.[168] Her parents, Youssef Fneich and Layla Khamis, are both deceased, her father having died in March and her mother in September 2021.[169] Her brother Mohammed, she testified, was "in his twenties" at the time of the bombing, and "was working with my dad" at the United States Embassy; he died in 2023, aged about sixty-one.[170]

She was nine years of age upon the day of the bombing, and her evidence of it is the evidence of a child who watched what it did to her mother. She testified: "I remember we were, like we were shocked, especially my mom. My mother was cleaning that day when somebody told her,

---

[164] Declaration (styled as an Affidavit) of Issam Yousssef Fneich, at ¶7.
[165] Remote Deposition of Samira Youssef Fneich, taken on 7 June 2024, at *passim*. The witness gave her evidence in the English language. An English-Arabic interpreter was sworn and remained present, but the witness declined his assistance, and the interpreter confirmed upon the record that "[s]he understood everything." *Id.* at pp. 9-10.
[166] Remote Deposition of Samira Youssef Fneich, taken on 7 June 2024, at pp. 10, 21...
[167] *Id.* at pp. 10-11.
[168] *Id.* at 11.
[169] *Id.* at 11-12.
[170] *Id.* at 13-14.

like because my dad and my brother were there, right. And when the news came she thought they passed away and she left the home. I remember she left the home without her shoes. She was running down the stairs and she wanted to go like walking to the place, to the embassy. And my brothers and sisters, like we were all screaming and crying because of what we saw my mom doing. So, yeah, it was terrible."[171] The neighbours went out toward the Embassy but were kept back, the site being unsafe; word came after a time that the two men were alive but injured, and it was not until late that night that they came home.[172] She was not permitted to go to the scene: "Not me. They would not allow me. I was like about nine, ten years. I was so young."[173] When her father and brother did return, "they were injured, my brother and my father. My father in two places and my brother in his knee." The house was crowded for a week afterwards, "people come and see them."[174]

Of her father's injuries she recalled "his shoulder," and that "he suffered a lot from it. He was in pain."[175] It was upon his state of mind that she was most particular, and her account is worth setting out at length: "Oh, my God. I remember this very well because my father, he doesn't express his feelings or anything, but at that time he was very sad and he doesn't want to speak, like he doesn't want to say anything. He was like, it's like a trauma, like he was traumatized. Like he was in shock because he heard, he was in the same place, he was in the same room until somebody called him out. Like imagine like maybe he would die if he stayed in the same room. They were traumatized. Like they were in shock for maybe more than a week."[176] Of her brother

[171] *Id*. at 14-15.
[172] *Id*. at 15.
[173] *Id*. at p. 22.
[174] *Id*. at pp. 15-16.
[175] *Id*. at p. 17.
[176] *Id*.

she testified that the injury was to "his leg, his knee, and he suffered from there his whole life, even before he passed," adding that when she visited him "he doesn't walk … it's visible. You can tell his walk is not normal," though he used no cane or other device.[177] Asked how her brother seemed emotionally, she answered, "Same. Same. Like even us seeing them this way, we were hurt a lot, and even the people around us. We get suffered so much on top of the war, on top of everything happening."[178] She understood her father's work at the Embassy to have been "janitorial," continuing "until late '80s," and she was unable to say whether either man was at the Embassy at the time of the second bombing or after its removal to another location.[179] Of the lasting change in her father she said: "after what happened, my dad wasn't the same person anymore … He wasn't the same person. He was so sad."[180]

Asked whether her father's experience had affected her relationship with him, she answered that it had not, but that "when I see him sad, I get sad too, right. And the whole house wasn't the same anymore … We get suffered on that." Of her brother she said the relationship "stayed the same," explaining that "we are very connected family and when we see one of us bad or anything we get sad too. So it's in the house, you know. It's in the house and if you see something you get affected."[181] Her mother, she testified, was "very emotional," such that "even if we go out and like be late, she will get distressed until maybe the last day of her life," having nearly lost "her husband and her son at the same time," and being thereafter "very sad and crying all the time."[182] She attributed her mother's physical decline to the same cause: "because of what happened she

---

[177] *Id.* at p. 18.
[178] *Id.*
[179] *Id.* at pp. 19-20.
[180] *Id.* at p. 20.
[181] *Id.* at p. 21.
[182] *Id.* at pp. 22-23.

suffered, she got diabetes, she got blood pressure, she got so many things," being always "worried if one of us is not at home," and "after what happened then she was more protective and worried and that's why her health … wasn't good." Asked whether it had brought on a great deal of anxiety for her mother, she answered, "Oh, yeah. For all of us."[183]

Of her own injury she testified: "because of what happened and everything else in Lebanon, I'm very, like I'm scary, like I'm a chicken. I scared from everything. I'm like resembling my mom now. I'm worried about my kids. If I go to Lebanon, if I hear something like any sound, I get scared."[184] She has sought medical attention in Canada for that anxiety.[185] She thinks of the bombing "[a]lways," and "especially when I speak with my siblings and especially now we lost my mom and dad," for "whenever we open that subject we remember, we go back"; she added, with candour, that her brothers and sisters "know more" than she does, they having "lived with it more," she being the youngest and her family having "kept protecting me from all these stories."[186] Asked what she hoped would come of this litigation, she answered: "[E]ven if we get something, we win the case or anything, it's not going to satisfy us for a hundred percent. The pain, the scars is not going to go away. We lost what we lost. So even if we win the case, we are getting maybe something, but those years we suffered, seeing my parents and my siblings suffering, it's not going to go away."[187] Invited to add anything further, she said, "I wish this never happened. I wish I didn't witness this."[188]

---

183 *Id.* at pp. 23.
184 *Id.* at p. 24.
185 *Id.*
186 *Id.* at pp. 24-25.
187 *Id.* at p. 25.
188 *Id.* at pp. 25-26.

***Evidence of Amna Youssef Fneich*:**

Amna Youssef Fneich[189] is a daughter of the direct victim, Youssef Fneich, and a sister of the direct victim, Mohammed Youssef Fneich, and gave a remote video deposition, through an English-Arabic interpreter, on 4 December 2023. She was born on 1 July 1965, in Beirut, Lebanon, where she still resides.[190] She is married to Bilal Hassan and has one son.[191] Her parents, Youssef Fneich and Laila Khamis, are both deceased, her father having died about eleven years and her mother about three years before the date of her deposition; she is one of nine children.[192] Her father "was employed at the US embassy" in Beirut as "a maintenance man," and her brother Mohammed was employed there as "a driver." She could not give the dates, saying that her father had worked at the Embassy "for a long time before the explosion," and that her brother "started working before the explosion once he got older."[193] Both men, she testified, were "very happy," "were treated very well by their coworkers," and "enjoyed working at the US embassy"; the family were "happy … with the positions that they had."[194]

She was at home upon the day of the bombing. She learned of the explosion, and then that it had been at the Embassy, and described the day as "such a chaotic … day." What followed is the particular of her evidence which distinguishes it from that of her brothers and sisters: the family were told that her father was dead. In the interpreter's rendering, "she talks about how they got

[189] Although her given name is spelt as Amna Youssef Fneich in the Second Amended Complaint herein, her Declaration (styled as an Affidavit) is captioned in the name of "Amne Youssef Fneich." For the sake of clarity, her name is spelt herein as it is spelt in the Second Amended Complaint. In any event, the underlying Arabic is آمنة , with the latter spelling reflecting the Levantine dialect.

[190] Remote Deposition of Amna Youssef Fneich, taken on 4 December 2023, at p. 3.
[191] Remote Deposition of Amna Youssef Fneich, taken on 4 December 2023, at p. 3.
[192] *Id.* at pp. 3-5.
[193] *Id.* at pp. 5-6.
[194] *Id.* at p. 6.

news that her dad had passed away. And it was a very upsetting, very upsetting news."[195] She described the fear "that took over her when people were describing about the details of the explosion, how the building was collapsed," and asked herself "how is somebody supposed to survive something like this?" When her father came home later that day she was "obviously very ecstatic that he was still alive."[196] Her mother received the same report. The witness testified that "[h]er mom was affected the most because … they gave her the news that … the likelihood of her husband being … deceased is very high," that she "remembers her mom fainting," and that her mother was thereafter "depressed and very, very upset," having "had to deal with it the most."[197]

Of her father's injuries she testified that he "sustained an injury from a ricochet or … the parts of the building hitting her dad in the back," that "the main injury was to his back," and that "the rest were to his … shoulder and leg."[198] Of her brother she said that he "didn't really have any serious injuries for her to remember," that she thought "he might have been at a different location in a building that wasn't affected," that "he had, like, dust on him and stuff, but … no … major injuries," and that "the main focus was on her dad and … her dad's injuries."[199] Her father did speak to her of what he had seen. She testified that he "was very, very affected by the explosion because he had friends who were severely injured or hurt," that "[h]e was in the main … area where it got hit," that "he described to her … the noise and … the situation," and that he

[195] *Id*. at pp. 6-7.
[196] *Id*. at p. 7.
[197] *Id*. at 9.
[198] *Id*.
[199] *Id*. at 8.

"was very upset and traumatized because a lot of … his coworkers had been affected or passed away."[200]

Both her father and her brother continued in the Embassy's service afterwards. The family's condition thereafter she described thus: "We were very scared and very fearful. We would worry every day if they're going to come back home or, you know, back of our minds … worried if there's going to be a second explosion."[201] Asked whether there was ever another attack upon the Embassy while the two men were working there, she drew the distinction which the file has now heard from several witnesses: "in Beirut, the embassy in Beirut, no, there wasn't a second explosion. But she recalls that the … new embassy location there was a second explosion, and she recalls her brother being at that new embassy location." She did not recall his having been injured in it.[202] Asked how her relationship with the two men had been affected, she spoke of "living in a very tense environment, having to worry about them after the explosion." Before the bombing, she said, "even though there was war … they were happy," and "being treated well at the embassy," so that although "[i]t wasn't an ideal situation … they were happy." Afterwards there was "not only the fear of something else happening and them being targeted, but also … a lot of negative conversations from the neighbors and in society about them going back to work and working for the embassy," which "brought a lot of stress and tension to their lives."[203] Invited to add anything further, she reiterated "that … the explosion just caused a lot of tension, stress and fear for … their lives."[204] Her Declaration attests that, as a result of the bombing, she "experienced extraordinary grief, mental anguish, and intentional infliction of emotional

---

[200] *Id.*
[201] *Id.* at 9-10.
[202] *Id.* at p. 10.
[203] *Id.* at pp. 10-11.
[204] *Id.* at p. 11.

distress," that she "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[205]

***Evidence of Fatima Youssef Fneich*:**

Fatima Youssef Fneich[206] is a daughter of the direct victim, Youssef Fneich, and a sister of the direct victim, Mohammed Youssef Fneich, and gave a remote video deposition, through an English-Arabic interpreter, on 7 June 2024.[207] She was born on 12 April 1961, and is the eldest of the five daughters of Youssef Fneich.[208] She now resides in Germany, holds Lebanese citizenship only, and is a housewife; in 1983 she was a citizen of Lebanon and resided at Beirut.[209] She married Ali Karam Khamis in 1992; the couple have no children.[210] Her parents, Youssef Fneich and Layla Khamis, are both deceased, her father having died in 2012 and her mother in 2019.[211] Her brother Mohammed died in 2023.[212] Her father had no formal schooling, "his learnings were through the Quran and just general," for "[b]ack in the day they didn't really have schools"; her brother left school at twelve or thirteen.[213]

---

205 Declaration (styled as an Affidavit) of Amne Youssef Fneich, executed on 1 November 2023, ¶¶ 6-7.
206 Although her given name is spelt as Fatima Youssef Fneich in the Second Amended Complaint herein, at ¶ 30, her Declaration (styled as an Affidavit) is captioned with the name of "Fatme Youssef Fneich" and recites, at ¶ 3, that "[v]ariations of my name include 'Fatima'." For the sake of clarity, her name is spelt herein as it is spelt in the body of the Second Amended Complaint, although, in any event, it bears mention that both spellings reflect same name in Arabic, فاطمة (*Fāṭima)*, with the "Fatme" spelling reflecting Lebanese speech.

207 Remote Deposition of Fatima Youssef Fneich, taken on 7 June 2024, at *passim*.
208 *Id.* at p. 9. Declaration, styled as an Affidavit, of Fatme Youssef Fneich, executed on 1 November 2023,at ¶ 2.
209 Remote Deposition of Fatima Youssef Fneich, taken on 7 June 2024, at pp. 9-10.
210 *Id.* at p. 10.
211 *Id.* at p. 11.
212 *Id.* at p. 12.
213 *Id.* at p. 13.

Of the day of the bombing, she said that "of course she remembers that day. It was a very ugly day." She was at home. She recalled "the family finding out the news and panicking and being worried about her dad and her brother because they were at the embassy," and that her mother "left the house to look for any news or anything," being "in such a rush that she left barefoot." It was, she said, "a very bad day and a very sad day for the family because the whole day they were sitting and they were fearful and they were very sad that they might lose her brother and father."[214] She could not say how long the waiting lasted, explaining that "in Lebanon when rumors fly … [i]t was very chaotic," and that "people … tend to lose time," her mother being the one who went out repeatedly "to try to find any news on her father and brother."[215] She saw the two men later that same day: "I remember seeing them that day and their state. They were all dusty and injured."[216]

Her father, she testified, "sustained injuries to his eye, shoulder, and knee."[217] Of his state when he came home she gave the following account, which is the fullest description in the file of what the injury did to the man: "He looked like he was devastated. It looked like he have lost everything, his job, his way of providing. He's been shaken up. It looked like he lost himself completely. And it really took a toll on us just watching him be like that because he was the rock of the family and it was really tough for the kids to see him in that state and that upset."[218] Her brother "had an injury to his knee and it affected him severely," and "developed chronic pain due to his knee injury."[219] Emotionally her brother was, she said, in the same case as her father, and

---

[214] *Id.* at pp. 13-14.
[215] *Id.* at pp. 14-15.
[216] *Id.* at p. 15.
[217] *Id.* at pp. 15-16.
[218] *Id.* at p. 16.
[219] *Id.* at pp. 16-17.

she described the injury to both men in a single figure: it was as though "somebody has something that's precious and he's very hopeful in that thing and all of a sudden it just disappears in thin air. So both of them were very, very upset."[220]

Of her mother she testified that she "was affected the most," first through "the fear of losing her husband and her son, the two providers of the family," and her worry "how the rest of the family is going to survive," and afterwards because "she was the main caretaker for her dad and her brother and she firsthand saw their injuries and saw the pain and how bothered they were from their injuries."[221] Of herself she said, "just like any kid that his parents are affected or upset, the kids tend to get affected by it. So just seeing my dad injured and my mom upset, it carried on to me and it upset me as well."[222] Neither her mother nor any of the children sought the help of a medical professional.[223]

Asked how the experience had affected her father over time, she answered that "he was changed forever," that "from that on … he wouldn't joke," that "[h]e was never really in a great mood," and that it "changed him and changed the course of his life completely."[224] Of her brother she said that he too "changed," and "developed an anxiety and constant fear because of this."[225] Asked whether the attack had affected her relationship with her brother, she testified that "because of the explosion they've gotten closer and closer," but explained that what changed was the manner of their dealing with him: "before her brother was independent and strong but after it they had to … tend to him, tell him to be patient, tell him to … persevere, and tell him … it's

---

220 *Id.* at p. 17.
221 *Id.* at p. 18.
222 *Id.* at pp. 18-19.
223 *Id.* at p. 19.
224 *Id.* at pp. 19-20.
225 *Id.* at p. 20.

okay, this will pass. So they had to care for him and tend to him and be a lot gentler with him after the explosion." It was "similar with my dad," for "[w]e put an effort to sit with him a lot more and to conversate him a lot more so we can distract him from what he had experienced and kind of lighten the mood for him."[226] She thinks of the bombing often.[227] Her Declaration attests that, as a result of the bombing, she "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that she "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[228]

**Analysis & Conclusion:**

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In this jurisdiction, individuals who were substantially injured in a terrorist attack, but who did not succumb to their injuries, are typically awarded a "baseline" of $5 million in compensatory damages. *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 154 (D.D.C. 2011) (citing the *Peterson* framework from *Peterson v. Islamic Republic of Iran* ("Peterson II"), 515 F. Supp. 2d 25, 54 (D.D.C. 2007)). Courts will "depart upward from this baseline to $7-12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," and will "depart downward to $2-$3 million where victims suffered only minor injuries." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010).

---

[226] *Id.* at pp. 20-21.
[227] *Id.* at p. 21.
[228] Declaration (styled as an Affidavit) of Fatme Youssef Fneich, executed on 1 November 2023, at ¶¶ 7-8.

For the family members of a victim who survived the attack, this Court applies the *Heiser/Peterson* framework at half the value of the awards made to the family members of a decedent, *viz*., $4 million to a spouse, $2.5 million to a parent, $2.5 million to a child, and $1.25 million to a sibling.[229] Valore, 700 F. Supp. 2d at 85; Peterson II, 515 F. Supp. 2d at 51-52; Estate of Bland, 831 F. Supp. 2d at 157.

In addition to the case law cited above, the Special Master notes that the *Heiser* Matrix, promulgated in *Peterson II, supra*, at 51-52, has now stood without adjustment for nearly two decades, over which period inflation has materially eroded the real value of every figure within it. In a companion action before this same Court, arising out of these very same two bombings, the Plaintiffs herein have filed "Proposed Findings of Fact and Conclusions of Law on Adjustments of Non-Economic Damages Matrix," in the related case of *Abdallah El Deek v. Islamic Republic of Iran*, No. 1:23-cv-02241 (CRC) (D.D.C.) [Doc. 39, filed 31 March 2026], in which they urge the Court to update that Matrix as the guidance for determining the appropriate award of non-economic compensatory damages in terrorism litigation, citing that inflation, the trends in awards in the 9/11 civil litigation before the Southern District of New York, which are considerably higher than the awards in this jurisdiction, and the perceived need for a uniform standard in applying the federal cause of action represented by 28 U.S.C. § 1605A. The Special Master is of the view that the arguments they advanced are valid and worthy of consideration, and that they apply with equal force to the claimants in the instant action, who were injured in

---

[229] The half-value figures are not applied uniformly across the reported decisions. *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 157 (D.D.C. 2011), applied $1.5 million, rather than $2.5 million, to a child of a surviving victim. The Special Master follows the $2.5 million figure derived from the *Heise*r Matrix as promulgated in Peterson II, 515 F. Supp. 2d at 51-52, and notes the variance so that the Court may resolve it should it wish to do so.

the very same attacks, by the very same acts of the very same defendants; and he has accordingly taken the proposed upward adjustments into account in making his recommendations herein.

Upon due consideration of the evidence presented in support of the claims of Youssef Fneich and Mohammed Youssef Fneich and of the members of that family, I recommend that the following awards of compensatory damages be made, *viz.*:

| **Plaintiff Name** | **Direct Victim** | **Relationship to Direct Victim** | **Recommended Award** |
|---|---|---|---|
| Mohammed Youssef Fneich[230] | Mohammed Youssef Fneich | Direct victim | $10,000,000 |
| Estate of Youssef Fneich[231] | Youssef Fneich | Direct victim | $10,000,000 |
| Maryam Youssef Fneich[232] | Youssef Fneich and Mohammed Youssef Fneich | Daughter | $5,000,000 |
| Zainab Youssef Fneich | Youssef Fneich and Mohammed Youssef Fneich | Daughter | $5,000,000 |
| Ali Youssef Fneich | Youssef Fneich and Mohammed Youssef Fneich | Son | $5,000,000 |
| Hussein Youssef Fneich | Youssef Fneich and Mohammed Youssef Fneich | Son | $5,000,000 |
| Essam Youssef Fneich | Youssef Fneich and Mohammed Youssef Fneich | Son | $5,000,000 |

[230] Although Mohammed Youssef Fneich is himself a direct victim of the 18 April 1983 bombing and is also a son of the direct victim Youssef Fneich, and, therefore, in principle, a solatium claimant, his recommended award is made upon the higher of the two, being that of direct victim, and is not aggregated with a solatium award as a son.
[231] The same consideration referenced in Footnote #238, *supra*, is also followed in respect of the recommended award to the Estate of Youssef Fneich, and for corresponding reasons.
[232] Each of the eight family claimants of this family is at once a child of the direct victim Youssef Fneich and a sibling of the direct victim Mohammed Youssef Fneich. Where a claimant stands in a compensable relationship to more than one direct victim of a single attack, the awards are not aggregated; the claimant recovers upon the higher of the two relationships. *See, e.g.: Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40 (D.D.C. 2012). The higher relationship in each instance is that of child, and the recommended award is made upon that footing.

| Plaintiff Name | Direct Victim | Relationship to Direct Victim | Recommended Award |
|---|---|---|---|
| Samira Youssef Fneich | Youssef Fneich and Mohammed Youssef Fneich | Daughter | $5,000,000 |
| Amna Youssef Fneich | Youssef Fneich and Mohammed Youssef Fneich | Daughter | $5,000,000 |
| Fatima Youssef Fneich | Youssef Fneich and Mohammed Youssef Fneich | Daughter | $5,000,000 |
| **Total** | | | **$60,000,000** |

***Claims From the Family of Mahmoud Yakzan***[233]

*Findings of Fact*:

1. Direct victim Mahmoud Yakzan was born in 1950, in Lebanon, and currently resides in Lebanon.

2. Direct victim Mahmoud Yakzan is a citizen of Lebanon.

3. On 20 September 1984, Mahmoud Yakzan was a security guard, employed by the United States Government, at the United States Embassy Annex, in East Beirut, Lebanon.

4. On 20 September 1984, the United States Embassy Annex, in East Beirut, Lebanon, was attacked by a suicide bomber who drove a station wagon vehicle loaded with some 1,500 kilograms of high explosives into the Embassy compound. Upon entering the Embassy compound, the explosives detonated, collapsing the embassy building, killing more than 20 people and injuring more than 50 others.

[233] Mahmoud Yakzan is a direct victim Plaintiff in the related case of *Mohammed Abdallah, et alii, v. Islamic Republic of Iran, et alii, supra,* where the Special Master also serves as a Special Master, and the claims of Mahmoud Yakzan are addressed in the *Report of the Special Master* filed in said related case in the Report and Recommendation of the Special Master in said related case on 5 May 2025 [Doc 40, at Pages 99 - 104 of 128].

5. At the moment of the said bombing, Mahmoud Yakzan was working at the Embassy Annex compound, as a security guard, and was walking to a guard post, on the embassy compound, near the site of the blast.

6. As a direct, proximate and actual result of the bombing, Mahmoud Yakzan suffered physical injury and emotional trauma incident to the subject attack, that is both severe and permanent.

7. As of 20 September 1984, direct victim Mahmoud Yakzan, had the following immediate family members in the instant litigation who are all citizens and residents of the Republic of Lebanon, excepting brother Ibrahim Yakzan, who resides in Sweden,[234], and brother Imad Yakzan, who resides in Germany[235], and are all parties plaintiff to the instant litigation, and who all sustained significant and lasting emotional and psychological injury as a direct, proximate result of the harm sustained by Mahmoud Yakzan in the subject 20 September 1984 terrorist bombing attack, *viz.*: his wife, Rima Abou Shar, who was born on 3 February 1965, in Beirut, Lebanon, and married the direct victim, Mahmoud Yakzan, in 1980[236]; his brother Ibrahim Yakzan, who was born on 21 November 1951, in Beirut, Lebanon[237]; his brother Nouhad Yakzan, who was born on 17 July 1954, in Beirut, Lebanon[238]; Hassana Yakzan, his daughter, who was born on 27 June 1982, in Beirut, Lebanon[239]; Khodor Yakzan, his son, who was born on 1 July 1984, in Beirut, Lebanon[240]; Hussam Yakzan, his son, who was born on 12 March

---

234 Remote Deposition of Ibrahim Yakzan, taken on 5 December 2023, at pp. 3-4. Ibrahim Yakzan also has Swedish citizenship. *Id.*

**235** Remote Deposition of Imad Yakzan, taken on 5 December 2023, at p. 4-5. Imad Yakzan also has German citizenship. *Id.*

236 Declaration, styled as an Affidavit, of Rima Abou Shar, executed on 4 November 2023, ¶ 2; & Remote Deposition of Rima Abu Shar, taken on 15 December 2023, at pp. 8-9.

237 Remote Deposition of Ibrahim Yakzan, taken on 5 December 2023, at pp. 3-4.

238 Remote Deposition of Nouhad Yakzan, taken on 9 August 2023, at p. 7.

239 Remote Deposition of Hassana Yakzan, taken on 5 December 2023, at p. 3.

240 Remote Deposition of Khodor Yakzan, taken on 9 August 2023, at p. 3.

1981, in Beirut, Lebanon[241]; & Imad Yakzan, his brother, who was born on 30 October 1955, in Beirut, Lebanon[242].

***Evidence of Rima Abou Shar*:**

Rima Abou Shar is the wife of the direct victim, Mahmoud Yakzan, and gave a remote video deposition, through an English–Arabic interpreter, on 15 December 2023.[243] She was born on 3 February 1965, in Lebanon, and has been at all times throughout her life a citizen of Lebanon.[244] She has never been employed.[245] She married Mahmoud Yakzan in 1980, and the couple have three children, *viz*., Hussam, born in 1981, Hassana, born in 1982, and Khodor, born on 1 July 1984.[246] She described the marriage as one that had been arranged rather than begun in romance, but characterised it as "a great partnership," observing of her husband that "[h]e's very close to the heart. It's easy to like him right away," and that he was a good husband and a good father.[247] Mahmoud Yakzan took up employment in security at the United States Embassy, in Beirut, on 2 July 1984, some eleven weeks before the subject bombing, and remained so employed until 5 May 1990.[248] She testified that she was "very happy" and "very impressed" that he was working there and, asked whether she had been worried, answered, "No, not at all."[249] The couple then had three small children, and he was the sole support of the household of five.[250]

---

[241] Remote Deposition of Hussam Yakzan, taken on 5 December 2023, at p. 4.
[242] Remote Deposition of Imad Yakzan, taken on 5 December 2023, at p. 4
[243] Remote Deposition of Rima Abu Shaar, taken on 15 December 2023, at *passim*.
[244] Declaration( styled as an Affidavit, of Rima Abou Shar) executed on 4 November 2023, ¶ 2; & Remote Deposition of Rima Abu Shaar, taken on 15 December 2023, at pp. 8-9.
[245] Remote Deposition of Rima Abu Shaar, taken on 15 December 2023, at p. 9.
[246] *Id*. at pp. 9-10.
[247] *Id*. at pp. 12, 14.
[248] Declaration, styled as an Affidavit, of Rima Abou Shaar, executed on 4 November 2023, ¶ 4; & Remote Deposition of Rima Abu Shaar, taken on 15 December 2023, at p. 14.
[249] Remote Deposition of Rima Abu Shaar, taken on 15 December 2023, at p. 15.
[250] *Id.*

Asked whether she remembered 20 September 1984, she responded that "she's been trying to forget that date ever since it happened."[251] On that date her husband went to work at the Embassy Annex and she remained at home with the children.[252] She first learned of the attack from people talking in the street, and testified that "[w]hen she heard the news that it was on the American Embassy, an indescribable fear hit her," that she was "wondering if her husband is alive," and that what came into her mind, knowing nothing of what had in fact occurred, was "that a suicide bomb car had just ran into the building."[253] Her family withheld the news from her for much of that day because she had a two-month-old infant and was breastfeeding, and "they were worried about her … state."[254] She nonetheless "knew during the day that something is off," having observed unusual activity at her parents-in-law's home, which adjoined her own, and learned that her husband was alive only that evening.[255]

She was not permitted to see her husband for two further days, going to the hospital on the third morning, the remainder of the family having gone at once.[256] Of that interval she testified that "the feeling is indescribable. Even if she tried, she's incapable of … explaining, and we're incapable of understanding," describing "the panic, the anxiety, the severity of the fear," and relating that she had been "begging them to go see her husband."[257] Her family had been "trying to downplay his injuries," telling her that they were minor; when she saw him, "she was shocked," repeating the word "wow."[258] The most severe of his injuries was to his throat, being

[251] *Id.* at p. 16.
[252] *Id.* at p. 18.
[253] *Id.* at pp. 18-19.
[254] *Id.* at pp. 19.
[255] *Id.* at pp. 19-20.
[256] *Id.* at p. 20.
[257] *Id.* at p. 21.
[258] *Id.* at pp. 21-22.

"a severe cut across his neck." His face was bandaged and "swollen up from cuts," and his arms were "all cut up."[259] He was unable to speak with her, and remained in hospital approximately two weeks.[260]

Asked whether the bombing had changed her husband, she testified that "the bombing collapsed his spirit, destroyed his spirit," describing nightmares, that he was "very jumpy," that he "would panic," and that "[w]hen he would hear anything outside, he would freak out," and adding that "he has ear pain and trouble hearing, and he still … goes to the doctor and gets treatment on his hearing."[261] He bears a scar upon his neck, though none upon his face.[262] He never really discussed the bombing with her, "because he himself doesn't really know what happened," relating that "it happened so fast, that the shock makes you forget things."[263] The incident "took a strain on the family and especially the kids": her husband "wasn't able to play with them," became fearful for them and markedly stricter, refusing to let them go out to play or attend gatherings, the witness characterising his disposition as "a no, no, no, no. So everything was no," such that, against the Lebanese civil war then in progress, the children's childhood "took a toll until they got older."[264] Of her own marriage she testified that "the dynamic of the relationship changed": she became "a lot more loving, and a lot more attentive," tending to him "around the clock," observing that she had had three children and "now she had four," and that she "did whatever it took … to heal him back to strength," adding, tellingly, that "when he was healed and back to normal, she got sick."[265]

---

[259] *Id.* at p. 22.
[260] *Id.* at pp. 22-23.
[261] *Id.* at 23-24.
[262] *Id.* at 24.
[263] *Id.* at 24-25.
[264] *Id.* at 25-26.
[265] *Id.* at 26-27.

Her husband could not return to work for approximately two months, during which the family was supported by her sister, since deceased, and by her father-in-law and other family members; when he did return, it was again to the Embassy, and she described her feelings thus: "Indescribable fear. I would stand at the balcony, waiting for him to come back every single day."[266] Asked how the attack had affected her in the long run, she testified as follows, *viz.*: "I lived the rest of my life in anxiety and fear. He transferred that fear and what he went through onto me. And as you know, in Lebanon, it's been constant, non-stop war. So every time I would hear anything, I would take my kids, and run inside the shelter. It built that indescribable fear, and I … was scared for … every minor thing."[267] Invited to add anything further, she said only that "she's trying to forget this day altogether" and that "it's a memory that she wishes that nobody remembers."[268] Her Declaration attests that, as a result of the bombing, she "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that she "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[269]

***Evidence of Ibrahim Yakzan*:**

Ibrahim Yakzan is a brother of the direct victim, Mahmoud Yakzan, and gave a remote video deposition, through an English-Arabic interpreter, on 5 December 2023.[270] He was born on 21 November 1951, in the Mazraa district of Beirut, Lebanon.[271] He moved to Sweden in 1976, has resided at Stockholm since, and holds both Swedish and Lebanese citizenship.[272] He is married

[266] *Id.* at 27.
[267] *Id.* at p. 28.
[268] *Id.* at pp. 28-29.
[269] Declaration, styled as an Affidavit, of Rima Abou Shaar, executed on 4 November 2023, ¶¶ 6-7.
[270] Remote Deposition of Ibrahim Yakzan, taken on 5 December 2023, at *passim.*
[271] Remote Deposition of Ibrahim Yakzan, taken on 5 December 2023, at pp. 3-4.
[272] *Id.* at p. 4.

to Houda and has four children.[273] His parents, Mahassan and Khodor Yakzan, died in 1986 and 1989 respectively, and he is one of six siblings.[274] His brother, Mahmoud Yakzan, was employed in security at the United States Embassy, in Beirut, from 2 July 1984 until 5 May 1990, though the witness recalled only that his brother had begun there at some point and could not fix the dates, observing that "there's a lot of war and things like that in Lebanon" at the time and that "just driving through the embassy was … very dangerous."[275] Mahmoud Yakzan is one year his senior, and the witness testified that "not only he was his brother, he was his … best friend," that "they did everything," that "they grew up together," and that "[t]hey had an amazing childhood together."[276]

On 20 September 1984 the witness was out of the country, and he first learned of the attack upon the Embassy Annex from a news broadcast.[277] He testified that he had left Lebanon in the 1970s, "where it was a very peaceful time," and that when he saw the news "he was very shocked and … terrified of what's happening in Lebanon."[278] Knowing that his brother was at the Embassy, he was "very … concerned and shocked," and he described the difficulty of communication in that era, that "it was very hard to … get ahold of anybody in Lebanon at the time."[279] He was unable to obtain any news of his brother until the following day, and he described the intervening sleepless night; when he did speak with his brother, he learned that he "was severely hurt and affected by the bombing, which caused him a lot of sadness and anxiety

[273] *Id.*
[274] *Id.* at p. 5.
[275] Remote Deposition of Ibrahim Yakzan, taken on 5 December 2023, at pp. 5-6.
[276] *Id.* at pp. 8-9.
[277] *Id.* at 6.
[278] *Id.* at 6-7.
[279] *Id*. at 7.

and stress to see him in that state."[280] It was some while before he was able to travel to Lebanon to see his brother, but he recalled being told that his brother had sustained injuries to his neck, and testified that "the real damages wasn't really physical, it was more mental," that he could tell that his brother "wasn't really the same," and that he "was experiencing some emotional and internal injuries from the explosion."[281] Of the change in his brother he testified simply that "[h]e wasn't himself. He wasn't the person that he used to be," and that his brother thereafter "spent a lot of time seeing doctors."[282]

The witness testified that the attack left the whole family "very depressed," and that his mother "was affected the most."[283] He related that, because his brother worked in security for the United States Embassy, it was assumed locally that he was "transporting weapons for the … Embassy," and that in consequence "a group of militia, one night, attacked their home," surrounding the house and searching it for weapons. That night, he testified, "caused his mom to have a heart attack," for which she was hospitalised "for a significant period of time," and she died a year or two afterward at the age of fifty-four, the witness pinpointing "that night to be the trigger point for … her passing." He further testified that his father "sustained some health issues due to that scare" and died three years after his mother.[284] Invited to say how he himself had been affected, the witness returned to the day of the bombing and "talk[ed] about how traumatic and scary that day was," describing "the shock, that it's indescribable knowing that loved ones are in the building," and not his brother alone, for he had "personal friends that … were in the

[280] *Id.* at 7-8.
[281] *Id.* at 8.
[282] *Id.* at p. 9.
[283] *Id.*
[284] *Id.* at pp. 9-10.

building," and he knew friends of his brother who "had passed away."[285] He summed up the matter as "what a sad incident that … it was," and spoke of "the trickling [e]ffects that … it had on … their family and their lives."[286] His Declaration attests that, as a result of the bombing, he "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that he "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[287][288]

***Evidence of Nouhad Yakzan*:**

Nouhad Yakzan[289] is a brother of the direct victim, Mahmoud Yakzan, and gave a remote video deposition, through an English-Arabic interpreter, on 9 August 2023.[290] He was born on 17 July 1954, in the district of Beirut, Lebanon.[291] He is one of six siblings, five brothers and one sister, all of whom are living.[292] Of those siblings, only Mahmoud Yakzan was employed at the United States Embassy, an employment which Nouhad Yakzan placed in the 1980s without recalling its dates with precision,[293] and which the documentary evidence fixes as having run from 2 July 1984 until 5 May 1990.[294] Asked to describe his attachment to his brother, he answered that "my brother is like myself," and that "for me, my brother is as precious as my own

[285] *Id*. at p. 10.
[286] *Id.*
[287] *Id*. at p. 11.
[288] Declaration, styled as an Affidavit, of Ibrahim Yakzan, executed on [DATE], ¶¶ 5-6.
[289] Although his given name is spelt as Nouhad Yakzan in the Second Amended Complaint herein, and in his Declaration, the transcript of his deposition spells it, *passim*, as "Nouhan." For the sake of clarity, his name is spelt herein as it is spelt in the Second Amended Complaint.
[290] Remote Deposition of Nouhad Yakzan, taken on 9 August 2023, at *passim*..
[291] Remote Deposition of Nouhad Yakzan, taken on 9 August 2023, at p. 7. Declaration, styled as an Affidavit, of Nouhad Yakzan, executed in October 2023, ¶ 2.
[292] *Id*. at p. 8.
[293] *Id.*
[294] Declaration, styled as an Affidavit, of Nouhad Yakzan, executed in October 2023, ¶ 3. Republic of Lebanon, United States Embassy, Beirut, Letter of Employment respecting Mahmoud Yakzan.

self," adding, when asked whether the two were close, "Of course, he's my, you know, there's nothing better than having a brother."[295]

He learned of the bombing upon the day it occurred, testifying that "when the bombing happened, everyone was talking about it," and that those about him "felt the pressure of the explosion from far away."[296] His first reaction, as he described it, was to the scale of the loss to others: "It was very saddening. These innocent people had nothing to do with it."[297] He knew at once that his brother would have been within the Embassy, "Of course he would be at the embassy because he was working there," and he described the hours that followed thus: "We were very confused. We didn't know what to do. We were very saddened by what had happened. We were very, you know, confused."[298] Having no motor car of his own, he and his family engaged a taxicab and set out to search for his brother, not knowing where he had been taken.[299] It was not until the evening of that day that they learned that he was alive.[300] When he first saw his brother thereafter, "[h]e was in a dire mode," and "couldn't, you know, speak properly or handle himself properly."[301] He described the injury to his brother's throat as "a very large cut," observed that "they thought he was dead at the time," and testified that, to the present day, his brother suffers a ringing in his ears for which "he can't find any treatment."[302] He further related that his brother had been thrown by the pressure of the blast and had lost consciousness, and that Mahmoud Yakzan to this day "doesn't know what exactly caused this injury on his throat."[303]

---

[295] Remote Deposition of Nouhad Yakzan, taken on 9 August 2023, at pp. 10, 12.
[296] *Id.* at p. 9.
[297] *Id.*
[298] *Id.* at pp. 9-10.
[299] *Id.* at p. 10.
[300] *Id.*
[301] *Id.* at p. 11.
[302] *Id.* at pp. 8-9.
[303] *Id.* at p. 11.

The consequences of the bombing to the Yakzan household did not end with the injury to the direct victim. Nouhad Yakzan testified that, because his brother was employed at the American Embassy, "[p]eople thought that we were closely working with the United States," and that on that account "some militiamen came to our house and started searching our house for weapons, thinking that we were closely working with the Americans, that we were basically American agents." Between ten and twelve armed men, he said, "barged into our house looking for weapons."[304] The consequence to his mother was immediate and, in his account, final: "[W]e had to take our mother to the hospital because of the shock. After that, she didn't live for long. She died soon thereafter."[305] Returning to the subject unprompted at the close of his deposition, when invited to add anything further, he said, "Right now, I remember my mother. I was going to cry when remembering my mother," and, asked whether that was owing to the effect of the bombing upon her, answered, "Yes. She was sick and she became even more sick when the explosion happened. After just a short period, we had to call our siblings and they came to Lebanon to say their goodbyes and that she passed away."[306] As to the bombing's effect upon himself, he testified that his relationship with his brother "became stronger," and that "I became concerned for him more and more."[307] He described a continuing sensitivity to sudden noise, *viz*., that "[t]o this day, when a person hears of an explosion, my mind becomes scattered," and that "one may lose one's nerves when they hear of an explosion."[308] His Declaration attests that, as a result of the bombing, he "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that he "suffered and continue[s] to suffer because of the pain inflicted by

304 *Id.* at p. 12.
305 *Id.*
306 *Id.* at pp. 12, 14.
307 *Id.* at p.13.
308 *Id.*

those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[309]

***Evidence of Hassana Yakzan*:**

Hassana Yakzan is a daughter of the direct victim, Mahmoud Yakzan, and gave a remote video deposition, through an English-Arabic interpreter, on 5 December 2023.[310] She was born on 27 June 1982, in Beirut, Lebanon.[311] She resides in Beirut, is married, and has five children.[312] She has two brothers, Hussam Yakzan and Khodor Yakzan, both of whom are parties plaintiff herein,[313] and the three of them "grew up all together in Beirut."[314] Her father's employment at the United States Embassy ran from 2 July 1984 until 5 May 1990,[315] so that Hassana Yakzan was two years and three months of age upon the date of the subject bombing. She has, accordingly, no memory of 20 September 1984, and her evidence is not of the event but of a childhood conducted in its shadow, the particulars of which came to her only by degrees.

She testified that, "as she got older," she began to notice that her father bore scars, and that "when she would ask about it, her dad would tell her that he sustained it from an explosion while he was working at the US embassy." She learned the rest from her mother: when her father "would act up" or "would have outbursts," her mother "would tell her to be patient with him and try to be understanding, because he went through a lot, a lot, and sustained a lot during the explosion at the US embassy." That, she said, "is how she came to find out" what had happened

---

309 Declaration, styled as an Affidavit, of Nouhad Yakzan, executed in October 2023, ¶¶ 5-6.
310 Remote Deposition of Hassana Yakzan, taken on 5 December 2023, at *passim.*
311 Remote Deposition of Hassana Yakzan, taken on 5 December 2023, at p. 3.
312 Remote Deposition of Hassana Yakzan, taken on 5 December 2023, at p. 4.
313 *Id.* at p. 5.
314 *Id.* Although the witness gave the name of her younger brother as "Haider," the Second Amended Complaint herein, her brother's own Declaration, and the deposition of her mother, Rima Abou Shaar, all give his name as Khodor Yakzan, and his name is so given herein.
315 United States Embassy, Beirut, Letter of Employment respecting Mahmoud Yakzan.

to him.[316] Asked what injuries her father had sustained, she described "a lot of scars, small scars," but said that "the most noticeable external injury is the big scar that he sustained on his neck."[317] She further testified that he "always, always complained from hearing loss and hearing pain," that he had "ringing in his ears," and that the physician had told him that "there's no fix for that," and that "he had to live with it for the rest of his life."[318]

Her account of her own injury is drawn, characteristically for a child of a direct victim, from comparison. She measured her father against other parents and found him "living in fear," and "not the same human anymore": "He's always fearful. He's always scared. He's always living with anxiety." Where other children "were living normal life and carefree," her father "was very protective and very worried about them," and "[i]t wasn't normal."[319] She observed that his reaction to the explosion at the Port of Beirut, some years since, was "way more severe than a regular person."[320] A normal family, she said, "lived a normal life, even though the circumstances in Lebanon were not ideal, but they found joy. They went and did family stuff outside the house." Her father, by contrast, "would not leave the house. He was very scared," and though the family "would even encourage him to go out," the incident "had changed him so much that he was more not very open and not very communicative and not able to do what a normal parent would do with his family."[321] She testified that it took her father "a very long time to get back to work, physically healing from his wounds and to get out of his depression and get his psychological state back to normal," though she recalled a period after his return when "he

[316] Remote Deposition of Hassana Yakzan, taken on 5 December 2023, at p. 6.
[317] *Id.*
[318] *Id.* at 6-7.
[319] *Id.* at 7.
[320] *Id.* at 7-8.
[321] *Id.* at 8.

was kind of in a better mood and a better state because he was doing something."[322] Invited to add anything further, she said that "it's sad to see her dad broken, stuck in life," that "he's just never going to be the same, always living in fear," and that "[i]t's just sad to see him in that state."[323] She described her father's continuing fear for his children's future in an unstable Lebanon, and that he had urged them to seek employment at the United States Embassy because it "can help them, support them, give them a way out."[324] She closed with an image drawn from the attack itself, viz., that just as the explosion had ruined the Embassy, so her father "was ruined and destroyed and collapsed mentally because of that explosion."[325]

***Evidence of Khodor Yakzan*:**

Khodor Yakzan is a son of the direct victim, Mahmoud Yakzan, and gave a remote video deposition, through an English-Arabic interpreter, on 9 August 2023.[326] He was born on 1 July 1984, in Beirut, Lebanon, where he has lived his whole life.[327] He has one brother, Hussam Yakzan, and one sister, Hassana Yakzan, both of whom are parties plaintiff herein.[328] His father's employment at the United States Embassy ran from 2 July 1984 until 5 May 1990,[329] so that Khodor Yakzan was two months and twenty days of age upon the date of the subject bombing, and is the youngest of the claimants herein. He testified candidly to the consequence, *viz*., "I was young, I wasn't, I was too little. I wasn't conscious of this, but I knew that he was

[322] *Id.*
[323] *Id.* at p. 9.
[324] *Id.*
[325] *Id.* at p. 10.
[326] Remote Deposition of Khodor Yakzan, taken on 9 August 2023, at *passim.*
[327] Remote Deposition of Khodor Yakzan, taken on 9 August 2023, at p. 3.
[328] Remote Deposition of Khodor Yakzan, taken on 9 August 2023, at p. 4.
[329] United States Embassy, Beirut, Letter of Employment respecting Mahmoud Yakzan.

working, I heard that he was working there."[330] What he knew of his father's work was that "he was working at the security unit of the American Embassy."[331]

His father never spoke to him of the bombing. Asked whether his father had ever discussed what he experienced, he answered, "No. He didn't want us to know about these things. He's always afraid and anxious." He added that "[h]e doesn't talk about it," and that, for his father, "it's something that happened, he was in shock."[332] What Khodor Yakzan observed instead was the shape his father's fear took in the ordinary conduct of family life. He recounted an occasion, years afterwards, when a bombing was carried out against a Lebanese member of parliament, and his father, knowing that Khodor was then working in security at the Phoenicia Hotel, "rushed to the hotel when, as soon as the bombing happened, to check if I was alive or not."[333] He testified that when his father returned home after the Embassy bombing "he was in such a bad psychological shape that he would prevent them from going outside and going on trips because he was afraid that something would happen to them," and that thereafter "he was always anxious about everything." That anxiety extended to his son's livelihood: if Khodor Yakzan proposed to work in a given place, his father "would always have reservations about working there, because that would be a place, for example, frequented by politicians." The family, he said, "were struggling very much financially. We couldn't even go to school. We couldn't even afford school."[334]

The particular in which his father's fear came home to him most sharply was his own attempt to follow his father into the Embassy. He testified that he "tried to apply to the same position,"

---

330 Remote Deposition of Khodor Yakzan, taken on 9 August 2023, at p. 5.
331 *Id.*
332 *Id.* at pp. 5-6.
333 *Id*. at p. 6.
334 *Id*. at p. 7.

that he "applied three times," and that he "wasn't accepted"; and that when he did apply, his father "wouldn't support me in this, and I had to go by myself. I just went by myself."[335] Asked how his father's experience in the bombing had affected his life and his family, he answered that "it affected us all very much," and framed the injury as one of altered character: "Because before the bombing, from what I heard, he was a very strong and very confident person. Someone that one can rely on. After the bombing, he changed completely. So, he was someone that was seen as being overly afraid and anxious, and not someone that I can depend on for protection or security." He concluded, "my view of my father changed because of the bombing and how he changed in terms of personality."[336] Of his father's condition at the time of the deposition, he testified that "[t]o this day, he still suffers, you know, his ears, and there is no cure for it. He's tried many times to get treated and find a cure for his ear condition. He couldn't get it treated."[337] He also testified that the family had hoped to obtain permanent residence in the United States through his father, and that "we weren't able to get it, nor was he."[338]

***Evidence of Hussam Yakzan*:**

Hussam Yakzan is the eldest son of the direct victim, Mahmoud Yakzan, and gave a remote video deposition, through an English-Arabic interpreter, on 5 December 2023.[339] He was born on 12 March 1981, in Beirut, Lebanon.[340] He is married to Safa Abdullah and has three children, Hamza, Layal and Omar.[341] He has one sister, Hassana Yakzan, and one brother, Khodor Yakzan, both of whom are parties plaintiff herein; he grew up in Beirut and remained there until

---

[335] *Id.* at pp. 5, 7.
[336] *Id.* at p. 8.
[337] *Id.*
[338] *Id.* at p. 3.
[339] Remote Deposition of Hussam Yakzan, taken on 5 December 2023, at *passim.*
[340] Remote Deposition of Hussam Yakzan, taken on 5 December 2023, at p. 4.
[341] Remote Deposition of Hussam Yakzan, taken on 5 December 2023, at pp. 4-5.

the end of 2006, when he removed to the United Arab Emirates, where he now resides and works as an onboarding manager for a financial services company.[342] His father's employment at the United States Embassy ran from 2 July 1984 until 5 May 1990,[343] so that Hussam Yakzan was three years and six months of age upon the date of the subject bombing. He described his father's post at the Embassy simply as "embassy security."[344]

Asked whether his father had been involved in a terrorist attack, the witness corrected the premise of the question in a manner that captures his evidence as a whole, viz., "He was involved, or he was affected by a terrorist attack."[345] He was candid that he had no memory of the day: "See, if I tell you, I know, that would be bad of me. The truth is that I was young." What he knew, he knew because the injury was visible and the household spoke of it: "I know that it happened in 1984 because we always discussed that. And whenever he looked at the mirror, we know that he feels bad. So we'll ask him, what is that in your neck? So he told us this whole story."[346] Of the attack itself, he related what his father had told them: that when the bomb detonated his father "passed out" for a period, that "they sent him with the ambulance, and he waked up in the hospital," and that "later on, he came to know that a few friends were passed away. Again, this make him feel very bad."[347] He described his father as having been "injured in his neck," an injury he characterised as "[t]oo much, not an easy effect," adding that his father "was affected badly" and "stayed home for a long time for recovering."[348]

[342] *Id.* at p. 6.
[343] United States Embassy, Beirut, Letter of Employment respecting Mahmoud Yakzan. The witness placed his father's Embassy employment at "around eight to nine years or ten years," beginning "something around 1980, 1979," and ending "before the 90s." Remote Deposition of Hussam Yakzan, taken on 5 December 2023, at p. 8.
[344] Remote Deposition of Hussam Yakzan, taken on 5 December 2023, at p. 8.
[345] *Id.* at pp. 8-9.
[346] *Id.* at p. 9.
[347] *Id.* at pp. 10-11.
[348] *Id.* at p. 10.

The witness framed his father's injury as the destruction of a trajectory. "[H]e started as a guard, no, security in the US embassy with a lot of ambition, big hopes in life. And suddenly someone decided to bomb the embassy and ruined the whole life of a full family, especially my dad. So his life was ruined." He testified that his father "was affected by panic attack and anxiety," and that "until now, if you look at him, his personality was, it's finished."[349] That injury reached the household through the loss of the father's livelihood. After leaving the Embassy, the witness testified, "no one was recruiting him because he used to work with the Americans, unfortunately. So we have to suffer again," and he "stayed a long period at home until he got the job in the ACS."[350] Of what was lost he said: "All the support which we used to get from his work, all the benefits, even the insurance. We lost everything. He couldn't find a job after that."[351] The consequence to the eldest child was direct and economic. "[B]ecause I'm the elder, definitely I was affected dramatically because, you know, it's a curse to be the elder in the family. But when I became, like, 15, 16 years, I started working and supporting him because, to tell you the truth, he's not productive anymore."[352] He began work at fifteen, and upon finishing school "couldn't enter university," but instead "had to join a restaurant as a waiter for two years" because he "didn't have cash to join a university." He entered university two years late and read hospitality management, which, he said, "wasn't my ambition, but this is the cheapest credit I can afford."[353] He continues to support his parents financially, on a monthly basis, to this day.[354]

---

349 *Id.* at p. 11.
350 *Id.* at p. 12.
351 *Id.* at pp. 15-16.
352 *Id.* at p. 11.
353 *Id.* at 13.
354 *Id.* at 14.

The final consequence he described was exile. His father had travelled to the United States intending to bring the family after him, but the government "didn't accept in the moment to bring us," and, being unable to remain alone by reason of his anxiety and panic attacks, "[h]e went and came back. Our bad luck. He came back."[355] The witness himself left Lebanon at the end of 2006 because he "seen that there is no future," having concluded that he had to go in order "to support you," as he put it to his mother, who wept and asked him not to leave.[356] At the time of his deposition he had not visited his country in five years, and had lately brought his parents to the Emirates for a month because "I missed my parents," observing that they had never before seen his daughter, then four years of age, and did not know his family.[357] He recounted, as an illustration of what his father's service had cost the family, that when he applied for a passport to travel to the Emirates he was asked at the Embassy what his father had done for work, and answered "in the US as if I did the crime because my father was working with the US government."[358] Of his mother he testified, becoming emotional upon the record and apologising for it, that "[i]f I feel bad, I feel bad for her," that she had undergone heart surgery, and that it was "[a]ll because what she has seen in her life," she having been married only some five years when the bombing occurred.[359] He closed by relating that he had asked his mother whether his father had been as he now is when she married him, and that "[s]he said no. He was very strong. But suddenly, God forbid, this is what happened, unfortunately. And we have to live with it."[360]

---

[355] *Id.* at 14-15.
[356] *Id.* at 12-13.
[357] *Id.* at 16.
[358] *Id.* at 17.
[359] *Id.* at 12.
[360] *Id.* at 16.

***Evidence of Evidence of Imad Yakzan*:**

Imad Yakzan is a brother of the direct victim, Mahmoud Yakzan, and gave a remote video deposition, through an English-Arabic interpreter, on 5 December 2023.[361] He was born on 30 October 1955, in the Mazraa district of Beirut, Lebanon.[362] He resides at Berlin, in Germany, is married to Amal Mustafa Turkk, and holds both Lebanese and German citizenship.[363] He has four children, three daughters and a son, and is one of six siblings, his parents being both deceased.[364] He removed to Germany in 1978, some six years before the subject bombing, and has lived there since.[365] His brother, he testified, "used to work for the U.S. Embassy and then after that, for the U.S. School," and his post at the Embassy was "general security, maybe sometimes dedicated security, but security in general."[366] That employment ran from 2 July 1984 until 5 May 1990.[367]

He learned of the attack in Germany, from a television broadcast, testifying that he received news of Lebanon readily there and remained "in-tuned with what's happening in Lebanon and with the family," and that when he heard it "at that time, it was very big news." He at once attempted to telephone, but "because of what happened, he wasn't able to get through," and he obtained no news of his brother until the following day, when he learned that his brother was hurt.[368] He was told that his brother had sustained injuries to his neck, and "a lot of stress and

---

361 Remote Deposition of Imad Yakzan, taken on 5 December 2023, at *passim*.
362 Remote Deposition of Imad Yakzan, taken on 5 December 2023, at p. 4. Declaration, styled as an Affidavit, of Imad Yakzan, executed on 6 July 2023, ¶ 2.
363 Remote Deposition of Imad Yakzan, taken on 5 December 2023, at pp. 4-5.
364 *Id.* at p. 5.
365 *Id.* at p. 6.
366 *Id.*
367 Declaration (styled as an Affidavit) of Imad Yakzan, executed on 6 July 2023, ¶ 3. Republic of Lebanon, United States Embassy, Beirut, Letter of Employment respecting Mahmoud Yakzan.
368 Remote Deposition of Imad Yakzan, taken on 5 December 2023, at p. 7.

nerve pain and a lot of emotional damage."[369] He did not see his brother for a year, being then unable to travel from Germany, having lately opened a shop there and being engaged in supporting the family financially, including the provision of money for his brother's medical treatment; but he spoke with him shortly after the explosion and was thereafter "in constant communication."[370] Of the injury as it endured, he testified that his brother "had a lot of hearing problems, like hearing noises in his ears," that he consulted a specialist who told him "that stuff like that can't be medicated," and that "he'll have to live with the hearing pain for the rest of his life, there's nothing they can do."[371] What he observed when he did see his brother was "the noticeable scar that he had on his neck and the emotional trauma that his brother had sustained": his brother "wasn't able to sleep, he was very jumpy, he was very scared," and "wasn't able to be himself or live in peace, the incident had just changed him completely." He summed the matter up by saying that "it's not his brother anymore."[372]

Asked how that made him feel, the witness answered that "at the end of the day, it's his brother," and that "[e]ven if he doesn't see him every day, he lives in his heart." He described himself as "very, very upset and sad" to see his brother "turn to that level of change," having to "live with fear his whole life," to "live and deal with ear pain," and to be "very scared of whatever loud noises happen next to him."[373] The injury, in his account, did not stop at his brother. He testified that his mother was gravely affected, that "from that day on, his mom started having very high blood pressure and it was persistent for the rest of her life," that his father likewise "sustain[ed] a lot of also health issues due to that," and that the family "were all

---

[369] *Id.*
[370] *Id.* at 8.
[371] *Id.* at 9.
[372] *Id.*
[373] *Id.* at 10.

living in fear."[374] He described the particular cause of that fear: because his brother had been provided a weapon in the course of his Embassy employment, armed men, "two dozen soldiers," would come to search the family's homes for guns. Upon the last such occasion, "they came to his brother's house, his mom was there and she was super terrified of the scene and she fainted. She was in the hospital for 11 days and from that, she passed away." The incident, he said, "caused not only the death of his mom, but a lot of health issues and living in fear for the rest of the family."[375] He testified that "the family was torn to pieces" by the bombing and its consequences, that his mother required medication "just to calm her nerves," and that the accumulating medical bills of his brother and both parents "com[e] with a financial burden that the rest of his siblings had to bear."[376] He himself sent financial support to Lebanon monthly.[377] His Declaration attests that, as a result of the bombing, he "experienced extraordinary grief, mental anguish, and intentional infliction of emotional distress," that he "suffered and continue[s] to suffer because of the pain inflicted by those injuries," and that the Defendants "have inflicted severe emotional stress on me and my entire family."[378]

**Analysis and Conclusion:**

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In this jurisdiction, individuals who were substantially injured in a terrorist attack, but who did not succumb to their injuries, are typically awarded a "baseline" of $5 million in compensatory damages. *Estate of Bland v. Islamic Republic of Iran*,

---

[374] *Id.* at 7-8, 10.
[375] *Id.* at 12.
[376] *Id.* at 11-12.
[377] *Id.* at 11.
[378] Declaration (styled as an Affidavit) of Imad Yakzan, executed on 6 July 2023, at ¶¶ 5-6.

831 F. Supp. 2d 150, 154 (D.D.C. 2011) (citing the *Peterson* framework from Peterson v. *Islamic Republic of Iran* ("*Peterson II*"), 515 F. Supp. 2d 25, 54 (D.D.C. 2007)). Courts will "depart upward from this baseline to $7-12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," and will "depart downward to $2-$3 million where victims suffered only minor injuries." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010).

For the family members of a victim who survived the attack, this Court applies the Heiser/Peterson framework at half the value of the awards made to the family members of a decedent, viz., $4 million to a spouse, $2.5 million to a parent, $2.5 million to a child, and $1.25 million to a sibling.[379] *Valore*, 700 F. Supp. 2d at 85; *Peterson II*, 515 F. Supp. 2d at 51-52; *Estate of Bland*, 831 F. Supp. 2d at 157.

In addition to the case law cited above, the Special Master notes that the Heiser Matrix, promulgated in *Peterson II*, *supra*, at 51-52, has now stood without adjustment for nearly two decades, over which period inflation has materially eroded the real value of every figure within it. In a companion action pending before this same Court, arising out of these very same two bombings, *viz*., *Abdallah El Deek v. Islamic Republic of Iran*, No. 1:23-cv-02241 (CRC) (D.D.C.) [Doc. 39, filed 31 March 2026]. the Plaintiffs, represented by the same law firm as the Plaintiffs in the instant case, have filed "Proposed Findings of Fact and Conclusions of Law on Adjustments of Non-Economic Damages Matrix," in which they urge the Court to update that

[379] The half-value figures are not applied uniformly across the reported decisions. Estate of Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150, 157 (D.D.C. 2011), applied $1.5 million, rather than $2.5 million, to a child of a surviving victim. The Special Master follows the $2.5 million figure derived from the Heiser Matrix as promulgated in Peterson II, 515 F. Supp. 2d at 51-52, and notes the variance so that the Court may resolve it should it wish to do so.

Matrix as the guidance for determining the appropriate award of non-economic compensatory damages in terrorism litigation, citing that inflation, the trends in awards in the 9/11 civil litigation before the Southern District of New York, which are considerably higher than the awards in this jurisdiction, and the perceived need for a uniform standard in applying the federal cause of action represented by 28 U.S.C. § 1605A. The Special Master is of the view that the arguments there advanced are valid and worthy, and that they apply with equal force to the claimants in the instant action, who were injured in the very same attacks, by the very same acts of the very same defendants; and he has accordingly taken the proposed upward adjustments into account in making his recommendations herein.

Upon due consideration of the evidence presented in support of the claims of the members of the family of Mahmoud Yakzan who are parties plaintiff in the instant action, I recommend that the following awards of compensatory damages be made, *viz.*:

| **Plaintiff Name** | **Direct Victim** | **Relationship to Direct Victim** | **Recommended Award** |
|---|---|---|---:|
| Rima Abou Shaar | Mahmoud Yakzan | Wife | $8,000,000 |
| Ibrahim Yakzan | Mahmoud Yakzan | Brother | $3,000,000 |
| Nouhad Yakzan | Mahmoud Yakzan | Brother | $3,000,000 |
| Hassana Yakzan | Mahmoud Yakzan | Daughter | $5,000,000 |
| Khodor Yakzan | Mahmoud Yakzan | Son | $5,000,000 |
| Hussam Yakzan | Mahmoud Yakzan | Son | $5,000,000 |
| Imad Yakzan | Mahmoud Yakzan | Brother | $3,000,000 |
| **Total** | | | **$32,000,000** |

Dated: 28 August 2026

Respectfully submitted,

/s/Joseph Peter Drennan
**JOSEPH PETER DRENNAN**
218 North Lee Street
Third Floor
Alexandria, Virginia 22314-2631
Telephone: (703) 519-3773
Telecopier: (703) 548-4399
E-Mail: joseph@josephpeterdrennan.com
District of Columbia Unified Bar No. 358196

*Special Master*

***CERTIFICATE OF SERVICE***

I, Joseph Peter Drennan, undersigned, hereby and herewith certify that, on this 28th day of July 2026, the foregoing Motion and Statement of Points and Authorities, and the accompanying Proposed Order, were served upon counsel of record for the Plaintiffs, as well as Special Master Paul Griffin, via electronic mail, *viz*.:

Caragh Fay Owens, Esq.
Fay Law Group, P.A.
6205 Executive Boulevard
Rockville, Maryland 20852
caraghfay@gmail.com ;

Molly Hoffman Wolfe, Esq.
Fay Law Group, P.A.
6205 Executive Boulevard
Rockville, Maryland 20852
mollywolfeattorney@gmail.com ;

Matthew Nace, Esq.
Fay Law Group, P.A.
6205 Executive Boulevard
Rockville, Maryland 20852
mnace@faylawgroup.com ; &

Paul Griffin, Esq.
8720 Georgia Avenue

Suite 703
Silver Spring, Maryland 20910
paul.griffin@child-justice.org .

Respectfully submitted,

/s/Joseph Peter Drennan
**JOSEPH PETER DRENNAN**
218 North Lee Street
Third Floor
Alexandria, Virginia 22314-2631
Telephone: (703) 519-3773
Telecopier: (703) 548-4399
E-Mail: joseph@josephpeterdrennan.com
District of Columbia Unified Bar No. 358196

*Special Master*