**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **MOHAMMED FNEICH, et al.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ISLAMIC REPUBLIC OF IRAN, et al.**<br><br>**Defendants.** | **Case No. 24-cv-1843(CRC)** |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ADJUSTMENTS OF NON-ECONOMIC DAMAGES MATRIX

***COME NOW*** Plaintiffs, by and through undersigned counsel, and respectfully submit to this Honorable Court their Proposed Findings of Fact and Conclusions of Law on Adjustments of Non-Economic Damages Matrix. In relation thereto, Plaintiffs present the following to the Court for acknowledgement and acceptance.

## HISTORY OF NON-ECONOMIC DAMAGES MODELS

### I. *PETERSON v. ISLAMIC REPUBLIC OF IRAN*

*Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46 (D.D.C. 2003) is the original case establishing liability under the Foreign Sovereign Immunities Act ("FSIA"). *Peterson* was a multi-party action brought on behalf of Marines and their family members who were victims of the October 23, 1983 Marine Barracks bombing in Beirut, Lebanon. In the early morning hours of that day, 241 American servicemen were murdered in their sleep by a suicide bomber. "The resulting explosion was the largest non-nuclear explosion that had ever been detonated on the face of the Earth." *Peterson*, 264 F.Supp.2d at 56. Upon finding in favor of the Plaintiffs on liability, the Court

ordered the appointment of Special Masters to issue reports on "all claims for damages." *Peterson*, 264 F.Supp.2d at 65.

## II. THE *HEISER* MATRIX

On December 22, 2006, this Court issued its opinion in the matter of *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 299 (D.D.C. 2006). *Heiser* stated:

> In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium. *Prevatt*, 421 F.Supp.2d at 160. "While interning changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress." *Haim*, 425 F.Supp.2d at 71.
>
> In determining the amount of compensatory damages awards to family members of a surviving victim, this Court has held that these awards are determined by the "nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member." *Haim,* 425 F.Supp.2d at 75. Spouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings. *Compare, e.g., Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107, 113 (D.D.C.2000) (Jackson, J.) (awarding $10 million to the wife of a hostage and torture victim); *Cicippio,* 18 F.Supp.2d at 70 (same), *with Eisenfeld,* 172 F.Supp.2d at 8 (awarding $5 million each to the parents and $2.5 million each to the siblings of victims of a suicide bombing on a passenger bus); *see also Flatow,* 999 F.Supp. at 31 (awarding parents each $5 million and siblings each $2.5 million of victim who was killed in the same passenger bus bombing in which Seth was injured). Moreover, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Id.* While the loss suffered by the plaintiffs in these cases is undeniably difficult to quantify, courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed.

*Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006)(internal footnotes omitted). This allocation of non-economic damages has come to be referred to as the *Heiser* Matrix within like terrorism cases seeking damages against Iran.

In coming to this determination on the dollar values of the Matrix, the Court relied upon *Anderson v. Islamic Republic of Iran*; *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d at 70;

*Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d at 8; and *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 31. In re-evaluating this Matrix, it is important to analyze the factual basis relied upon of each of these cases:

- *Anderson*: Terry Anderson was a Marine serving in Beirut, Lebanon when he was taken hostage and kidnapped. He remained a hostage for over six and a half years before he was ultimately released. At the time of his kidnapping, he was married to Madeleine Bassil, who was pregnant with their first child. Ms. Bassil was awarded $10,000,000 and the after-born daughter was awarded $6,700,000. This award was rendered in 2000.

- *Cicippio*: In this case, David Jacobsen, Frank Reed, and Joseph Cicippio were all taken hostages in Beirut, Lebanon between 1985 and 1986. Respectively, they were held captive for 532 days, 1,330 days, and 1,908 days. In relation to the solatium claims for the spouses of Mssrs. Cicippio and Reed, each spouse was awarded $10,000,000. This award was rendered in 1998.

- *Eisenfeld*: Matthew Eisenfeld was a student at the Jewish Theological Seminary in Israel and was killed during a bus explosion on February 25, 1996. Likewise, Sara Rachel Duker was a postgraduate student at the Hebrew University of Jerusalem who was killed on the same bus explosion. Both Mr. Eisenfeld and Ms. Duker were survived by their parents and siblings. The Court noted in its discussion of solatium damages that "damages for solatium belong to the individual heir personally for injury to the feelings and loss of decedent's comfort and society. The unexpected quality of a death may be taken into consideration in gauging the emotional impact to those left behind." *Eisenfeld*, 172 F.Supp.2d at 8. The parents of Mr. Eisenfeld and Ms. Duker were awarded $5,000,000 each and the siblings were awarded $2,500,000 each. This award was rendered in 2000.

- *Flatow*: Alisa Flatow was engaged in a study abroad program in Israel when was she was a victim of suicide bomber on a bus on April 9, 1995. She was survived by her two parents and siblings. The Court stated in this matter that "[a]s damages for mental anguish are extremely fact-dependent, claims require careful analysis on a case-by-case basis." *Flatow*, 999 F.Supp. at 30. The Court also acknowledged that in terrorism actions, "[t]he terrorists intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve political objectives. Thus, the character of the wrongful act itself increases the magnitude of the injury. It thus demands a corresponding increase in compensation for increased injury." *Id*. In relation to the solatium claims, Ms. Flatow's parents were each awarded $5,000,000 and the siblings were each awarded $2,500,000. This award was rendered in 1998.

As stated above, ultimately *Heiser* held that "[w]hile the loss suffered by the plaintiffs in these cases in undeniably difficult to quantify, courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse approximately $5 million to a

parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed." *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 269 (2006)(*See also Valore v. Islamic Republic of Iran*, 700 F.Supp.2d at 83 – 84; *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57-58(D.D.C. 2009)).

While basing its Matrix upon these four cases, none of those cases submitted themselves to be a basis for a future matrix. In fact, it is clear from the rulings of each of those cases that "claims require careful analysis on a case-by case basis." *Flatow*, 999 F.Supp. at 30. Additionally, the cases also recognize that the individual terroristic **act** triggers different emotional responses that affect the magnitude of the damages awarded. *Anderson* and *Cicippio* involved horrendous acts of kidnapping; while *Eisenfeld* and *Flatow* involved different suicide bombers attacking students on busses. Each action is horrific and deplorable in their own rights; however, they were all separate actions. This matter before the Court today involves neither a kidnapping nor a suicide bomber on a bus. It is distinct from those forms of terrorism. Its aim was intentionally directed at those who worked in the U.S. Embassy and was designed to instill fear and terror in all those associated with any such employee. The function of an embassy is to keep the peace between countries and allow for open communications to avoid conflicts. Targeting such a facility carries its own horror and terror to those people who were working to avoid the very act to which they fell victim.

III. *Peterson II*

In deriving its final damages award for the Plaintiffs in the *Peterson* case, the Court issued its ruling in *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25 (D.D.C. 2007), which has subsequently been referenced to as *Peterson II*. In *Peterson II*, the Court stated that "to ensure that the Court determines the appropriate amount of damages available to each plaintiff under the law,

it must first ensure that each plaintiff has a valid claim under state law." *Peterson II* at 37 – 38.[1] The Court then went through a very detailed and extensive evaluation of each individual claim, weeding out those claims whose state damages' law did not allow for recovery.

Once the Court had weeded out what it determined to be claims not supported by state law, it assessed the validity of the Special Masters' recommendations on damages. In doing so, the Court adopted the *Heiser* Matrix: "This Court finds that the damages framework set forth in *Heiser* to be an appropriate measure of damages for those family members of victims who died in this attack." *Peterson II* at 51 - 52. The Court then pivoted away from the solatium damages and directed its attention to the damages model associated with those servicemembers and their families for those who survived the terrorist attack: "The Court finds that the framework detailed in *Blais*[2] is appropriate to help determine damages for those surviving servicemen and their families seeking redress." *Peterson II* at 51 – 52. The individual awards for the surviving servicemember for non-economic damages varied between $2 million to $12 million based on the various physical injuries suffered.

IV. <u>"The Belts And Suspenders" Opinion</u>

On September 30, 2009, this Court issued ECF. Dock. No. 439 in *In Re: Islamic Republic of Iran Terrorism Litigation*, 1:01-cv-02094-RCL. This document has been referred to internally

[1] This statement would serve as the backdrop for many potential priority battles in the subsequent asset turnover litigations that would commence and would necessitate future lobbying efforts by the victims to amend the statutory language, which will be addressed *infra*.

[2] In *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006), the Court determined that, "[w]ith respect to pain and mental anguish damages, the Court admits that assessing the amount of compensatory damages for pain and suffering due an injured plaintiff is undeniably difficult. This Court has, however, established a general framework for making such a determination. In cases that involve an attack where the victim survives, and where no captivity occurred, courts typically award a lump sum award based in large part on an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Id.* at 73." *Blais v. Islamic Republic of Iran,* 459 F. Supp. 2d 40, 59 (D.D.C. 2006), <u>enforcement granted,</u> No. 02-CV-285 (RCL), 2011 WL 13376985 (D.D.C. Dec. 2, 2011)

as the "Belts and Suspenders Opinion" because it is a robust opinion that addresses numerous outstanding legal conundrums permeating to numerous such terrorism cases against Iran.[3] As Judge Lamberth stated in the opinion, "[t]his consolidated opinion focuses on recent legislative change in this extraordinary area of the law, as implemented by Congress last term in §1083 of the 2008 National Defense Appropriations Act for Fiscal Year 2008 (2008 NDAA). . . . Section 1083 completely repeals the original state sponsor of terrorism exception – 28 U.S.C. §1605(a)(7) – which was originally enacted in 1996, and enacts in its place a new exception – 28 U.S.C. §1605A – that is in many ways more favorable to plaintiffs." (*In Re: Islamic Republic of Iran Terrorism Litigation*, 1:01-cv-02094-RCL, Dock. No. 439 at 4 – 5). Despite the change in the law, the Court determined that "§1605A is a much more expansive provision, **one which provides a federal cause of action,** as well as many other statutory entitlements. **These new rights and remedies** are the central focus of today's decision. The issue is whether the plaintiffs in actions that were filed, at least initially, under the now-repealed §1605(a)(7), can now avail themselves of the additional entitlements associated with the new exception, §1605A. Thus, to extent that some of these plaintiffs are unable to claim the benefits of the new terrorism law retroactively, the prior exception, §1605(a)(7) – even though now repealed – remains viable and indeed is the controlling source of law in their cases." (*In Re: Islamic Republic of Iran Terrorism Litigation*, 1:01-cv-02094-RCL, Dock. No. 439 at 11) (emphasis added).

In its examination of the multitude of plaintiffs involved in the Terrorism litigation and manner in which the prior immunity exception from which relief was sought under §1605(a)(7) created disparity amongst similarly situated plaintiffs solely due to the State laws in which they resided, the Court reiterated that "this Court expressed the view in *Flatow* that the preferable

[3] It also discussed various ways in which terrorism cases sought to amend, re-file, and take all other "belts and suspenders" approaches to comply with the changing law.

approach would have been to have a federal cause of action consistent with the traditional principle of uniformity in this Country's dealings with foreign nations." (*In Re: Islamic Republic of Iran Terrorism Litigation*, 1:01-cv-02094-RCL, Dock. No. 439 at 79). The Court further acknowledged that "§1605A, through the passage of the §1083 of the 2008 NDAA[ ]. . .completely changed the landscape with respect to actions against state sponsors of terror. This latest version of the terrorism exception is not a mere jurisdiction conferring or 'pass-through' statute, but rather *it is a source of substantive federal law – a uniform federal standard designed to hold rogue nations accountable for their promotion of terrorist acts. But as fundamental as this shift to federal law surely is, §1605A also contains a broad array of substantive rights and remedies that simply were not available under §1605(a)(7).*" (*In Re: Islamic Republic of Iran Terrorism Litigation*, 1:01-cv-02094-RCL, Dock. No. 439 at 80) (emphasis added).

Thus, the Belts and Suspenders Opinion took the position that the enactment of §1605A created "federal substantive law" applicable to the "substantive rights and remedies," and it took away individual state control of outcomes of such cases and created a uniform federal cause of action: "Thus, the application by courts of preclusion defenses in new actions under §1605A would lead to a result entirely at odds with the aim of the new statue because our courts, by granting preclusive effect to prior judicial determination under state law, would, practically speaking, allow those individual state sources of law to again control outcomes in civil actions against state sponsors of terror. Such a perverse result should be avoided, especially in this foreign affairs context in which both the President and Congress have expressed a clear policy preference in favor of a uniform federal standard." (*In Re: Islamic Republic of Iran Terrorism Litigation*, 1:01-cv-02094-RCL, Dock. No. 439 at 92).

## V. THE *VALORE* MATRIX

Subsequent to the *Heiser* opinion and *Peterson II*, in 2010 the Court issued a ruling in *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010). *Valore* examined the initial award to the survivors of terrorist attacks in the *Peterson* case and reaffirmed the following:

> Damages for surviving victims are determined based upon an assessment of such factors as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson II,* 515 F.Supp.2d at 52 n. 26 (quotation omitted). "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." *Peterson II,* 515 F.Supp.2d at 54. Thus in *Peterson,* the Court granted a baseline award of $5 million to individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain." *Id.* The Court was willing to depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead, as was one soldier who "was placed in a body bag [and] buried alive in a morgue for four days until someone heard him moaning in pain." *Id.* Similarly, the Court was willing to depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire. *Id.* With these considerations in mind, the Court now considers whether departures recommended by the special masters are warranted.

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83–84 (D.D.C. 2010).

In analyzing the award of solatium claims, *Valore* adopted the *Heiser* Matrix:

> In *Peterson,* the action to which these cases is most closely related, this Court adopted the framework set forth in *Heiser* as "an appropriate measure of damages for the family members of victims who died" in the Beirut bombing. *Peterson II,* 515 F.Supp.2d at 51 (citing *Heiser I,* 466 F.Supp.2d at 271–356). That framework awarded valid claims brought by spouses, parents, and siblings of deceased servicemen $8 million, $5 million, and $2.5 million each, respectively. Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased: $4 million for spouses, $2.5 million for parents, and $1.25 million for siblings. Although "the loss suffered" by family members of victims "is undeniably difficult to quantify," *Heiser I,* 466 F.Supp.2d at 269, a review of similar cases shows that the damages framework as laid out in *Peterson* has strong precedential support, *see, e.g., Brewer,* 664 F.Supp.2d at 57–58; *Heiser II,* 659 F.Supp.2d at 27 n. 4; *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107, 113 (D.D.C.2000); *Eisenfeld,* 172 F.Supp.2d at 10–11; *Flatow,* 999 F.Supp. at 29–32.

> These numbers, however, are not set in stone. The Court may award greater amounts in cases "with aggravating circumstances," *Greenbaum v. Islamic Republic of Iran,* 451 F.Supp.2d 90, 108 (D.D.C.2006) (Lamberth, J.), indicated by such things as "[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence" or "[m]edical treatment for depression and related affective disorders," *Flatow,* 999 F.Supp. at 31. Such departures are usually relatively small, absent "circumstances that appreciably worsen" a claimant's "pain and suffering, such as cases involving torture or kidnapping" of the party to whom extreme and outrageous conduct was directed. *Greenbaum,* 451 F.Supp.2d at 108 (departing a widower's award upward from $8 million to $9 million upon consideration of "the severity of his pain and suffering due to the loss of his wife and unborn first child"). Conversely, the Court may depart downward in amount where the relationship between the claimant and the decedent is more attenuated. *See, e.g., Smith ex rel. Smith v. Islamic Emirate of Afghanistan,* 262 F.Supp.2d 217, 236 (S.D.N.Y.2003). With these considerations in mind, the Court now considers whether departures recommended by the special masters are warranted.

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85–86 (D.D.C. 2010).

As with all of the previously addressed matters, *Valore* relied upon cases that applied early 2000's damages figures. Most notably, *Valore* highlighted that "**[t]hese numbers, however, are not set in stone.**" *Id.* (emphasis added).

**<u>ECONOMIC ANALYSIS</u>**

Recognizing that *Heiser* is a twenty-year-old case that relied upon cases that are twenty-five years old as of today, the Court should take into consideration the changes in today's economy and the value of a dollar. Additionally, in wake of the Belts and Suspenders Opinion that identified 28 U.S.C. §1605A as "*a source of substantive federal law – a uniform federal standard designed to hold rogue nations accountable for their promotion of terrorist acts*" that was designed to protect against states taking control of such actions because such "a perverse result should be avoided, especially in this foreign affairs context in which both the President and Congress have expressed a clear policy preference in favor of a uniform federal standard," the Court should take into consideration the deviations of other jurisdictions from the original *Heiser* Matrix and seek to make all Plaintiffs whole to the same extent as 28 U.S.C. §1605A allows.

I. Economic Considerations:

The purchasing power of the dollar has drastically changed over the past twenty to twenty-five years along with inflation. Put forth by the U.S. Bureau of Labor Statistics, the "Consumer Price Index (CPI) is a measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." (bls.gov/cpi)(last checked March 10, 2026). "The all items Consumer Price Index for All Urban Consumers increased 2.4 percent for the year ending December 2025. A year earlier, in January 2025, the 12-month change in the all items index was 3.0 percent." (*Id.*)




(https://www.bls.gov/opub/ted/2026/consumer-prices-up-2-4-percent-over-the-year-ended-january-2026.htm) (last checked September 9, 2026).

While the CPI measures the purchasing power of the U.S. dollar related to goods and services, it is frequently utilized by the judicial system to assist in the analysis of non-economic

damages. While this jurisdiction does not impose statutory caps upon non-economic damages, other jurisdictions have looked to the CPI to adjust for an increase in the yearly cap numbers. *See* West Virginia Code §55-7B-8(c) "[o]n January 1, 2004, and in each year thereafter, the limitation for compensatory damages contained in subsections (a) and (b) of this section shall increase to account for inflation by an amount equal to the Consumer Price Index published by the United States Department of Labor. . ."; *See also* Michigan Statute 600.1483(4), "[b]eginning April 1, 1994, the state treasurer shall adjust the limitations on damages for noneconomic loss set forth in subsection (1) by amounts determined by the state treasurer at the end of each calendar year to reflect the cumulative annual percentage change in the consumer price index. As used in this subsection, 'consumer price index' means the most comprehensive index of consumer prices available for this state from the bureau of labor statistics of the United States department of labor."; *See also* South Carolina Code §15-32-220(F), "[a]t the end of each calendar year, the Revenue and Fiscal Affairs Office, Board of Economic Advisors must determine the increase or decrease in the ratio of the Consumer Price Index to the index as of December 31 of the previous year, and the limitation on compensation for noneconomic damages pursuant to subsection (A), (B), or (C) must be increased or decreased accordingly…For purposes of this subsection, "Consumer Price Index" means the Consumer Price Index for All Urban Consumers as published by the United States Department of Labor, Bureau of Labor Statistics."

There is, thus, strong evidence and precedent to allow for the modification of a structured damages' analysis consistent with the changes in the CPI. In furtherance of this position, attached hereto is an economic report and *curriculum vitae* of Chad Staller. (Exhibits A & B). Mr. Staller is a forensic economist who has authored the attached report to provide an economic basis for the adjustment to the *Heiser* Matrix.

II. Consistency of Damages of Like Cases Should Be Acknowledged By This Court.

All cases that have analyzed the measurement of noneconomic damages have been clear that the determination of the value of such damages is difficult to ascertain; however, this is the fact-finding application that our system provides and a lynchpin of our civil justice system. Plaintiffs in no way are advocating for the imposition of caps in this matter, yet they do recognize that consistency amongst the victims for similar situated parties is just and appropriate.

Consistency, however, has not been applied across the board for the evaluation of non-economic damages for like-injured victims. While various jurisdictions allow for differing and various damages, "loss of enjoyment of life" is viewed in this jurisdiction to be an element of noneconomic damages. Nevertheless, some jurisdictions, such as the Northern District of Ohio have allowed for a deviation from the *Heiser* Matrix to allow for "loss of enjoyment of life" damages to be sought as economic damages. For instance, in the matter of *Bruce v. The Islamic Republic of Iran*, 5:21-cv-01206-SL (U.S.D.C. Northern District of Ohio), the Court accepted analysis of "loss of enjoyment of life" as an additional economic damage **as well as** including an evaluation and award of "pain and suffering" in excess of the *Heiser* matrix. (*See Bruce v. The Islamic Republic of Iran*, 5:21-cv-01206-SL (U.S.D.C. Norther District of Ohio, ECF Dock. No. 22, in which Sean A. Bruce was awarded a total of $16,380,388 for non-economic damages inclusive of $5,717,681 in "loss of enjoyment of life" damages and $10,662,707 for "pain and suffering" damages; Daniel L. Franklin was awarded a total of $16,883,258 for non-economic damages inclusive of $6,220,551 in "loss of enjoyment of life" damages and $10,662,707 for "pain and suffering" damages; Ronald L. Jones was awarded a total of $16,679,700 for non-economic damages inclusive of $6,016,993 in "loss of enjoyment of life" damages and $10,662,707 for "pain and suffering" damages; and Alfred L. Knight was awarded a total of $15,162,218 for non-

economic damages inclusive of $4,499.511 "loss of enjoyment of life" damages and $10,662,707 for "pain and suffering" damages.) (Exhibit C).

Recently, in *In re Terrorist Attacks on September 11, 2001*, 1:03-md-01570-GBD-SN (U.S.D.C. Southern District of N.Y.) at Dock. # 11883, the plaintiffs to that action have sought an "upward departure" from the *Heiser* Matrix. In that motion, the plaintiffs sought the following:

> Magistrate Judge Frank Maas previously recognized that the immediate family members of those killed in the September 11 terrorist attacks suffered and continue to suffer "profound agony and grief" and, "[w]orse yet, … are faced with frequent reminders of the events of that day." *See* ECF No. 2618 at 10 – 12. Given the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," Magistrate Judge Maas in his Report and Recommendation concluded that an upward departure from the *Heiser* framework was appropriate and recommended solatium damages in the following amounts:

| **Relationship to Decedent** | **Solatium Award** |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

> Subsequently, Magistrate Judge Maas and then Magistrate Judge Sarah Netburn issued orders awarding solatium damages in the amounts set forth above to various groups of plaintiffs.

*In re Terrorist Attacks on September 11, 2001*, 1:03-md-01570-GBD-SN (U.S.D.C. Southern District of N.Y.) at Dock. # 11883 at 11). In contradiction to this Court's rulings in the Belts and Suspenders Opinion, the Court is being asked to disregard the Matrix that was established without any quantifiable distinction to those who were injured against the Matrix. The basis for the upward departure is simply because of the "profound agony and grief" and the continuous reminder of the action. Such agony and grief and continuous reminder of the atrocities is not limited solely to the

911 Victims, especially today while our country is actively in a war (or a "military excursion," whichever position is used on Capital Hill one hour versus the next) with Iran. Moreover, if the Court were to analyze the amount of time that the parties have been suffering from the non-economic damages in these two matters, the Court should take note that – again while both acts were of an atrocious manner – the Beirut bombing victims have been living with the agony and grief since 1983 while the 911 victims have been exposed since 2001. If there was a reason for the upward departure from the Matrix, surely the length of time the victims have been living with damages should be taken into consideration. It appears that Magistrate Maas' reasoning for ascribing an upward departure was not based on any one victim's specific and unique damages compared to the damages suffered by those in the *Heiser* case. Instead, Magistrate Maas seems to have just created the "Maas Matrix" to be applied to the 911 victims despite the well-reasoned opinion of this Court in recognizing that §1605A created a federal cause of action with federal remedies to be applied uniformly.

Furthermore, in an unreported case out of this Court, on October 16, 2023, the Court adopted the special master's recommendation for an upward departure of the Matrix because the "resulting injuries are more complex than those caused by other explosives, because they include novel medical issues like traumatic amputations and heterotropic ossification, are ploytraumatic in nature, often require numerous surgeries and lengthy hospital stays, and are resistant to healing and prolonged in nature, such as the impact of shrapnel embedded in the body, which can cause persistent infections. The impact of the attack can cause neurological and psychological issues, including TBI, post-traumatic stress disorder (PTSD), and major depressive disorder (MDD)." *Lee v. Islamic Republic of Iran*, 19-cv-00830 (APM) (D.D.C. October 16, 2023) Dock. No. 98 at 4 – 5. The proposed damages framework then accepted was the following:

| Category | Characteristic Injuries | Proposed Damages |
|---|---|---|
| 1 | Psychological injuries (without traumatic brain injury ("TBI") diagnosis/severe shrapnel/ fractures/orthopedic injuries/polytrauma) | Baseline: $2 million<br>Range: $1.5–$8 million |
| 2 | Mild TBI with psychological injuries (without severe shrapnel/fractures/ orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $5 million<br>Range: $3–$7 million |
| 3 | Mild TBI with psychological injuries (with severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million<br>Range: $4–$10 million |
| 4 | Mild TBI with psychological injuries (with severe shrapnel/fractures/orthopedic injuries) | Baseline: $15 million<br>Range: $10–$20 million |
| 5 | Moderate/severe TBI (without severe shrapnel/fractures/orthopedic injuries/ polytrauma/traumatic amputations) | Baseline: $20 million<br>Range: $15–$25 million |
| 6 | Moderate/severe TBI (with severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $30 million<br>Range: $25–$50 million |

(*Id.*)

This upward adjustment was partially contradictory with the justification for its acceptance. For instance, the justifications provided for by the Court addressed the sequalae caused by various damages above and beyond those whose damages were "limited" by a TBI damage; however, the upward departure matrix provides for an increased baseline of an individual whose damage was "limited" to a "moderate/severe TBI" of $20 million. Without debating the values of one terrorist victim's amputation to another, it is clear to see that the Court has simply recognized that the Matrix' baseline numbers are simply not in line with the value of a dollar for damages today. Victims of the Beirut bombings suffered same, similar, and, often times, more extreme and harmful physical and psychological damages that should not be downplayed and devalued against victims of other terrorists' attacks. Rather than seeking an "upward departure" to bring the Matrix values in line with today's dollars, it is more appropriate to provide a rational basis supported by an expert economist to bring the values into proper alignment. If all the future parties are going to do is to

simply request an upward departure in every case and have each special master issue his or her own Matrix, then there is no reason for the *Heiser* Matrix to be accepted any more as it has become obsolete.

Additionally, the parties who have obtained judgments against Iran in *Heiser*, *Valore*, and all of the other cases cited have been able to benefit from the judgment by way of obtaining post-judgement interest against Iran that is still accumulating. The parties to the Beirut Bombings were damaged between 1983 and 1984, just as many of those other parties, yet they will not receive the benefit of the post-judgment interest to the same extent.

For these various reasons, Plaintiffs have input the *Heiser* Matrix along with the *Valore* Matrix values into the CPI Calculated consistent with Mr. Staller's Report and arrived at the following adjustments:

| **Claimant** | **2006 Established Base Matrix** | **2006 Upward Adjustment** | **2006 Downward Adjustment** | **2026 Adjusted Matrix** |
|---|---|---|---|---|
| Spouse of Decedent | $8-$12 million | | | $13,156,960.24 – $19,735,440.36[4] |
| Parent/Child of Decedent | $5 million | | | $8,223,100.15 |
| Sibling of Decedent | $2.5 million | | | $4,111,550.08 |
| | | | | |
| Survivor | $5 million | $12 million | $1.5 million | $2,466,930.05 – $8,223,100.15 – $19,735,440.36 |
| Spouse of a Survivor | $4 - $6 million | | $1.5 million | $2,466,930.0 – $6,578,480.12 – $9,867,720.18 |
| Parent/Child of a Survivor | $2.5 million | | $1 million | $1,644,620.03 – $4,111,550.08 |
| Sibling of a Survivor | $1.25 million | | $500,000 | $822,310.02 – $2,055,775.04 |

Given the breadth of time that has existed since the initial values to the Matrix were assigned and the economic changes that have existed over that time period along with the Court's prior ruling and acknowledgement that like-injured terrorism victims should be compensated consistently, it is appropriate to adjust the Matrix values to reflect today's values in comparison to those previously relied upon. It would thus be appropriate to assign the following values for non-economic damages in this matter and other fact similar matters:

[4] Due to the U.S. Labor and Statistics calculator not being able to calculate inflationary adjustments for values over $10,000,000, I have utilized the Federal Reserve Bank of Minneapolis' website calculator found at https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator.

| | | |
|---|---|---|
| Spouse of a Decedent: | Baseline Award: | $13,156,960.24 - $19,735,440.36 |
| Parents/Child of a Decedent: | Baseline Award | $8,223,100.15 |
| Siblings of a Decedent: | Baseline Award | $4,111,550.08 |
| Survivor: | Baseline Award | $8,223,100.15 |
| | Upward Adjustment | $19,735,440.36 |
| | Downward Adjustment | $2,446,930.05 |
| Spouse of a Survivor: | Baseline Award | $6,578,480.12 - $9,867,720.18 |
| | Downward Adjustment | $2,446,930.05 |
| Parent/Child of a Survivor: | Baseline Award | $4,111,550.08 |
| | Downward Adjustment | $1,644,620.03 |
| Sibling of a Survivor: | Baseline Award | $2,055,775.04 |
| | Downward Adjustment | $822,310.02 |

If the Court believes that utilization of economic inflationary principles is not the appropriate way to seek uniformity and consistency with the non-economic damages analysis and wishes to instead re-ascribed new numbers on its own accord, it is respectfully requested that such numbers be consistent with those awarded in such recently ruled upon judgments.

Dated: September 9, 2026

Respectfully submitted,

/s/Caragh Fay

Caragh Fay, Esq.
Fay Law Group, P.A.
Washington, D.C.
6205 Executive Blvd.
Rockville, MD 20852
Telephone: 202-589-1300
cfay@faylawgroup.com
*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**

This is to certify that on this 9th day of September, 2026 a true and correct copy of the above and foregoing document was filed via the Court's Online File Service.

//s// *Caragh Fay*
Caragh Fay